1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   DOUGLAS M. MILLER (SBN: 240398)
4  Assistant United States Attorney
   NICOLA J. MRAZEK
5  JEFFREY A. GOLDBERG
   Senior Trial Attorneys
6       1300 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone:  (213) 894-2216
8       Facsimile:  (213) 894-6436
        Email: douglas.m.miller@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11               UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,    ) CR No. 10-1031(A)-AHM
                                )
14         Plaintiff,           ) OPPOSITION TO DEFENDANTS' MOTION TO
                                ) DISMISS THE FIRST SUPERSEDING
15         v.                   ) INDICTMENT; MEMORANDUM OF POINTS
                                ) AND AUTHORITIES; EXHIBITS
16 ENRIQUE FAUSTINO AGUILAR     )
   NORIEGA, ANGELA MARIA        ) Hearing: March 24, 2011, 9:30 a.m.
17 GOMEZ AGUILAR, KEITH E.      ) (Courtroom 14)
   LINDSEY, STEVE K. LEE, and   )
18 LINDSEY MANUFACTURING        )
   COMPANY,                     )
19                              )
                  Defendants.   )
20

21      Plaintiff United States of America, by and through its

22 attorneys of record, the United States Department of Justice,

23 Criminal Division, Fraud Section, and the United States Attorney

24 for the Central District of California (collectively, "the

25 government"), hereby files its Opposition to defendants' KEITH E.

26 LINDSEY, STEVE K. LEE, and LINDSEY MANUFACTURING COMPANY's Motion

27 to Dismiss the First Superseding Indictment, joined by defendant

28 ANGELA AGUILAR, based upon the attached memorandum of points and

1  authorities, attached exhibits, and the files and records in this

2  matter, as well as any evidence or argument presented at any

3  hearing on this matter.

4  DATED:     March 10, 2011

5                                      Respectfully submitted,

6

7  ANDRÉ BIROTTE JR.
   United States Attorney

8  ROBERT E. DUGDALE
   Assistant United States Attorney
9  Chief, Criminal Division

10

11                          _____/s/_____
   DOUGLAS M. MILLER
12  Assistant United States Attorney

13  NICOLA J. MRAZEK
   JEFFREY A. GOLDBERG
14  Senior Trial Attorneys
   Criminal Division, Fraud Section

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . .  vi

MEMORANDUM OF POINTS AND AUTHORITIES  . . . . . . . . . . .  1

I.   FACTUAL AND LEGAL BACKGROUND . . . . . . . . . . . . .  1

     A.   The Foreign Corrupt Practices Act ("FCPA")  . . . . .  1

     B.   The First Superseding Indictment ("FSI")  . . . . . .  2

     C.   The Nature of CFE . . . . . . . . . . . . . . . .  3

II.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . .  4

     A.   Summary of Argument . . . . . . . . . . . . . . .  4

     B.   The Defendants' Motion Is Premature . . . . . . . .  5

          1.   Legal Standard for a Motion to Dismiss . . . . .  6

          2.   Directors of Operations of CFE Are Properly
               Pled as Foreign Officials, as CFE Is an
               Agency and Instrumentality of Mexico . . . . . .  9

     C.   Interpretation of the Term "Instrumentality"  . . .  10

          1.   Introduction . . . . . . . . . . . . . . . .  10

          2.   Plain Meaning . . . . . . . . . . . . . . . .  11

               a.   Dictionary Definition . . . . . . . . . .  10

               b.   Canons of Construction  . . . . . . . . .  12

                    (1)  Courts Interpret Statutes to Give
                         Meaning to All Their Parts. . . . .  12

                    (2)  Courts Interpret Statutes So That
                         They Comport with U.S. Treaty
                         Obligations. . . . . . . . . . . .  14

                    (3)  Courts Interpret Terms Following the
                         Modifier "Any" Broadly. . . . . . .  19

                    (4)  Courts Interpret Statutes So That
                         the Same Term in Similar Statutes Is
                         Given Consistent Meaning . . . . . .  21

**TABLE OF CONTENTS (CONTINUED)**

PAGE(S)

(a)  The Foreign Sovereign Immunities Act's Definition of Instrumentality Includes State-Owned Entities. . . . . . 22

(b)  The Economic Espionage Act's Definition of Instrumentality Includes State-Owned Entities . 23

(5)  The Canons of Construction <u>Noscitur a Sociis</u> and <u>Ejusdem Generis</u>, Cited by the Defendants, Support the Government's Interpretation That State-owned Entities Are Government Instrumentalities . . . . . . . . . 24

(6)  The Defendants' "Absurd" Examples Have No Relevance to This Case. . . 25

3.  <u>Every Court That Has Faced the Issue Has Decided That Officials of State-Owned Entities Can Be Foreign Officials</u> . . . . . . 26

a.  Previous Interpretations of the Term Government "Instrumentality" . 26

b.  Previous Acceptance of State-Owned Entities as Government Instrumentalities . . . . . . . . 27

c.  Jury Instructions Concerning the Term Government Instrumentality . . 29

4.  <u>The FCPA's Legislative History Supports the Government's Interpretation That Officers of State-Owned Entities Are Foreign Officials</u> . . 29

a.  Congress Enacted the FCPA Against a Backdrop of Concern About Bribery of Officials at State-Owned Entities. 31

b.  When Congress Chose a General Term Over A List of Specific Categories It Did Not Intend to Exclude the Specific Categories. . . . . . . . 32

5.  <u>Summary</u> . . . . . . . . . . . 34

iv

**TABLE OF CONTENTS (CONTINUED)**

PAGE(S)

D.   The Rule of Lenity Has No Application to the
     Instant Case . . . . . . . . . . . . . . . . .   35

E.   The Definition of Foreign Official Is Not Void-
     for-Vagueness . . . . . . . . . . . . . . . . .   37

III. CONCLUSION . . . . . . . . . . . . . . . . . . . .   40

v

**TABLE OF AUTHORITIES**

**FEDERAL CASES:**                                    PAGE(S)

America Paper Institute, Inc. v. America Electric Power
Serv. Corp.,
        461 U.S. 402 (1983) . . . . . . . . . . . . . . . .    25

Barber v. Thomas,
        130 S. Ct. 2499 (2010) . . . . . . . . . . . .    35, 37

Callanan v. United States,
        364 U.S. 587 (1961) . . . . . . . . . . . . . . . .    35

Chapman v. United States,
        500 U.S. 453 (1991) . . . . . . . . . . . . . .    36, 37

Colautti v. Franklin,
        439 U.S. 379 (1979) . . . . . . . . . . . . . . . .    40

Corporacion Mexicana de Servicios Maritimos v. The M/T
Respect,
        89 F.3d 650 (9th Cir. 1996) . . . . . . . . . . . .    22

Grayned v. City of Rockford,
        408 U.S. 104 (1972) . . . . . . . . . . . . . . . .    26

Hagner v. United States,
        285 U.S. 427 (1932) . . . . . . . . . . . . . . .    6, 8

Hamling v. United States,
        418 U.S. 87 (1974) . . . . . . . . . . . . . . . . .     6

Hertzberg v. Dignity Partners, Inc.,
        191 F.3d 1076 (9th Cir. 1999) . . . . . . . . . . .    20

Kolender v. Lawson,
        461 U.S. 352 (1983) . . . . . . . . . . . . . . . .    41

Lisbey v. Gonzales,
        420 F.3d 930 (9th Cir. 1995) . . . . . . . . . . .    36

Murray v. The Schooner Charming Betsy,
        6 U.S. (2 Cranch) 64 (1804) . . . . . . . . . . . .    14

Muscarello v. United States,
        524 U.S. 125 (1998) . . . . . . . . . . . . . .    35, 36

National Endowment for Arts v. Finley,
        524 U.S. 569 (1998) . . . . . . . . . . . . . . . .    25

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL CASES:**                                          **PAGE(S)**

National-Standard Co. v. Adamkus,
    881 F.2d 352 (7th Cir. 1989) . . . . . . . . . . . .   26

Public Lands Council v. Babbitt,
    529 U.S. 728 (2000) . . . . . . . . . . . . . . . .   25

Regions Hospital v. Shalala,
    522 U.S. 448 (1998) . . . . . . . . . . . . . . . .   12

Reiter v. Sonotone Corp.,
    442 U.S. 330 (1978) . . . . . . . . . . . . . . . .   12

Skilling v. United States,
    130 S. Ct. 2896 (2010) . . . . . . . . . . . . . .   38

Smith v. City of Jackson,
    544 U.S. 228 (2005) . . . . . . . . . . . . .   21, 22

U.S. ex rel. Barajas v. United States,
    258 F.3d 1004 (9th Cir. 2001) . . . . . . . . . .   20

United States v. Brumley,
    116 F.3d 728 (5th Cir.) . . . . . . . . . . . . .   38

United States v. Covington,
    395 U.S. 57 (1969) . . . . . . . . . . . . . . . .   7

United States v. Critzer,
    951 F.2d 306 (11th Cir. 1992) . . . . . . . . . .   8

United States v. Jae Gab Kim,
    449 F.3d 933 (9th Cir. 2006) . . . . . . . . . .   40

United States v. Jensen,
    93 F.3d 667 (9th Cir. 1996) . . . . . . . . .   7, 8, 9

United States v. Lanier,
    520 U.S. 259 (1997) . . . . . . . . . . . . . . .   38

United States v. Lunstedt,
    997 F.2d 665 (9th Cir. 1993) . . . . . . . . . .   7

United States v. Marra,
    481 F.2d 1196 (6th Cir. 1973) . . . . . . . . . .   7

United States v. Mazurie,
    419 U.S. 544 (1975) . . . . . . . . . . . . .   37, 39

vii

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL CASES:**                                                     **PAGE(S)**

United States v. National Dairy Products Corp.,
        372 U.S. 29 (1963) . . . . . . . . . . . . . . . . .   38

United States v. Rodriguez,
        360 F.3d 949 (9th Cir. 2004) . . . . . . . . . . . .   37

United States v. Shabani,
        513 U.S. 10 (1994) . . . . . . . . . . . . . . . . .   36

United States v. Shortt Accountancy Corp.,
        785 F.2d 1448 (9th Cir. 1986) . . . . . . . . . . .   7

United States v. Vroman,
        975 F.2d 669 (9th Cir. 1992) . . . . . . . . . . .   7

United States v. Williams,
        441 F.3d 716 (9th Cir. 2006) . . . . . . . . . . . .   37

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
        455 U.S. 489 (1982) . . . . . . . . . . . . . . . .   40

Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,
        515 U.S. 528 (1995) . . . . . . . . . . . . . . . .   15

Weinberger v. Rossi,
        456 U.S. 25 (1982) . . . . . . . . . . . . . . . . .   15

Whitney v. Robertson,
        124 U.S. 190 (1888) . . . . . . . . . . . . . . . .   15


**FEDERAL STATUTES:**

15 U.S.C. § 78dd-2 . . . . . . . . . . . . . . . . . . .  passim

18 U.S.C. § 1839(1) . . . . . . . . . . . . . . . . . . .   23

28 U.S.C. § 1603(b)(2) . . . . . . . . . . . . . . . . .   22


**OTHER AUTHORITIES:**

Blacks Law Dictionary (9th ed. 2009) . . . . . . . . . .   11

144 Cong. Rec. 18509 (1998) . . . . . . . . . . . . . . .   16

Fed. R. Crim. P. 7(c)(1) . . . . . . . . . . . . . . . .   6

viii

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL CASES:**                                                    **PAGE(S)**

Fed. R. Crim. Proc. 11(b)(3) . . . . . . . . . . . . . .   28

H.R. 3815, 95th Cong. (1977) . . . . . . . . . . . .   33, 34

H.R. 7543, 95th Cong. (1977) . . . . . . . . . . . .   33, 34

H. Conf. Rep. 95-831 (1977) . . . . . . . . . . . . .   34

H. Rep. No. 95-640 (1977) . . . . . . . . . . . . . .   31

Merriam-Webster's Dictionary of Law (1996 ed.) . . . . . . .   11

Pub. L. 105-366, S. Res. 2375, 105th Cong. (1998) . . . . .   16

Restatement of Foreign Relations Law (Third) . . . . . . . .   15

S. 305, 95th Cong. (1977) . . . . . . . . . . . . . . .   33, 34

S. 3741, 94th Cong. (1976) . . . . . . . . . . . . .   33, 34

S. Rep. No. 105-2177 (1998) . . . . . . . . . . . .   16, 17

S. Exec. R. 105-19 (1998) . . . . . . . . . . . . . .   17

**EXHIBITS:**

Exhibit A (Jury Instructions in United States v. Bourke,
    1:05-CR-518 (S.D.N.Y. 2009)) . . . . . . . . . . .   2, 29

Exhibit B (Jury Instructions in United States v. Jefferson,
    1:07-CR-209 (E.D. Va. 2009)) . . . . . . . . . . .   2, 29

Exhibit C (Mexican Constitution, translated by the
    Organization of American States) . . . . . . . . . . .   3

Exhibit D (Electric Power Public Utility Service Law of
    1975, certificate of translation and official
    translation) . . . . . . . . . . . . . . . . . . . .   4

Exhibit E (Sunita Kikeri and Aishetu Kolo, The World Bank
    Group, State Enterprises (Feb. 2006),
    http://rru.worldbank.org/documents/publicpolicyjournal/
    304Kikeri_Kolo.pdf) . . . . . . . . . . . . . . . . .   11

Exhibit F (Organization of Economic Co-Operation and
    Development adopted the Convention on Combating
    Bribery of Foreign Officials in International Business
    Transactions) . . . . . . . . . . . . . . . . . .   15, 17

### TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES:**                                                              **PAGE(S)**

Exhibit G (Presidential Statement on Signing the
      International Anti-Bribery and Fair Competition Act
      of 1998) . . . . . . . . . . . . . . . . . . . . . .  16

Exhibit H (Dept. of State, Bureau of Econ. & Bus. Affairs,
      Battling International Bribery: 1999 Report,
      http://www.state.gov/www/issues/economic/toc99.html
      (1999)) . . . . . . . . . . . . . . . . . . . . . .  16

Exhibit I (List of Examples of Enforcement Actions Based on
      Foreign Officials of State-Owned Entities)

Exhibit J (Order Denying Motion to Dismiss in United
      States v. Esquenazi, et al., 09-CR-21010
      (S.D. Fl. 2010)) . . . . . . . . . . . . . . . . .  21, 39

Exhibit K (Order Denying Motion to Dismiss in United
      States v. Nguyen, et al., 08-CR-522
      (E.D. Pa. 2009)) . . . . . . . . . . . . . . . . .  27, 39

Exhibit L (Criminal Information in United States v.
      Silicon Contractors, Inc., 85-CR-251 (E.D. La. 1985))  .  28

x

## II.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   FACTUAL AND LEGAL BACKGROUND

### A.   <u>The Foreign Corrupt Practices Act ("FCPA")</u>

The defendants are charged with violations of the FCPA and conspiracy to violate the FCPA.   To sustain its burden of proof for the offense of violating the FCPA, the government must prove the following seven elements beyond a reasonable doubt.

First:     The defendant is a domestic concern, or an officer, director, employee, or agent of a domestic concern;

Second:    The defendant acted corruptly and willfully;

Third:     The defendant made use of the mails or any means or instrumentality of interstate commerce in furtherance of an unlawful act under the FCPA;

Fourth:    The defendant offered, paid, promised to pay, or authorized the payment of money or of anything of value;

Fifth:     That the payment or gift was to a foreign official or to any person, while knowing that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official;

Sixth:     That the payment was for one of four purposes:

— to influence any act or decision of the foreign official in his official capacity;

— to induce the foreign official to do or omit to do any act in violation of that official's lawful duty;

— to induce that foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality; or

— to secure any improper advantage; and

1

> Seventh:    That the payment was made to assist the defendant in obtaining or retaining business for or with, or directing business to, any person.

*See* 15 U.S.C. § 78dd-2; <u>see also</u> (Exhibit A) (Jury Instructions in <u>United States v. Bourke</u>, 1:05-CR-518 (S.D.N.Y. 2009) (Trial Tr. at 3363:18 – 3368:19 (July 8, 2009)); (Exhibit B) (Jury Instructions in <u>United States v. Jefferson</u>, 1:07-CR-209 (E.D. Va. 2009) (Trial Tr. 77:21 – 79:13 (July 30, 2009)).

A "foreign official" is defined in the FCPA as

> any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality or for or on behalf of any such public international organization.

15 U.S.C. § 78dd-2(h)(2)(A).

B.    <u>The First Superseding Indictment ("FSI")</u>

On October 21, 2010, the defendants were charged in the FSI with one count of conspiracy to violate the FCPA and five counts of substantive FCPA violations. The FSI alleges that "Comisión Federal de Electricidad ('CFE') was an electric utility company owned by the government of Mexico" that, at the time "was responsible for supplying electricity to all of Mexico other than Mexico City." FSI ¶ 3. The FSI further alleges that "Official 1 [Nestor Moreno] was a Mexican citizen who held a senior level position at CFE" and "became the Sub-Director of Generation for CFE in 2002 and the Director of Operations in 2007." FSI ¶ 4. Likewise, the FSI alleges that "Official 2 [Arturo Hernandez] was a Mexican citizen who also held a senior level position at CFE"

and "was the Director of Operations at CFE until that position was taken over by [Moreno] in 2007." FSI ¶ 4. The FSI alleges that both of these individuals were foreign officials, as that term is defined in the FCPA.  FSI ¶¶ 4, 5.

C.   <u>The Nature of CFE</u>

Whether officials at CFE are "foreign officials" as defined by the FCPA is not a difficult question.  At trial, the government intends to present factual evidence concerning many aspects of CFE, including its ownership, control, nature, and function.  As will be discussed below, in deciding a motion to dismiss, all the government's allegations are assumed to be true, and, therefore, a full discussion of the government's evidence is inapposite.  However, as the defendants claim that there are no factual issues for which trial would aid the Court, the government provides the following relevant facts that illustrate the nature of CFE.

Under the Mexican Constitution, the supply of electricity is <u>solely</u> a government function. (Exhibit C) (Mexican Constitution, translated by the Organization of American States). Specifically, Article 27 provides:

> It is exclusively a function of the general Nation to conduct, transform, distribute, and supply electric power which is to be used for public service.  No concessions for this purpose will be granted to private persons and the Nation will make use of the property and natural resources which are required for these ends.

<u>Id.</u> Under the Public Service Act of Electricity of 1975, the organic law that created CFE, CFE is defined as "a decentralized

3

public entity with legal personality and its own patrimony."
(Exhibit D) (Electric Power Public Utility Service Law of 1975,
certificate of translation and official translation).  Article 10
provides that CFE's Governing Board is composed of the
Secretaries of Finance and Public Credit, Social Development,
Trade and Industrial Development of Agriculture and Water
Resources, and Energy, Mines, and State Industry, and Article 14
provides that the "President of the Republic shall appoint the
Director General." Id.  Further, the law makes clear why the
Mexican government created CFE: The provision of electricity in
Mexico is considered a "public service." Id. at Art. 1.

Consequently, CFE is part of the Mexican government,
mandated by its constitution, formed by its laws, owned in its
entirety by the people of Mexico, and constituted to serve the
public.  Therefore, as a factual matter, the government does not
anticipate difficulty proving that CFE's officers were foreign
officials for the purpose of the FCPA.

**II.  LEGAL ARGUMENT**

A.   Summary of Argument

The defendants argue that the FSI must be dismissed because,
"as a matter of law no state owned corporation is an
'instrumentality,' meaning that no CFE employee is a 'foreign
official' under the FCPA." (Mot. #220 at 6).  The defendants'
overbroad contention should be soundly rejected.[1]

---

[1]  This motion was originally filed by only LINDSEY, LEE,
and LMC.  On March 2, 2011, two days after the motion deadline,
ANGELA AGUILAR joined in the motion.  ANGELA AGUILAR is not

First, the defendants' argument is premised, despite their denials, upon a question of fact and is therefore premature to address pre-trial. This prematurity is highlighted by the proof the government will offer at trial that CFE is a government agency and a government instrumentality.

Second, the plain language of the term government "instrumentality," as shown by the definition of "instrumentality" and by application of established canons of construction, demonstrates that it includes state-owned entities. Significantly, an interpretation that did not include state-owned entities would leave a portion of the FCPA without any effect and would take the United States out of compliance with its treaty obligations, results that precedent dictates be avoided. Indeed, every court that has faced the issue has rejected the defendants' cramped view of the term "instrumentality."

Third, an interpretation of government "instrumentality" that includes state-owned entities is consistent with the legislative history of the FCPA.

Finally, the Court should deny the motion because the defendants misapply the legal standards under the "rule of lenity" and "void for vagueness" doctrines, which do not apply to the facts of this case.

B.   The Defendants' Motion Is Premature

The defendants move to dismiss the FSI for failure to state an offense. (Mot. #220 at 5). The Court should deny their

_____

charged with conspiracy to violate the FCPA or FCPA violations.

motion because the defendants are appropriately informed of the elements of the charged offenses and are sufficiently apprised of the essential facts to be protected from double jeopardy.  The defendants' motion to dismiss is instead a challenge to the sufficiency of the evidence that should be rejected pre-trial.

    1.   <u>Legal Standard for a Motion to Dismiss</u>

    Rule 7(c)(1) of the Federal Rules of Criminal Procedure states that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  It is a long-established matter of law that:

> The true test of the sufficiency of an indictment is
> not whether it could have been made more definite and
> certain, but whether it contains the elements of the
> offense intended to be charged, and sufficiently
> apprises the defendant of what he must be prepared to
> meet, and, in case any other proceedings are taken
> against him for similar offenses, whether the record
> shows with accuracy to what extent he may plead a
> former acquittal or conviction.

<u>Hagner v. United States</u>, 285 U.S. 427, 431 (1932).

    This well known rule is simple to apply.  An indictment is sufficient if it: (1) states the elements of the offense sufficiently to apprise the defendant of the charges against which he or she must defend, and (2) provides a sufficient basis for the defendant to make a claim of double jeopardy.  <u>See</u> <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974) ("An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an

acquittal or conviction in bar of future prosecutions for the same offense"); United States v. Vroman, 975 F.2d 669, 670-71 (9th Cir. 1992) (same).  Nothing more is required.

A district court cannot grant a motion to dismiss an indictment pursuant to Rule 12(b)(2) if the motion is "substantially founded upon and intertwined with evidence concerning the alleged offense . . . ." United States v. Lunstedt, 997 F.2d 665, 667 (9th Cir. 1993) (quoting United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986)).  Rather, a district court can only grant such a dismissal if it is "entirely segregable" from the evidence to be presented at trial.  Id.  Otherwise, "the motion falls within the province of the ultimate finder of fact and must be deferred [to the jury]."  Id.  "[A] motion requiring factual determinations may be decided before 'trial [only] if trial of facts surrounding the commission of an alleged offense would be of no assistance in determining the validity of the defense.'"  Id. (quoting United States v. Covington, 395 U.S. 57, 60 (1969)).

"A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence. . . .  The Court should not consider evidence not appearing on the face of the indictment." United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996) (quoting United States v. Marra, 481 F.2d 1196, 1199-1200 (6th Cir. 1973)).  The Federal Rules of Criminal Procedure do not provide for pre-trial consideration of the available evidence like the summary judgment procedure set forth in Rule 56 of the

Federal Rules of Civil Procedure.  _Id._ (citing <u>United States v.</u>

<u>Critzer</u>, 951 F.2d 306, 307 (11th Cir. 1992)).  As is most often

the case, when the sufficiency of an indictment turns on

questions of fact, motions premised on Rule 12(b)(2)(B) for

failure to state a claim are routinely denied.  <u>See, e.g.</u>,

<u>Jensen</u>, 93 F.3d at 669 (reversing a district court's 12(b)(2)(B)

dismissal because "[b]y basing its decision on evidence that

should only have been presented at trial, the district court in

effect granted summary judgment for the defendants.  This it may

not do.").

     The defendants do not address whether the FSI fails on

either prong of the <u>Hagner</u> test, perhaps in an attempt to avoid

its application.  However, the FSI clearly states every element

of the offense, and the step-by-step description in the overt

acts makes it impossible for the defendants to credibly claim

either that they do not know the offense against which they must

defend or that they would later be unable to assert a claim of

double jeopardy.  Rather, the defendants seek to circumvent the

trial process and have the Court determine, before the

presentation of any evidence, that the government has not met its

factual burden.  As will be demonstrated in the government's

case-in-chief, whether CFE was an agency or instrumentality of

the Republic of Mexico is not a close call — a fact the

defendants likely understand and therefore attempt to raise this

issue before the Court and jury has heard evidence regarding CFE.

Taken as true, the FSI is more than sufficient to meet the <u>Hagner</u>

1  standard, as interpreted by the Ninth Circuit, and, consequently,

2  the defendants' motion should be denied.

3      2.  <u>Directors of Operations of CFE Are Properly Pled as
          Foreign Officials, as CFE Is an Agency and</u>
4         <u>Instrumentality of Mexico.</u>

5      Of particular importance to the case at hand, the government

6  is not limited to proving that CFE is a government

7  instrumentality, which it is, but may also prove to the jury that

8  CFE is a government agency.  The defendants' motion focuses

9  solely on whether CFE is a government "instrumentality," and does

10 so at its peril.  Indeed, while admitting in a footnote that "CFE

11 describes itself as an 'agency' on its website," the defendants

12 quickly and tautologically argue that "what CFE calls itself is

13 of no moment." (Mot. #220 at 3 n.3).  However, far from being

14 "irrelevant," (<u>id.</u>), the question of what something is

15 constitutes the very definition of a factual issue.

16     Here, the government has properly alleged in the FSI that

17 the conspiracy to violate the FCPA and substantive FCPA

18 violations involved "foreign officials," namely that Moreno and

19 Hernandez were both, at times, Directors of Operations at

20 Mexico's state-owned utility, CFE.  At trial, the government

21 intends to prove that CFE is an agency and an instrumentality of

22 the Mexican government.  Therefore, given the clear and binding

23 precedent in this Circuit, the defendants' motion to dismiss for

24 failure to state a claim should be denied, and the Court need not

25 reach any further issues.  Consequently, the defendants' legal

26 arguments are better made in the context of jury instructions or

27

28                          9

for the Court after the government's case-in-chief pursuant to
Federal Rule of Criminal Procedure 29.   However, given the
imminent trial date and, thus, the lack of time for further
briefing, the government will respond to the substance of the
defendants' arguments.

    C.    <u>Interpretation of the Term "Instrumentality"</u>

        1.   <u>Introduction</u>

    The bulk of the defendants' motion focuses on suggesting
that, based on the legislative history of the FCPA, the Court
should adopt an insupportably narrow interpretation of government
"instrumentality."   However, the defendants' proposed
interpretation is contradicted by the plain meaning of the
statute.   The definition of "instrumentality" as well as
established canons of construction demonstrate that the term
includes state-owned entities.   In particular, the term
government "instrumentality" should be interpreted as including
state-owned entities (1) to give effect to all of the provisions
of the statute, (2) to allow the United States to remain in
compliance with its treaty obligations, (3) to comport with the
FCPA's broad construction, and (4) to interpret the term
"instrumentality" consistently across similar statutes.   Such an
interpretation is also consistent with all prior interpretations
of this provision by other courts and fully supported by the
statute's legislative history.

10

2.   <u>Plain Meaning</u>

a.   <u>Dictionary Definition</u>

Statutory interpretation always starts with the text.  As stated in <u>Barnhart v. Sigmon Coal Co., Inc.</u>:

> As in all statutory construction cases, we begin with the language of the statute. The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent.

534 U.S. 438, 450 (2002)(internal citations omitted).  Here, the Court is confronted with what the term "instrumentality" means. Instrumentality is not an uncommon word in the law. <u>See</u> United States Code (2009) (using the term "instrumentality" 1,492 times). As such, it has an accepted legal definition.  <u>Blacks Law Dictionary</u> (9th ed. 2009) (defining instrumentality as "[a] thing used to achieve an end or purpose"); <u>Merriam-Webster's Dictionary of Law</u> (1996 ed.) (defining instrumentality as "something through which an end is achieved or occurs").

Therefore, in the context of the FCPA, a government instrumentality is an entity through which a government achieves an end or purpose.  And government purposes can be myriad.  Of particular relevance to this case is the fact that, although the United States does not provide electricity as a government service to its citizens, many other countries do.[2]  By

--------

[2] "Power utilities in nearly 85 developing countries are still owned and operated by the state."  (Exhibit E) (Sunita Kikeri and Aishetu Kolo, The World Bank Group, State Enterprises at 3 (Feb. 2006), http://rru.worldbank.org/documents/publicpolicyjournal/304Kikeri_Kolo.pdf).

definition, if a government decides to provide electricity through an entity as a government service, that entity is an instrumentality of the government.  Indeed, the Court's analysis could stop here.  However, in addition, several important canons of construction further demonstrate that the term government "instrumentality" includes state-owned entities.

           b.   <u>Canons of Construction</u>

           (1)  Courts Interpret Statutes to Give
                 Meaning to All Their Parts.

A basic principle of statutory construction is that courts should not interpret a statute in such a way that portions of the statute have no effect.  <u>See</u> <u>Reiter v. Sonotone Corp.</u>, 442 U.S. 330, 339 (1978) (explaining that "[in] construing a statute we are obliged to give effect, if possible, to every word Congress used").  This strong presumption against surplusage has been repeatedly endorsed by the Supreme Court in analyzing the meanings of terms within a statute.

> We are not at liberty to construe any statute so as to deny effect to any part of its language.  It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word.  As early as in Bacon's Abridgment, sect. 2, it was said that "a statute ought, upon the whole to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant."  This rule has been repeated innumerable times.

<u>Regions Hosp. v. Shalala</u>, 522 U.S. 448, 467 (1998).

The FCPA prohibits corrupt payments to foreign officials. It also provides an exception to its prohibitions for "routine

12

governmental action."  15 U.S.C. § 78dd-2(b).  This provision

provides

    (b) Exception for routine governmental action
    Subsections (a) and (i) of this section [prohibiting
    payments to foreign officials, political parties, and
    party officials] shall not apply to any facilitating or
    expediting payment to a foreign official, political
    party, or party official the purpose of which is to
    expedite or to secure the performance of a routine
    governmental action by a foreign official, political
    party, or party official.

<u>Id.</u>  The FCPA goes on to define precisely what a "routine

governmental action" is:

    (A)  The term "routine governmental action" means only
        an action which is ordinarily and commonly
        performed by a foreign official in-

        (i)      obtaining permits, licenses, or other
                official documents to qualify a person
                to do business in a foreign country;

        (ii)     processing governmental papers, such as
                visas and work orders;

        (iii)    providing police protection, <u>mail</u>
                <u>pick-up</u> and delivery, or scheduling
                inspections associated with contract
                performance or inspections related to
                transit of goods across country;

        (iv)     <u>providing phone service</u>, <u>power and water</u>
                <u>supply</u>, loading and unloading cargo, or
                protecting perishable products or
                commodities from deterioration; or

        (v)      actions of a similar nature.

    (B)  The term "routine governmental action" does not
        include any decision by a foreign official
        whether, or on what terms, to award new business
        to or to continue business with a particular
        party, or any action taken by a foreign official
        involved in the decision-making process to
        encourage a decision to award new business to or
        continue business with a particular party.

15 U.S.C. § 78dd-2(h)(4) (emphasis added).  The routine

13

governmental action exception thus describes actions individuals and companies can pay foreign officials to perform without running afoul of the FCPA.  For all of the provisions of the government action exception to have meaning, the definition of foreign official must include officials at governmental entities that provide phone service, electricity, water, and mail service; otherwise there would be no need for an exception for payments for phone service, power and water supply, or mail pickup.  The only governmental entities that do perform such tasks are state-owned telecommunications companies, state-owned electric and water utilities, and state-owned mail services.  Therefore, by the FCPA's statutory scheme, the term government instrumentality must include state-owned entities.[3]

(2)   Courts Interpret Statutes So That They
Comport with U.S. Treaty Obligations.

It is a long-established canon of statutory construction that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."  <u>Murray v. The Schooner Charming Betsy</u>, 6 U.S. (2 Cranch)

---

[3] In their motion, the defendants discuss how the "routine governmental action" provision was an amendment to the FCPA and that when this provision was added, part of the definition of "foreign official" was deleted.  (Mot. #220 at 17).  Originally, the definition of "foreign official" excluded "an employee of a foreign government or any department, agency or instrumentality whose duties are essentially ministerial or clerical."  Foreign Corrupt Practices Act of 1997, Pub. L. No. 95-213 §104(d)(2), 91 Stat. 1494.  The fact that the routine governmental action provision in effect replaced part of the definition of "foreign official" only strengthens the government's argument that the term "foreign official" was intended to apply to employees of state-owned entities.

14

64, 117-18 (1804).  Known as the "Charming Betsy" rule of statutory construction, the canon provides,

> Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.

Restatement of Foreign Relations Law (Third) § 114.  The rationale behind the canon is straightforward:

> If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements.

Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 539 (1995); see also Weinberger v. Rossi, 456 U.S. 25, 32 (1982); Whitney v. Robertson, 124 U.S. 190, 194 (1888) (explaining that courts must "endeavor to construe [statutes and treaties] as to give effect to both, if that can be done without violating the language of either").

With respect to the term government "instrumentality," this canon is easy to apply because the United States' treaty obligations require it to criminalize bribes made to officials of state-owned enterprises, and Congress clearly indicated its conformity with those obligations through the FCPA.  On December 17, 1997, the members of the Organization of Economic Co-Operation and Development adopted the Convention on Combating Bribery of Foreign Officials in International Business Transactions.  (Exhibit F) (the "OECD Convention").  The Senate

ratified the OECD Convention on July 31, 1998, 144 Cong. Rec.
18509 (1998), and Congress implemented it through various
amendments to the FCPA.   The International Anti-Bribery and Fair
Competition Act of 1998, Pub. L. 105-366, S. Res. 2375, 105th
Cong. (1998).  Congress was explicit in its intentions: "This Act
amends the FCPA to conform it to the requirements of and to
implement the OECD Convention."  S. Rep. No. 105-2177 (1998) at
2; <u>see also</u> (Exhibit G) (Presidential Statement on Signing the
International Anti-Bribery and Fair Competition Act of
1998)("This Act makes certain changes in existing law to
implement the Convention on Combating Bribery of Foreign Public
Officials in International Business Transactions.").[4]  Congress
could not have been clearer that it intended for the FCPA to
fully comport with the OECD Convention.[5]

_____

[4] The State Department's first annual report to Congress on
implementation of the OECD Convention, which was required by the
Senate's resolution of advice and consent, reflected this
understanding.  (Exhibit H) (Dept. of State, Bureau of Econ. &
Bus. Affairs, Battling International Bribery: 1999 Report,
Chapter 2 at p. 3, http://www.state.gov/www/issues/economic/
toc99.html (1999)).  Providing "an assessment of the
compatibility of the laws of each country with the requirements
of the Convention, the report found that 1998 amendments to the
FCPA "conform[ed] it to the requirements of and . . .
implement[ed] the OECD Convention."  <u>Id.</u> at 3.

[5]  If this Court were to interpret the FCPA in such a way
that officials of state-owned and state-controlled enterprises
could not be foreign officials, the United States would be out of
compliance with its treaty obligations under the OECD Convention.
The government has requested a declaration from the State
Department confirming this assessment and explaining its
implications for U.S. foreign policy.  Given the short response
period, the declaration could not be finalized, but the
government will endeavor to secure the declaration before
argument on this motion and will file it if and when it is
received.

With regard to the definition of "foreign official," only one amendment to the FCPA was necessary in Congress's view to bring the statute into compliance with the OECD Convention, namely to expand the definition to include officials of public international organizations.  Id. ("Section 3(b) implements the OECD Convention by amending § 104(h)(2) of the FCPA to expand the definition of 'foreign official' to include an official of a public international organization.").  Otherwise, the FCPA's definition of foreign official was considered to be inclusive of the definition in the OECD Convention.  S. Rep. No. 105-2177; S. Exec. R. 105-19 (1998).  In other words, Congress intended that bribes to any official that were prohibited under the OECD Convention would also be prohibited under the FCPA.  This is significant because, as will be discussed below, the OECD Convention has always contained a prohibition against the bribery of officials of state-owned and state-controlled entities. (Exhibit F).

First, the OECD Convention requires OECD parties to make it a criminal offense under their law for:

> any person intentionally to offer, promise or give any undue pecuniary or other advantage, whether directly or through intermediaries, to a foreign public official, for that official or for a third party, in order that the official act or refrain from acting in relation to the performance of official duties, in order to obtain or retain business or other improper advantage in the conduct of international business.

Id. at art. 1.1 (emphasis added).  The Convention further provides that a

> "foreign public official" means any person holding a legislative, administrative or judicial office of a foreign country, whether appointed or elected; any person exercising a <u>public function</u> for a foreign country, including <u>for a public agency or public enterprise</u>; and any official or agent of a public international organisation;

<u>Id.</u> at art. 1.4.a (emphasis added). Finally, the OECD Convention's Commentaries further elaborate on the OECD Convention's definitions:

> 12. "Public function" includes any activity in the public interest, delegated by a foreign country, such as the performance of a task delegated by it in connection with public procurement.

> 13. A "public agency" is an entity constituted under public law to carry out specific tasks in the public interest.

> 14. A <u>"public enterprise"</u> is any enterprise, regardless of its legal form, <u>over which a government, or governments, may, directly or indirectly, exercise a dominant influence</u>. This is deemed to be the case, inter alia, when the government or governments hold the majority of the enterprise's subscribed capital, control the majority of votes attaching to shares issued by the enterprise or can appoint a majority of the members of the enterprise's administrative or managerial body or supervisory board.

<u>Id.</u> at cmt. on art. 1.4 (emphasis added). Therefore, the OECD Convention is clear that in the case of public enterprises where the government exercises a "dominant influence," directly or indirectly, the OECD Convention is intended to prohibit bribes to those enterprises. Indeed, the OECD Convention specifically gives as examples of "public enterprise" those with majority state-ownership and majority state-control.

18

In light of such a clear requirement by the OECD Convention to criminalize bribes paid to "public enterprises" and Congress's clear intent to comport the FCPA with the OECD Convention, the defendants' arguments that the 1998 amendments illustrate Congress's clear intent to "<u>exclude</u>" state-owned entities from its definition is nonsensical. (Mot. #220 at 17). In fact, the contrary is true.[6]

> (3) Courts Interpret Terms Following the Modifier "Any" Broadly.

Another reason why this Court should interpret "instrumentality" to include state-owned entities is that Congress intended the FCPA to be interpreted broadly, as evidenced by its use of the term "any." Indeed, the FCPA's section prohibiting corrupt payments by domestic concerns uses the word "any" twenty-seven times. 15 U.S.C. § 78dd-2(a)

---

[6] In addition, it is worth noting that from 1977 to 1997, over a dozen FCPA guilty pleas were accepted by U.S. District Courts, involved bribery of officials of state-owned companies. <u>See, e.g.</u>, (Exhibit I) (List of Examples of Enforcement Actions Based on Foreign Officials of State-Owned Entities). These enforcement actions put Congress, as well as businesses and the general public, on notice that state-owned companies were "agencies or instrumentalities" of foreign governments under the FCPA. Had Congress believed that this was an inappropriate interpretation of the statute by the enforcement agencies, it could have narrowed the definition when it amended the FCPA in 1998, but it did not do so. Subsequent to the 1998 amendments, enforcement of bribes to officials of state owned-companies has continued with more than 20 FCPA guilty pleas or trial convictions involving bribery of officials of state-owned enterprises. <u>See, e.g., id.</u> This enforcement activity should not be surprising as the FCPA (and the OECD Convention) is aimed at prohibiting bribes to foreign officials to obtain or retain business, which is often conducted by foreign governments through their respective agencies and instrumentalities. <u>Id.</u>

19

1  (prohibiting, among other things, "any" domestic concern or "any"
2  officer or employee from making use of "any" means of interstate
3  commerce corruptly in furtherance of "any" payment of "any money"
4  or "any" promise of "anything" of value to "any" foreign official
5  for influencing "any" act or securing "any" improper advantage,
6  in order to assist in obtaining or retaining business for "any"
7  person).  The FCPA's definition of "foreign official" also
8  includes the term "any" an additional five times.  15 U.S.C.
9  § 78dd-2(h)(2)(A) ("The term "foreign official" means <u>any</u> officer
10 or employee of a foreign government or <u>any</u> department, agency, or
11 instrumentality thereof, or of a public international
12 organization, or <u>any</u> person acting in an official capacity for or
13 on behalf of <u>any</u> such government or department, agency, or
14 instrumentality, or for or on behalf of <u>any</u> such public
15 international organization.") (emphasis added).

16

17     "The term 'any' is generally used to indicate lack of
18 restrictions or limitations on the term modified."  <u>U.S. ex rel.</u>
19 <u>Barajas v. United States</u>, 258 F.3d 1004, 1011 (9th Cir. 2001);
20 <u>see</u> <u>Hertzberg v. Dignity Partners, Inc.</u>, 191 F.3d 1076, 1080 (9th
21 Cir. 1999) (observing that Webster's Third New Int'l Dictionary
22 (3d ed. 1986) defines "any" as "one, no matter what one" and that
23 the term's "broad meaning" has been recognized by the Ninth
24 Circuit).  Consistent with Congress's use of the term "any," this
25 Court should give a broad construction to the FCPA generally and,

26

27

28                              20

specifically, interpret the phrase "any department, agency or instrumentality" to include state-owned entities within its scope.

>                    **(4)   Courts Interpret Statutes So That the Same Term in Similar Statutes Is Given Consistent Meaning.**

Another relevant canon of statutory construction is that courts should interpret the same term in at least two similar statutes to have the same or similar meanings.  <u>See</u> <u>Smith v. City of Jackson</u>, 544 U.S. 228, 233 (2005) (plurality opinion) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").  As discussed below, the way that Congress used "instrumentality" in two other, similar statutes, the Foreign Sovereign Immunities Act ("FSIA") and the Economic Espionage Act ("EEA"), makes clear that instrumentality can include state-owned entities.[7]

---

[7] The defendants cite the FSIA and the EEA to make another argument, namely, that because Congress included definitions of "instrumentality" in those statutes and not in the FCPA, the definition of instrumentality in the FCPA should be interpreted more narrowly than in the FSIA and the EEA.  (Mot. #220 at 12).  The defendants cite no cases supporting this position, and it is unclear why, as a logical matter, this should be true.  Indeed, in most cases, including a definition of a term limits that term's meaning, rather than expanding it.  The government's position is that the term "instrumentality" as used in the FCPA is broader than in the FSIA.

             (a)   The Foreign Sovereign Immunities Act's
                  Definition of Instrumentality Includes
                  State-Owned Entities.

    The FSIA, which Congress passed the year before the FCPA, provides a definition of "agency or instrumentality" that includes state-owned entities.  The FSIA states,

> An "agency or instrumentality of a foreign state" means any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . .

28 U.S.C. § 1603(b)(2).  Therefore, close in time to the passage of the FCPA, Congress included state-owned entities within the scope of a term similar to that used in the FCPA.

    Particularly relevant to the instant question, this Circuit has applied the FSIA to another Mexican state-owned entity, Pemex, and its subsidiary, Pemex-Refining.  <u>Corporacion Mexicana de Servicios Maritimos v. The M/T Respect</u>, 89 F.3d 650, 653-54 (9th Cir. 1996) (noting that under the Mexican Constitution "the government of Mexico is the only entity that may own and exploit the country's natural resources, including all petroleum and hydrocarbons" and holding that Pemex and Pemex-Refining are each an "agency or instrumentality" of the Mexican government under FSIA).  Under this precedent, CFE, which is a very similar Mexican institution, would also be considered an "agency or instrumentality" for purposes of the FSIA.  If the Court,

following <u>Smith</u>, interprets these similar statutes in a similar manner, then CFE is also an "agency or instrumentality" under the FCPA.

                (b)    The Economic Espionage Act's Definition of Instrumentality Includes State-Owned Entities.

Similarly, the Court should look to the term "instrumentality" in the EEA.  Although the words used are slightly different, the EEA, passed in 1996, defines "instrumentality" much the same way as it was defined by the FSIA.  Like the FSIA, the EEA looks at both ownership and other elements to determine what constitutes an instrumentality.  The EEA defines "foreign instrumentality" to mean:

> any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government.

18 U.S.C. § 1839(1).  By its text, under the EEA, a state-owned entity like CFE constitutes a "foreign instrumentality."[8] Therefore, if the term "instrumentality" in both the FCPA and the EEA are to be given similar interpretations, this interpretation should include state-owned entities.

---

[8] Although, to date, no court has specifically interpreted "foreign instrumentality" under the EEA, the statute's text is clear that the term includes a "corporation" that is "substantially owned" by a foreign government.

23

(5)   The Canons of Construction <u>Noscitur a Sociis</u>
and <u>Ejusdem Generis</u>, Cited by the Defendants,
Support the Government's Interpretation That
State-owned Entities Are Government
Instrumentalities.

The defendants primarily cite to two canons of construction
in support of their narrow interpretation of "foreign official."
Specifically, the defendants rely on the principle of <u>noscitur a</u>
<u>sociis</u> and <u>ejusdem generis</u> for the proposition that because the
FCPA lists three items ("department, agency or instrumentality")
in its list of government entities for which officers and
employees are "foreign officials," "instrumentality" should be
interpreted in relation to the other two.  The defendants are
quite right, as, of course, the term instrumentality should be
interpreted in context with the provision as a whole.  However,
the defendants go too far when they argue that the term
instrumentality "must be understood to capture <u>only</u> entities that
share qualities both agencies and departments share."  (Mot. #220
at 15).

Preliminarily, it is worth noting that state-owned entities
do, in fact, share qualities with both agencies and departments.
State-owned entities, like departments and agencies, often
perform public functions, are governed by public laws, and draw
from and contribute to the public fisc.  Indeed, every "share[d]
quality" of departments and agencies listed by the defendants is,
in fact, shared by state-owned entities generally and CFE in
particular.  Such entities exist at the "pleasure of
governments," are "funded" by government (at least in part),

24

"orient to policies and/or public policy," and "the extent of
their powers are defined" by the state.  (Mot. #220 at 8).[9]

However, taken to its extreme, the defendants' argument that
an "instrumentality" has to share all of its characteristics with
both a "department" and an "agency" would rob "instrumentality"
of independent meaning.  As explained above, see supra Part
II.C.2.b(1), canons of constructions counsel against such an
interpretation resulting in a term being considered mere
surplusage.  See Am. Paper Inst., Inc. v. Am. Elec. Power Serv.
Corp., 461 U.S. 402, 421 (1983) ("The Court will not adopt an
interpretation that renders a section useless, because Congress
did not mean to paralyze with one hand what it sought to promote
with the other."); see also Pub. Lands Council v. Babbitt, 529
U.S. 728, 748 (2000) ("Why would Congress add the words . . . if
. . . they add nothing?").  Therefore, the Court should interpret
the term "instrumentality" in accordance with its plain meaning.

                    (6)  The Defendants' "Absurd" Examples Have No
                         Relevance to This Case.

Finally, the defendants purport to have found "absurd,"
hypothetical examples of state-owned entities that, in their
opinion, should not be considered government instrumentalities
under the FCPA.  (Mot. #220 at 20).  Implicit in their argument

_____

     [9] The defendants argue that the difference between state-
owned entities and departments and agencies is that "[u]nlike
agencies and departments, corporations can take myriad forms and
are created and operated in innumerable ways and for infinitely
variable purposes."  (Mot. #220 at 8).  The government submits
that it is at least an open contest as to whether there are more
kinds of government entities or private ones.

is the contention that if one example exists in which one state-owned entity is not a government instrumentality, then no state-owned entity is a government instrumentality.  However, courts do not decide hypothetical cases, and imaginary situations do not control real ones.  Cf. National Endowment for Arts v. Finley, 524 U.S. 569, 584 (1998) ("[W]e are reluctant . . . to invalidate legislation on the basis of its hypothetical application to situations not before the Court.") (internal quotation marks omitted); Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language. It will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of (disputed) legal terms will be in nice question. . . . [However,] we think it is clear what the ordinance as a whole prohibits.").  In the instant case, the defendants' hypothetical examples are irrelevant to a determination of whether the FSI properly alleges violations of the FCPA against the defendants.  Given the plain meaning of the FCPA, there is no question that officers of CFE are "foreign officials" under the statute.

> 3.  Every Court That Has Faced the Issue Has Decided That Officials of State-Owned Entities Can Be Foreign Officials.

> a.  Previous Interpretations of the Term Government "Instrumentality"

To date, two similar motions to dismiss have been decided by district courts, both of which denied the motions.  Most

26

recently, in <u>United States v. Esquenazi</u>, a case involving Haiti's 97% state-owned telecommunications company, "Haiti Teleco," the district court rejected the defendants' argument that state-owned entities were not included in the FCPA's definition of government instrumentality:

> The Court, however, finds that the Government has sufficiently alleged that [Officers of Haiti Teleco] were foreign officials by alleging that these individuals were directors in the state-owned Haiti Teleco. . . . The Court also disagrees that Haiti Teleco cannot be an instrumentality under the FCPA's definition of foreign official. The plain language of this statute and the plain meaning of this term show that as the facts are alleged in the indictment Haiti Teleco could be an instrumentality of the Haitian government. <u>See</u> 15 U.S.C. § 78dd-2(h)(2)(A).

(Exhibit J) (Order Denying Motion to Dismiss in <u>United States v. Esquenazi, et al.</u>, 09-CR-21010 (S.D. Fl. 2010)). Likewise, the district court in <u>United States v. Nguyen</u> denied a motion based on the same premise. (Exhibit K) (Order Denying Motion to Dismiss in <u>United States v. Nguyen, et al.</u>, 08-CR-522 (E.D. Pa. 2009)). Although the defendants are correct that these decisions are not binding on this Court, they are persuasive.

<blockquote>b.   Previous Acceptance of State-Owned Entities<br>as Government Instrumentalities</blockquote>

Additionally, this Court should be aware that district courts have accepted more than 35 guilty pleas by individuals who have admitted to violating the FCPA by bribing officials of state-owned entities.[10] For a Court to accept a plea of guilty,

---

[10] <u>See, e.g.</u>, (Exhibit I) (List of Examples of Enforcement Actions Based on Foreign Officials of State-Owned Entities)

a district court must have a basis to believe that a crime has been committed.  Fed. R. Crim. Proc. 11(b)(3) ("Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.").  Presumably, in these 35 cases, the district courts did.[11]  This precedent is evidence that the plain meaning of "instrumentality" under the FCPA includes state-owned entities.  Consequently, in arguing that as a matter of law a state-owned entity cannot be an "agency or instrumentality," the defendants are arguing that on fifty different occasions, district court judges inaccurately assessed the law and improperly accepted guilty pleas.[12]

---

[11]  Indeed, in 1985, a district court accepted a plea of guilty to an FCPA charge involving paying bribes to an employee of the exact same entity that is at issue in the instant case - CFE.  See (Exhibit L) (Criminal Information in United States v. Silicon Contractors, Inc., 85-CR-251 (E.D. La. 1985)).

[12]  Obviously, more than 35 pleas of guilty were not accepted by district court judges without considering that defense counsel, zealously representing the defendants, had thoroughly examined the legal issues and advised their clients of all legitimate legal arguments, including whether the alleged state-owned entity was an "agency or instrumentality" of a foreign government.
    Of particular note here is that counsel for defendant LEE represents Mario Covino in a separate FCPA matter.  United States v. Covino, 08-CR-00336 (C.D.C.A. Dec. 17, 2008).  Mr. Covino pleaded guilty to FCPA violations for conspiring to make corrupt payments to "foreign officials at state-owned entities including, but not limited, to Petrobras (Brazil), Dingzhou Power (China), Datang Power (China), China Petroleum, China Resources Power, China National Offshore Oil Company, PetroChina, Maharashtra State Electricity Board (India), KHNP (Korea), Petronas (Malaysia), Dolphin Energy (UAE), and Abu Dhabi Company for Oil Operations (UAE)."  See (Exhibit I.19) (List of Examples of Enforcement Actions Based on Foreign Officials of State-Owned Entities).

28

                    c.    Jury Instructions Concerning the Term
                          Government Instrumentality

     Similarly, in considering the meaning of "instrumentality,"
this Court should look to other courts that have recently
examined the term "instrumentality" when instructing jurors on
the scope of liability for defendants.  Courts examining the
issue have instructed the jury that the definition of government
instrumentality includes companies owned or controlled by the
state. See (Exhibit A) (Jury Instruction in United States v.
Bourke, 1:05-CR-518 (S.D.N.Y. 2009) (Trial Tr. at at 3366:10-11
(July 8, 2009)) ("An instrumentality of a foreign government
includes government-owned or government-controlled companies".);
(Exhibit B) (Jury Instructions in United States v. Jefferson,
1:07-CR-209 (E.D. Va. 2009) (Trial Tr. 85:18-25 (July 30, 2009))
("An instrumentality of a foreign government includes a
government-owned or government-controlled company, such as
commercial carriers, airlines, railroads, utilities, and
telecommunications companies: Internet/telephone/television.  The
Indictment in this case charges that the Nigerian
Telecommunications, Limited, also known as Nitel, was a Nigerian
government-controlled company.").  That other courts have
interpreted the term "foreign official" when instructing juries
to include state-owned entities is persuasive that such an
interpretation comports with the natural understanding of the
statute.

                               29

4.   <u>The FCPA's Legislative History Supports the</u>
<u>Government's Interpretation That Officers of</u>
<u>State-Owned Entities Are Foreign Officials.</u>

Even though the definition of "instrumentality" plainly includes state-owned entities, as discussed above, the defendants still argue that an employee of a state-owned entity, like CFE, could never be a foreign official because the legislative history of the FCPA "evinces Congressional intent to address only a narrow range of conduct with the FCPA" that does not include these entities.  (Mot. #220 at 21).  The defendants are mistaken. Indeed, review of Michael Koehler's lengthy legislative history of the FCPA, cited by the defense, (Mot. #220 at 11 n.4), is chiefly revealing for what it does not contain.  In spite of 150 hours and 448 paragraphs spent distilling his research, Mr. Koehler is unable to find a single reference in any part of the legislative history that Congress intended to exclude state-owned companies from the definition of instrumentality.  Indeed, the legislative history of the FCPA supports an interpretation in which bribes to officials of state-owned enterprises are criminalized.[13]

_____

[13] Two important pieces of legislative history, the addition of the "routine governmental action" exception and Congress's intent to conform with the OECD Convention are addressed above in discussing the statutory construction.  <u>See</u> <u>supra</u> at Part II.C.2.b.(1)-(2).

        a.   Congress Enacted the FCPA Against a Backdrop of Concern About Bribery of Officials at State-Owned Entities.

Lost in the defendants' discussion of and references to the legislative history of the FCPA is the statute's broader historical context.  The FCPA was originally passed as a comprehensive response to what was seen as a pervasive problem of foreign bribery.  In explaining the need for the legislation, Congress explained:

> More than 400 corporations have admitted making questionable or illegal payments. The companies, most of them voluntarily, have reported paying out well in excess of $300 million in corporate funds to foreign government officials, politicians, and political parties. These corporations have included some of the largest and most widely held public companies in the United States; over 117 of them rank in the top Fortune 500 industries.
>
> . . .
>
> The payment of bribes to influence the acts or decisions of foreign officials, foreign political parties or candidates for foreign political office is unethical. It is counter to the moral expectations and values of the American public. But not only is it unethical, it is bad business as well.  It erodes public confidence in the integrity of the free market system.  It short-circuits the marketplace by directing business to those companies too inefficient to compete in terms of price, quality or service, or too lazy to engage in honest salesmanship, or too intent upon unloading marginal products. In short, it rewards corruption instead of efficiency and puts pressure on ethical enterprises to lower their standards or risk losing business.

H. Rep. No. 95-640 (1977) at 4-5.  To address this serious problem, Congress was clear that the legislation was to have expansive reach.  Id. at 7 (explaining that the legislation "broadly prohibits transactions that are corruptly intended to

31

induce the recipient to use his or her influence to affect any
act or decision of a foreign official, foreign government or an
instrumentality of a foreign government") (emphasis added).
Specifically, Congress stated its intention to address foreign
bribery throughout the international economy, including bribery
in the sectors of "drugs and health care; oil and gas production
and services; food products; aerospace, airlines and air
services; and chemicals," sectors that were rife with state-owned
and state-controlled companies when the FCPA was passed in 1977.
Id. at 4.  Thus, from the FCPA's inception, state-owned and
state-controlled companies were within Congress's intended
definition of instrumentalities of a foreign government.

> b.   When Congress Chose a General Term Over A
> List of Specific Categories It Did Not Intend
> to Exclude the Specific Categories.

The defendants' remaining argument concerning the FCPA's
legislative history is that, because Congress was presented with
bills that explicitly included state-owned entities in a list of
covered entities and did not choose to incorporate that list in
the final bill, Congress must have intended to exclude state-
owned companies from the FCPA's requirements.  The fatal flaw in
the defendants' logic, however, is that Congress did not choose a
more limited definition of "foreign official" but instead chose
to include a broad, general one.  There is no reason to presume
that when Congress chooses a general term over a specific list it
intends to exclude the specific items.  See National-Standard Co.
v. Adamkus, 881 F.2d 352, 360 (7th Cir. 1989) (finding it

32

significant that Congress "chose [a] broad, general term" over an enumerated list).

A side-by-side comparison of the four versions of bills discussed by the defendants is illuminating. (Mot. #220 at 15-16).

| S. 3741, 94th Cong. (1976) | H.R. 7543, 95th Cong. (1977) | S. 305, 95th Cong. (1977) | H.R. 3815, 95th Cong. (1977) |
|---|---|---|---|
| Defined "foreign government" as (1) the government of a foreign country, irrespective of recognition by the United States; (2) a department, agency, or branch of a foreign government; (3) a corporation or other legal entity established or owned by, and subject to control by, a foreign government; (4) a political subdivision of a foreign government, or a department, agency or branch of the political subdivision; or (5) a public international organization. (emphasis added) | Defined "foreign government" as: (A) the government of a foreign country, whether or not recognized by the United States; (B) a department, agency, or branch of a foreign government; (C) a political subdivision of a foreign government, or a department, agency or branch of such political subdivision; (D) a corporation or other legal entity established, owned, or subject to managerial control by a foreign government; or (E) a public international organization. (emphasis added) | Prohibited payments to an official of a foreign government or instrumentality of a foreign government | Defined "foreign official" as Any officer or employee of a foreign government or any department, agency or instrumentality thereof, of any person acting in an official capacity for or on behalf of such government or department, agency or instrumentality. |

33

1    S. 3741 and H.R. 7543 were both bills requiring reporting of

2    corrupt payments as opposed to prohibition of such payments.[14]

3    Both were referred to committee, and no further action was taken.

4    Ultimately, the FCPA of 1977 was an amalgamation of S. 305 and

5    HR. 3815.  With respect to the definition of foreign official,

6    the Senate receded to the House.  H. Conf. Rep. 95-831 (1977).

7    In comparing what Congress adopted and what Congress rejected,

8    there is no evidence that Congress was attempting to narrow the

9    scope of its legislation by choosing the definition in H.R. 3815.

10   Instead, it chose a general definition over an enumerated list.

11   If anything, by generalizing the FCPA's reach, Congress should be

12   seen as evidence of its intent to broaden its scope.

13         5.   <u>Summary</u>

14         In sum, the meaning of the term instrumentality in the FCPA

15   clearly includes state-owned entities.  By definition, government

16   "instrumentality" includes state-owned entities used to achieve a

17   government's end or purpose.  Furthermore, state-owned entities

18   must be government instrumentalities (1) for all of the text of

19   the FCPA to have meaning, (2) for the United States to be in

20   compliance with its treaty obligations, (3) for the FCPA to be

21   given the broad construction indicated by its text, and (4) for

22   the term "instrumentality" to be interpreted consistently with

23   other, similar statutes.  This Court should interpret the term

24   consistently with all other courts that have faced the issue and

25

26       [14] These bills can be found as Exhibits 32, 38, 39, and 44
     of Mr. Koehler's Declaration in <u>United States v. Carson, et al.</u>,
27   09-CR-00077-JVS CR 300.

28                                    34

1  hold that state-owned entities like CFE can be government

2  instrumentalities.

D.    The Rule of Lenity Has No Application to the Instant
      Case.

The defendants, in the alternative, argue that the

rule-of-lenity requires interpreting the FCPA so as not to

include state-owned entities.  (Mot. #220 at 28).  This argument

is flawed for two reasons.  First, their argument seriously

misconceives the rule's meaning and erroneously urges the Court

to dismiss the FSI if "there is any ambiguity" in the statutory

meaning of "foreign official" or "instrumentality."  Id.

(emphasis added).  In reality, "[t]he simple existence of some

statutory ambiguity . . . is not sufficient to warrant

application of that rule, for most statutes are ambiguous to some

degree."  Muscarello v. United States, 524 U.S. 125, 138 (1998).

Indeed, courts have soundly rejected the defendants'

any-ambiguity-is-sufficient formulation, holding instead that

only a "grievous ambiguity or uncertainty in the statute" that

leaves the Court only to "guess as to what Congress intended"

will warrant the rule's application.  Barber v. Thomas, 130 S.

Ct. 2499, 2508-09 (2010) (internal quotation omitted).

Second, the rule of lenity is applied sparingly, only after

all other interpretive tools have been unsuccessfully exhausted.

See, e.g., Callanan v. United States, 364 US. 587, 596 (1961)

(the rule "only serves as an aid for resolving an ambiguity; it

is not to be used to beget one . . . .  The rule comes into

35

operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.  That is not the function of the judiciary."); see also Barber, 130 S. Ct. at 2508-09 (explaining that "the rule of lenity only applies . . . after considering [the statute's] text, structure, history, and purpose"). Critically, neither the existence of an articulable, narrower construction, nor the statute's use of undefined terms is enough to require the rule of lenity's application.  See, e.g., Muscarello, 524 U.S. at 138-39 (although term "carry" was undefined, both parties "vigorously contest[ed] the ordinary English meaning of the phrase 'carries a firearm,'" and normal usage equally embraced the disparate meanings urged by the parties, the court rejected application of the rule of lenity and chose the meaning that criminalized comparatively more conduct); United States v. Shabani, 513 U.S. 10, 17 (1994) (noting the "mere possibility of articulating a narrower construction" is insufficient to warrant the rule's application) (quoting Smith v. United States, 508 U.S. 239 (1993)); Chapman v. United States, 500 U.S. 453, 461-64 (1991) (affirming LSD-distribution sentence and rejecting application of the rule of lenity, even though the statute failed to define key terms "mixture" and "substance"); Lisbey v. Gonzales, 420 F.3d 930, 933 (9th Cir. 1995) ("Courts should not deem a statute 'ambiguous' for purposes of lenity merely because it is possible to articulate a construction more narrow than that urged by the Government.").

Consequently, under this well-established case law, the rule of lenity is inapplicable to this case.  As noted above, at trial the government will present proof that CFE is an "agency" and an "instrumentality" of the Mexican government, and the defendants do not even allege ambiguity in the first term.  Further, the plain meaning of "instrumentality," its prior interpretation, and its legislative history make clear that corrupt payments to officers of state-owned entities are prohibited by the FCPA. In light of clear evidence of Congress's intent, certainly this Court is not left only to "guess" at the statute's meaning. Barber, 130 S. Ct. at 2509.

E.   The Definition of Foreign Official Is Not Void-for-Vagueness.

The defendants also argue, in the alternative, that the FCPA is unconstitutionally vague.  (Mot. #220 at 22).  That contention is without merit.  As an initial matter, defendants' facial challenge is precluded by binding precedent establishing that "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."  United States v. Mazurie, 419 U.S. 544, 550 (1975); see also Chapman v. United States, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed . . . so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); United States v. Williams, 441 F.3d 716, 724 (9th Cir. 2006) (citing Mazurie, 419 U.S. at 550); United States v. Rodriquez, 360 F.3d 949, 953 (9th Cir. 2004)

("Where . . . a statute is challenged as unconstitutionally vague in a cause of action not involving the First Amendment, we do not consider whether the statute is unconstitutional on its face.") (quoting United States v. Purdy, 264 F.3d 809, 811 (9th Cir. 2001)).

The defendants' as-applied challenge to the constitutionality of the FCPA is similarly unavailing.  A statute is void-for-vagueness if it fails to "define the criminal offense with [1] sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." Skilling v. United States, 130 S. Ct. 2896, 2927-28 (2010) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).  The relevant inquiry "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." United States v. Lanier, 520 U.S. 259, 267 (1997); see United States v. Brumley, 116 F.3d 728, 732 (5th Cir.) (en banc) ("Gauging fair notice requires an inquiry into the state of the law as a whole, not merely into the words printed on a single page of the United States Code.").  In assessing void-for-vagueness challenges, courts are required to "construe, not condemn, Congress' enactments." Skilling v. United States, 130 S. Ct. 2896, 2928 (2010) (quoting United States v. National Dairy Products Corp., 372 U.S. 29, 32 (1963) (stressing "[t]he strong presumptive validity that attaches to an Act of Congress")).

In applying these principles, no court has held that the FCPA is unconstitutionally vague on the basis advanced by defendants.  Indeed, in both recent decisions on similar motions, discussed above, the district courts rejected defendants' void-for-vagueness arguments.  (Exhibit J) (Order Denying Motion to Dismiss in <u>United States v. Esquenazi, et al.</u>, 09-CR-21010 (S.D. Fl. 2010)) ("[T]he Court finds that persons of common intelligence would have fair notice of this statute's prohibitions"); (Exhibit K) (Order Denying Motion to Dismiss in <u>United States v. Nguyen, et al.</u>, 08-CR-522 (E.D. Pa. 2009)).

Moreover, under "the facts of the case at hand," <u>Mazurie</u>, 419 U.S. at 550, defendants cannot meet the heavy burden of demonstrating that the statute is unconstitutionally vague. Defendants fail to establish that the FCPA's prohibition of bribes to foreign officials did not provide clear warning that their own conduct was proscribed, as applied to the facts alleged in the FSI.  Indeed, defendants do not make any reference to the facts whatsoever in arguing that the statute is vague as applied, instead simply urging the court to dismiss the FSI on this basis if it is not inclined to find the statute unconstitutionally vague on its face.

Finally, the FCPA is not unconstitutionally vague as applied to defendants because it contains a sufficient mens rea requirement.  It is well established that a mens rea or scienter requirement may serve to defeat a claim that a defendant is being punished for conduct he did not know was wrong.  See <u>United</u>

39

1  <u>States v. Jae Gab Kim</u>, 449 F.3d 933 (9th Cir. 2006) (quoting

2  <u>Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455

3  U.S. 489, 495 n.7 (1982)) ("[A] scienter requirement may mitigate

4  a law's vagueness, especially with respect to the adequacy of

5  notice to the complainant that his conduct is proscribed.");

6  <u>Colautti v. Franklin</u>, 439 U.S. 379, 395 (1979) ("This Court has

7  long recognized that the constitutionality of a vague statutory

8  standard is closely related to whether that standard incorporates

9  a requirement of mens rea.").  Section 78dd-2 contains a scienter

10  requirement sufficient to overcome defendants' challenge,

11  requiring defendants "to make use of the mails or any means or

12  instrumentality of interstate commerce <u>corruptly</u> in furtherance

13  of an offer, payment, promise to pay, or authorization of the

14  payment of any money, or offer, gift, promise to give, or

15  authorization of the giving of value to" any foreign official,

16  and to any person, to influence any act or decision of such

17  foreign official in his or her official capacity; and to assist

18  in obtaining or retaining business.  15 U.S.C. § 78dd-2(a)

19  (emphasis added).  For all these reasons, the defendants' void-

20  for-vagueness claim should be denied.

**III.**

**<u>CONCLUSION</u>**

For the reasons set forth above, this Court should deny
the defendants' Motion to Dismiss the First Superseding
Indictment.

40