UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR10-01031-AHM | | Date | April 20, 2011 |
|---|---|---|---|---|

| Present: The Honorable | A. HOWARD MATZ |
|---|---|
| Interpreter | N/A |

| Stephen Montes | Cindy Nirenberg | Douglas Miller – Not Present<br>Nicola Mrazek, DOJ – Not Present<br>Jeffrey Goldberg, DOJ – Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| (2) Angela Maria Gomez Aguilar | √ | | | Stephen Larson | | | √ |
| (3) Lindsey Manufacturing Company | | | | Jan L. Handzlik | | | √ |
| (4) Keith E. Lindsey | | √ | | Jan L. Handzlik | | | √ |
| (5) Steve K. Lee | | √ | | Janet Levine | | | √ |

**Proceedings:** **IN CHAMBERS (No Proceedings Held)**

## I.  INTRODUCTION

On October 21, 2010, the Government filed a First Superseding Indictment ("FSI") charging defendants Keith E. Lindsey, Steve K. Lee, and Lindsey Manufacturing Company ("the Lindsey Defendants") with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), as well as substantive violations of the FCPA.[1]  The gist of the allegations in the FSI is that the Lindsey Defendants paid bribes to two high-ranking employees of the Comisión Federal de Electricidad ("CFE"), an electric utility company wholly-owned by the Mexican government.  Lindsey Manufacturing Company ("LMC") funneled the alleged bribes to these employees (Nestor Moreno and Arturo Hernandez) by making payments to Grupo International

---

[1] The FSI also charges two Mexican citizens with related crimes.  Enrique Faustino Aguilar Noriega ("Enrique Aguilar") is charged with conspiracy to violate the FCPA, substantive FCPA violations, conspiracy to commit money laundering, and substantive money laundering violations.  Mr. Aguilar is a fugitive.  Angela Maria Gomez Aguilar ("Angela Aguilar"), Enrique Aguilar's wife, is charged with conspiracy to commit money laundering and substantive money laundering violations.  Enrique Aguilar and Angela Aguilar are referred to collectively herein as the "Aguilar Defendants."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

("Grupo"), a company owned and controlled by the Aguilar Defendants. The payments from LMC to Grupo ostensibly were commissions for services performed by Enrique Aguilar in his capacity as LMC's sales representative in Mexico. In reality, according to the Government, large portions of those payments were used to bribe Messrs. Moreno and Hernandez.

The Government claims these alleged bribes violated the FCPA. As relevant here, the FCPA makes it unlawful for any American company or person acting on behalf of such company to provide money or other benefits to any foreign official in order to obtain or retain business. The FCPA defines a "foreign official" as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international organization." 15 U.S.C. § 78dd-2(h)(2)(A).

The Lindsey Defendants have moved to dismiss the charges against them. Angela Aguilar has joined their motion. The question presented by the motion is whether an officer or employee of a state-owned corporation can be a "foreign official" for purposes of FCPA liability.[2] Defendants argue that under no circumstances can such a person be a foreign official, because under no circumstances can a state-owned corporation be a department, agency, or instrumentality of a foreign government.[3]

The Court DENIES the motion to dismiss, because a state-owned corporation having the attributes of CFE may be an "instrumentality" of a foreign government within the meaning of the FCPA, and officers of such a state-owned corporation, as Messrs. Nestor Moreno and Arturo Hernandez are alleged to be, may therefore be "foreign officials" within the meaning of

---

[2] Defendants have assumed, for purposes of their motion, that CFE is a state-owned corporation. As discussed in the Addendum to this order, the Government never directly challenged that assumption until more than two weeks *after* the Court had issued its oral ruling denying Defendants' motion to dismiss and trial had commenced.

[3] At the hearing on this motion, counsel for Defendant Lee intimated that there is a difference between state-owned corporations that act "as part of the state *qua* state" – whatever that may mean – and those state-owned corporations that engage in commercial activities. Even if that distinction had been explicit in the Defendants' motion to dismiss, however, it would not affect this ruling.

the FCPA.[4]

## II.     THE FIRST SUPERSEDING INDICTMENT

For purposes of this motion, Defendants "do not dispute the factual allegations in the FSI . . . ." Reply at 2 (emphasis removed).  The FSI alleges that "Comisión Federal de Electricidad ('CFE') was an electric utility company owned by the government of Mexico.  During the time period relevant to this Indictment, CFE was responsible for supplying electricity to all of Mexico other than Mexico City.  CFE contracted with Mexican and foreign companies for goods and services to help supply electricity services to its customers."  FSI at 2.

"Official 1 [now known to be Nestor Moreno] was a Mexican citizen who held a senior level position at CFE.  Official 1 became the Sub-Director of Generation for CFE in 2002 and the Director of Operations in 2007.  Official 1's position at CFE made him a 'foreign official,' as that term is defined in the FCPA, 15 U.S.C. § 78dd-2 (h) (2). . . .  Official 2 [now known to be Arturo Hernandez] was a Mexican citizen who also held a senior level position at CFE.  Official 2 was the Director of Operations at CFE until that position was taken over by Official 1 in 2007.  Official 2's position at CFE made him a 'foreign official,' as that term is defined in the FCPA, 15 U.S.C. § 78dd-2 (h) (2)."  *Id.* at 2-3.

"Defendant Lindsey Manufacturing Company . . . was a privately held company incorporated in California and headquartered in Azusa, California. . . .  Defendant Lindsey Manufacturing manufactured emergency restoration systems . . . and other equipment that was used by electrical utility companies. . . .  Many of defendant Lindsey Manufacturing's clients were foreign, state-owned utilities, including CFE . . . ."  *Id.* at 3.

"Defendant Keith E. Lindsey . . . was the President of defendant Lindsey Manufacturing.

---

[4] The Government argues that this motion should be denied because it is "premature," in that it should not have been made until after the Government had been given the opportunity (at trial) to prove the allegations about CFE in the FSI.  Consistent with that contention is the Government's related argument that under Federal Rule of Criminal Procedure 7(c)(1) the allegations in the FSI are plenty sufficient to withstand a motion to dismiss.  In principle, both contentions are sound, but because Defendants have chosen to treat their motion as one not requiring any factual determinations about CFE, the Court will address the merits of the motion.  In doing so, the Court recognizes that the Government reserved the right to prove at trial that CFE is not only an "instrumentality" of Mexico within the meaning of the FCPA, but also an "agency."

In that position, defendant Lindsey had ultimate authority over all of defendant Lindsey Manufacturing's operations. Defendant Lindsey also had a majority ownership interest in defendant Lindsey Manufacturing . . . . Defendant Steve K. Lee . . . was the Vice President and Chief Financial Officer of defendant Lindsey Manufacturing. In that position, defendant Lee controlled defendant Lindsey Manufacturing's finances . . . ." *Id.* at 3, 4.

"Grupo Internacional De Asesores S.A. ('Grupo') was a company incorporated in Panama and headquartered in Mexico. . . . Grupo's purported business was to provide sales representation services for companies like defendant Lindsey Manufacturing that had business with CFE. Grupo was defendant Lindsey Manufacturing's sales representative in Mexico and received a percentage of the revenue Lindsey Manufacturing received from its contracts with CFE. . . . Defendant Enrique Aguilar . . . was a Director of Grupo and was hired by defendant Lindsey Manufacturing to obtain contracts from CFE. . . . Defendant [Angela Aguilar] was a citizen of Mexico and was married to defendant Enrique Aguilar. [She] served as an Officer and Director of Grupo. In that position, [she] managed Grupo's finances . . . ." *Id.* at 4, 5.

"[D]efendants Enrique Aguilar, Lindsey Manufacturing, Lindsey, and Lee, together with . . . others known and unknown . . . conspired, and agreed to [violate the FCPA]. . . . The object of the conspiracy was carried out . . . as follows: . . . Defendants Lindsey Manufacturing, Lindsey and Lee would agree to pay defendant Enrique Aguilar a thirty percent commission on all of the goods and services defendant Lindsey Manufacturing sold to CFE . . . knowing that all or a portion of that money would be used to pay Official 1 and others at CFE bribes in exchange for CFE awarding defendant Lindsey Manufacturing contracts." *Id*. at 6, 7. The FSI further alleges five substantive FCPA violations committed by these defendants. *Id*. at 16-17. The FSI also alleges that Enrique Aguilar and Angela Aguilar conspired to commit money laundering and did launder money. *Id.* at 18-24.

### III.   ANALYSIS

####   A.   The Foreign Corrupt Practices Act

The FCPA states: "It shall be unlawful for any domestic concern . . . or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of value to – (1) any foreign official for purposes of . . . (B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such

domestic concern in obtaining or retaining business for or with, or directing business to, any person . . . ." 15 U.S.C. § 78dd-2(a).

As noted above, the FCPA defines "foreign official" as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization." *Id.* at § 78dd-2(h)(2)(A). The FCPA does *not* define "instrumentality."

### B. The Comisión Federal de Electricidad

For purposes of this motion, the Lindsey Defendants have not disputed the following facts, which were set forth in the Government's opposition papers ("Opp."), as follows:

"Under the Mexican Constitution, the supply of electricity is *solely* a government function. . . . Specifically, Article 27 provides:

> It is exclusively a function of the general Nation to conduct, transform, distribute, and supply electric power which is to be used for public service. No concessions for this purpose will be granted to private persons and the Nation will make use of the property and natural resources which are required for these ends.

Opp. at 3.

"Under [Mexico's] Public Service Act of Electricity of 1975, the organic law that created CFE, CFE is defined as 'a decentralized public entity with legal personality and its own patrimony.' . . . Article 10 provides that CFE's Governing Board is composed of the Secretaries of Finance and Public Credit, Social Development, Trade and Industrial Development of Agriculture and Water Resources, and Energy, Mines, and State Industry, and Article 14 provides that the 'President of the Republic shall appoint the Director General.'" *Id.* at 3-4.

Defendants further acknowledge that CFE is described as a governmental "agency" on its website, which also states that CFE is "a company created and owned by the Mexican government." Motion at 2 n.2, 3 n.3.

### C. Defendants' Categorical Motion

Defendants themselves acknowledge that, "[n]one of the issues raised by the instant motion rests on disputed facts and none is dependent on further finding of fact. Defendants argue that, *no matter what other characteristics of CFE the government may attempt to prove at trial*, and assuming that all of the allegations in the FSI are true, as a matter of law no state-owned corporation is an 'instrumentality,' meaning that no CFE employee is a 'foreign official' under the FCPA." *Id.* at 6 (emphasis added). Ergo, contend Defendants, the bribes allegedly paid to Messrs. Moreno and Hernandez could not and did not constitute a violation of the FCPA.

Thus, the question posed by Defendants' motion is not whether CFE itself does or does not have characteristics in common with a department, agency, or instrumentality. Indeed, according to Defendants, CFE's specific characteristics are irrelevant here. Instead, the dispositive question they pose is purely legal: whether *any* entity's status as a state-owned corporation – of any kind, with any characteristics – "disqualifies it as an entity properly addressed by an FCPA indictment." Reply at 2.

### D. Defendants' Various Arguments

#### 1. The Plain Meaning of "Instrumentality"

According to Defendants, "[i]t is plain from the definition of 'foreign official' that Congress did not intend for FCPA liability to be based on payments made to employees of state-owned corporations like CFE." Motion at 6. They argue that "[w]hat one of these entities calls itself in a particular case, and into which prong of the 'foreign official' definition the government claims a particular corporation falls, is irrelevant" to the central issue of their motion. *Id.* at 3 n.3. Defendants then proceed to focus on the plain meaning of the term "instrumentality," because they conclude that the "instrumentality" prong of the "foreign official" definition is the most likely fit for state-owned corporations as a whole. *Id.* at 3.

##### a. Defining instrumentality

"Statutory interpretation begins with the language of the statute. When the plain meaning of a statutory provision is unambiguous, that meaning is controlling." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1171 (9th Cir. 2011) (citations omitted). "Instrumentality" is a noun having an inherently broad scope, but it is unnecessary for this Court to choose a particularly elastic dictionary definition of that word. Instead, the Court will adopt the very definition that Defendants themselves proffer. Having asserted that it is plain

that "instrumentality" cannot and does not encompass a state-owned corporation, here is how they define "instrumentality":

> "[T]he ordinary meaning of instrumentality is 'the quality or state of being instrumental,' which, in turn, means 'serving as a means or agency: implemental,' or 'of, relating to, or done with an instrument or tool.' *Webster's II New College Dictionary* ('*Webster's II*') 589 (3d ed. 2005)."
>
> "*See also American Heritage Dictionary* 908 (4th ed. 2000) (defining instrumentality as '[a] means; an agency,' or '[a] subsidiary branch, as of a government, by means of which functions or policies are carried out'); *Black's Law Dictionary* 870 (9th ed. 2009) (defining instrumentality as '[a] thing used to achieve an end or purpose,' or '[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body')."

Motion at 7, 7-8 n.6.

Purporting to apply two canons of construction – *noscitur a sociis* and *ejusdem generis*[5] – Defendants argue that "the most ordinary meaning of an 'instrumentality of the government,' is an entity the government uses to accomplish its functions of setting forth and administering public policy or public affairs or exercising political authority." *Id.* at 8. They go on to assert that "'instrumentalities' most likely would include entities like government branches . . . administrations, [and] *commissions* . . . among others." *Id.* (emphasis added).[6] According to

---

[5] *Noscitur a sociis* provides that "a word is known by the company it keeps . . . ." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). The Ninth Circuit has "similarly recognized that words are to be judged by their context and that words in a series are to be understood by neighboring words in the series." *United States v. King*, 244 F.3d 736, 740-41 (9th Cir. 2001) (quotation marks and citation omitted). *Ejusdem generis* provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001) (quotation marks and citation omitted).

[6] The entity at issue here is named the "Comisión Federal de Electricidad" – the Federal Electricity Commission.

Defendants, "[c]orporations, *as a category*, have no place in this group. Unlike agencies and departments, corporations can take myriad forms and are created and operated in innumerable ways and for infinitely variable purposes." *Id*. (emphasis added).

Defendants argue that the claimed "lack of uniformity in how state-owned corporations are formed and operated contrasts starkly with the defined scope of the terms that precede 'instrumentality,' and it is impossible to identify any characteristic that the first two categories (departments, agencies) necessarily have in common with government/state-owned corporations." *Id.* at 9. In other words (according to Defendants), state-owned corporations as a category do not necessarily share *any* characteristics in common with departments or agencies. Based on this unsupported and unsupportable assertion, Defendants conclude that "instrumentalities must mean something different than state-owned corporations." *Id.*

The Government agrees with Defendants' proposition that "instrumentality" should be interpreted in light of the two words preceding it, "department" and "agency."[7] According to the Government, however, Defendants are wrong to assert that instrumentality "'must be understood to capture *only* entities that share qualities both agencies and departments share.'" Opp. at 24. Indeed, the Government argues, state-owned corporations *do* share various qualities with both agencies and departments, such as existing at the pleasure of the government and being oriented to public policy. Moreover, as the Government sensibly points out, if an instrumentality *must* share *all* of its characteristics with both a department and an agency, then the term "instrumentality" would be robbed of independent meaning. Canons of statutory construction counsel against this outcome, which would turn "instrumentality" into surplusage.

In reply, Defendants attempt to refine their argument by contending that "instrumentality" must be "interpreted not in light of *any* characteristic of departments and agencies, but rather in light of what is *consistent between* and what *defines* 'departments' and 'agencies.' . . . That is, only entities that have characteristics like those that are the *sine qua non* of both agencies and departments qualify as 'instrumentalities.'" Reply at 3. Defendants go on to argue that "[f]oreign government agencies and departments exist *only* when created by governments, and are *always* funded solely by governments or by exercise of their power to enforce government policies and laws. They *always* and *only* exist to execute, administer and enforce government policies. . . . In contrast, corporations, even corporations in which governments have an interest, are not always created by governments . . . . Such corporations

---

[7] The Government makes several other arguments in support of its interpretation of the plain meaning of "instrumentality," none of which is dispositive or need be addressed by the Court.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

are not always funded solely by governments . . . . Such corporations often do more than execute policy . . . ." *Id*. at 3-4. Defendants conclude that "the Court should look for defining similarities between agencies and departments and consider only entities that share these qualities to fall within the definition of 'instrumentality.'" *Id.* at 5.

Defendants' very language reveals an illogical flaw in their "all or nothing" approach. That is, they argue that a state-owned corporation can never be an "instrumentality" because state-owned corporations "do not always" share the characteristics of departments and agencies. This formulation implicitly concedes that *some* state-owned corporations can and do share the characteristics of departments and agencies. And Defendants never explain why those corporations must be excluded from the definition of "instrumentality."

In any event, the Court will respond to Defendants' invitation to "look for defining similarities between agencies and departments and consider only entities that share these qualities to fall within the definition of 'instrumentality.'" Although Defendants have not explained what they mean when they posit that "only entities that have characteristics like those that are the *sine qua non* of both agencies and departments qualify as 'instrumentalities'", it is not difficult to point to various characteristics of government agencies and departments that fall within that description. Here is a non-exclusive list:

- The entity provides a service to the citizens – indeed, in many cases to all the inhabitants – of the jurisdiction.

- The key officers and directors of the entity are, or are appointed by, government officials.

- The entity is financed, at least in large measure, through governmental appropriations or through revenues obtained as a result of government-mandated taxes, licenses, fees or royalties, such as entrance fees to a national park.

- The entity is vested with and exercises exclusive or controlling power to administer its designated functions.

- The entity is widely perceived and understood to be performing official (*i.e.*, governmental) functions.

As shown above, CFE has all these characteristics. It was created by statute as a "decentralized *public* entity" (emphasis added); its governing Board is comprised of various

high-ranking governmental officials; it describes itself as a government agency; and it performs a function the Mexican nation has described as a quintessential government function – the supply of electricity. Indeed, the Mexican Constitution recognizes the supply of electric power as "exclusively a function of the general nation."

>           b.      How the FCPA uses the term "instrumentality"

"To determine the plain meaning of a statutory provision, we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Levi Strauss*, 633 F.3d at 1171 (citation omitted). Defendants contend that the structure and purpose of the FCPA, as illuminated by Congressional history, demonstrate that Congress did not intend the statute to include state-owned corporations. They argue that the FCPA's focus is on government and politics, which is consistent with the purpose of Congress in enacting the FCPA. "Congress could have criminalized and thus limited *all* bribery abroad. It chose not to do so and instead, when it passed the FCPA, had in mind only the relatively narrow – albeit serious – problem of the impact of bribery on governmental affairs. The language it chose to address this narrow issue should, accordingly, be construed narrowly." Motion at 12 (emphasis added).

The Government, unsurprisingly, counters that the FCPA should be construed broadly. Among other arguments, the Government relies on the so-called *Charming Betsy* doctrine, which posits that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 117-18 (1804). Thus, "[w]here fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States." Restatement (Third) of Foreign Relations Law of the United States § 114 (1987); *see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995) ("If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements.")

According to the Government, the United States' treaty obligations "require it to criminalize bribes made to officials of state-owned enterprises, and Congress clearly indicated its conformity with those obligations through the FCPA." Opp. at 15. Specifically, "Congress could not have been clearer that it intended for the FCPA to fully comport with the [Organization for Economic Co-operation and Development ("OECD")] Convention [on Combating Bribery of Foreign Officials in International Business Transactions]." *Id.* at 16.

The members of the OECD adopted the Convention on November 21, 1997, 20 years

after the enactment of the FCPA. Congress ratified the OECD Convention and "implemented it through various amendments to the FCPA" in 1998. *Id.* at 15-16. The Defendants are charged with conspiracies and FCPA violations during the years 2002-2009. So the OECD Convention had legal effect at the time.

The OECD Convention prohibits "any person intentionally to offer, promise or give any undue pecuniary or other advantage, whether directly or through intermediaries, to a foreign public official . . . ." OECD Convention, art. 1.1. "Foreign public official" is defined to include "any person exercising a public function for a foreign country, including for a public agency or public enterprise . . . ."[8] *Id.* at art. 1.4.a. The OECD Convention's Commentaries define "public enterprise" to include "any enterprise, *regardless of its legal form*, over which a government, or governments, may, directly or indirectly, exercise a dominant influence." *Id.* at Commentary 14.

When Congress amended the FCPA in 1998, it meant "to conform it to the requirements of and to implement the OECD Convention." S. Rep. No. 105-2177 (1998) at 2. In so doing, the *only* change Congress made to the FCPA's definition of "foreign official" was to add officials of public international organizations. According to the Government, if the FCPA is to be construed consistent with the OECD Convention, then the FCPA's definition of "foreign official" should be understood to *include* "any person . . . exercising a public function for a foreign country, including for a public agency or public enterprise . . . ." Thus, high-ranking employees of certain state-owned corporations could fall within the scope of the FCPA.

Defendants counter this argument with the observation that at no time – not in 1977 or in the later amendments (including those in 1998) – did Congress specifically include state-owned corporations within the scope of the statute.

Given the analysis and conclusion in the preceding section, it is unnecessary to resolve this dispute over the "structure" of the FCPA. The structure, object, and purpose of the FCPA – even as posited by Defendants – are consistent with a definition of "instrumentality" that includes at least some state-owned corporations. In any event, this Court does find that the Government's *Charming Betsy* analysis in light of Congress's embrace of the OECD Convention is persuasive, notwithstanding Congress's failure to include the phrase "state-

---

[8] The OECD Convention's Commentaries defines "public function" as follows: "[A]ny activity in the public interest, delegated by a foreign country, such as the performance of a task delegated by it in connection with public procurement." OECD Convention at Commentary 12. Providing power to the inhabitants of the land is such a function.

owned corporation" in the FCPA.

### 2. <u>Legislative History of the FCPA</u>

"If ambiguity exists, we may use legislative history as an aid to interpretation." *Levi Strauss*, 633 F.3d at 1171 (citations omitted). Defendants contend that the FCPA's legislative history (some of which was discussed above) shows that Congress deliberately chose not to target bribes intended to influence state-owned corporations. It is unnecessary to base this ruling upon the legislative history of the FCPA, given that the meaning of "instrumentality" under Defendants' definition of the term clearly encompasses CFE. Nevertheless, because legislative history was so central to Defendants' motion, the Court will summarize the parties' contentions.

> a. Defendants argue the FCPA's legislative history shows that Congress deliberately chose not to target bribes intended to influence state-owned corporations

Prior to passage of the FCPA in 1977, Congress rejected proposed bills that explicitly addressed payments to employees of state-owned corporations. As one example, Defendants cite a Senate bill introduced on August 6, 1976, which defined "foreign public officials" as including "essentially, officers, employees or others acting on behalf of a foreign government." Motion at 15 (citing S. 3741, 94th Cong. § 2(e) (1976)). The bill also defined "foreign government" to include state-owned corporations. *Id.* ("(3) a corporation or other legal entity established or owned by, and subject to control by, a foreign government"). A House bill contained similar language. *Id.* at 16 (citing H.R. 15149, 94th Cong. §§ 2(e) & (h) (1976). These bills both died in committee. *Id.*

In 1977, the Senate considered S. 305, which "generally prohibited payments to 'official[s] of a foreign government or instrumentality' but did not define 'instrumentality.'" *Id.* (citing S. 305 § 30A, 95th Cong. (1977)). The parallel House bill, H.R. 3815, defined "foreign official" as:

> [A]ny officer or employee of a foreign government or any department, agency, or instrumentality thereof, or any person acting in an official capacity for or on behalf of such government or department, agency or instrumentality. Such terms do not include any employee of a foreign government or any department, agency, or instrumentality thereof whose duties are ministerial or clerical.

*Id*. at 16-17 (citing H.R. 3815, 95th Cong. § 30A(e)(2) (1977)).  The Senate agreed to include the House's definition in the final bill.  *Id.* at 17 (citing H.R. Rep. No. 95-831, at 12 (1977) (Conf. Rep.)).  The conference version of S. 305 and H.R. 3815 became the FCPA.  *Id.*  According to Defendants, this legislative history demonstrates that Congress was aware of state-owned corporations when it considered the scope of what eventually became the FCPA and ultimately did not include language in the FCPA addressing payments meant to influence such corporations.

    b.  FCPA amendments in 1988

In 1988, Congress amended the FCPA to emphasize that the FCPA's focus was "classic 'government action.'" *Id.* at 14.  The original FCPA excluded from the definition of "foreign official" "'any employee of a foreign government or any department, agency or instrumentality *whose duties are essentially ministerial or clerical*.'" *Id.* at 17 (quoting the 1977 version of the FCPA) (emphasis added).  This exclusion, which focused on an employee's duties, proved difficult to apply in practice.  *Id.* at 17-18.

To make the FCPA clearer, Congress set about considering various amendments to define "facilitation payments" in terms of the *purpose* of such payments.  *Id*. at 18.  Finally, after years of debate, Congress added the following language to the FCPA: "[The FCPA's anti-bribery provisions] shall not apply to any facilitating or expediting payment to a foreign official, political party, or party official the purpose of which is to expedite or to secure the performance of *routine governmental action* by a foreign official, political party, or party official."  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5003, 102 Stat. 1107 (1988) (emphasis added).

According to Defendants, the fact that this amendment focused on "governmental action" "illustrates the point that is clear from the history of the original FCPA: When [Congress] enacted and amended the FCPA, Congress did not have in mind government corporations – or corporate action – it had in mind a discernible and definite universe of governmental action."  Motion at 19.

    c.  The 1998 Amendment

The OECD Convention of 1998 required, among other things, that signatories criminalize payments to "foreign public officials," who were defined as "any person holding a legislative, administrative or judicial office of a foreign country, whether appointed or elected; any person exercising a public function for a foreign country, including for a public agency or *public enterprise*; and any official or agent of a public international organisation [sic]."  OECD Convention, art. 1, 4(a) (emphasis added).

Defendants point out that when Congress added the "public international organization" element of the OECD Convention to the FCPA definition of "foreign official" it did *not* also add the "public enterprise" prong of the OECD Convention's definition of "foreign official." According to Defendants, "[t]his is yet another clear sign that Congress did not intend that individuals or corporations would be prosecuted [under the FCPA] for payments to state-owned corporations . . . ." Motion at 20.[9]

The Government counters that nowhere in the legislative history is there a single reference to the effect that Congress "intended to exclude state-owned companies from the definition of instrumentality." Opp. at 30. The Government argues, contrary to Defendants' conclusion, that "[t]here is no reason to presume that when Congress chooses a general term over a specific list it intends to exclude the specific items." *Id.* at 32. To the contrary, the Government argues, the legislative history "supports an interpretation in which bribes to officials of state-owned enterprises are criminalized." *Id.* at 30. Moreover, as the Government points out, Congress's decision not to add the OECD Convention's "public enterprise" language to the FCPA is equally consistent with the notion that Congress believed that the FCPA's term "instrumentality" already included the sort of state-owned corporations that fall within the OECD Convention's definition of "public enterprise."

The Court finds that the legislative history of the FCPA is inconclusive. Although it does not demonstrate that Congress intended to include *all* state-owned corporations within the ambit of the FCPA, neither does it provide support for Defendants' insistence that Congress intended to *exclude* all such corporations from the ambit of the FCPA.

Given that the legislative history does not clearly support either side's contentions, and because the parties devoted such extensive emphasis to the legislative history in their briefs, the Court attempted to divine what Congress could be deemed to have contemplated, by circulating a written hypothetical during the recent hearing on Defendants' motion to dismiss. Here is that hypothetical:

---

[9] Defendants acknowledge in a footnote that the OECD Convention establishes "that not all state-owned corporations satisfy the OECD definition . . . . As the text makes clear, employees of public enterprises are contemplated only if they 'exercise a public function for' the foreign country at issue." Motion at 20 n.11. Defendants' very phrase "not all" state-owned corporations obviously suggests that *some* such corporations *do* fall within the ambit of the OECD Convention.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

1. (a) The Mexican Constitution provides that the government of Mexico is the only entity that may own and exploit the country's natural resources, including all petroleum and hydrocarbons. The Constitution also permits the Mexican government to create entities to manage and distribute these natural resources. Under this authority, the Mexican government established Petróleos Mexicanos ("PEMEX"), a petroleum company (one of the largest oil exporters in the world), all of whose stock is owned by the federal government of Mexico.

    (b) Under Mexican law, the PEMEX governing board is composed entirely of appointed government officials and PEMEX employs only public servants.

    (c) The PEMEX website states that it is a government agency and that it was created and is owned by the Mexican government.

2. Exxon is an American petroleum company that, among other things, explores for oil in foreign offshore waters, pursuant to contracts and concessions awarded by foreign governments.

3. Occidental is an American petroleum company that competes with Exxon to obtain contracts to drill for oil in foreign waters.[10]

4. Exxon and Occidental competed for a concession to drill in Mexican waters.

5. PEMEX had the power and authority to award the drilling concession. The competing bids were to be disclosed and the winning bid was to be awarded in a televised, public ceremony.

6. Exxon's bid was for $95 million.

7. Occidental's bid was for $100 million.

---

[10] Paragraphs 1, 2, and 3 actually are indisputable facts.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

8. At a public, televised ceremony, in which the CEO of PEMEX was to announce the winning bid, Exxon's chairman and CEO walked up to the CEO of PEMEX and presented him with a certified check for $10 million, payable to the CEO, before the winner was announced.

9. The PEMEX CEO thanked Exxon for its generous gift to him and thereupon awarded the concession to Exxon.

10. Thereafter, Occidental demanded that the United States Department of Justice prosecute Exxon and its CEO for violating the FCPA.

11. The Department of Justice thereupon invited the leaders of both houses of Congress to state whether under the FCPA the Department of Justice would be authorized to prosecute Exxon and its CEO.

At the hearing on this motion, the Court asked lead counsel for the Defendants whether any responsible Congressional leader would respond to such a DOJ inquiry by saying "No, do not prosecute Exxon or its CEO, because PEMEX is a state-owned corporation and it was not the intention of Congress to consider any corporation an 'instrumentality' of any foreign government, regardless of the other facts warranting prosecution." The colloquy that ensued was enlightening. In a display of skillful advocacy, Defendants' counsel responded, "If you were to ask them in a truth serum way, as opposed to a way where they're going to be quoted and run for office, I think their answer would be 'we meant what we said, which is that we did not include state-owned corporations.'"

In fact, Congress did not say that. Moreover, in the Court's view, the question the Court posed at the end of the hypothetical answers itself. Whether injected with truth serum or not, members of Congress would not deem such a prosecution to be beyond the purview of the FCPA merely because PEMEX is a state-owned corporation.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

## ADDENDUM

After the jury trial had been underway for more than two weeks, and just before this order was to be filed, the Government asked the Court to take judicial notice of what the Government claims is this fact: "CFE was created by Mexico as a decentralized public entity with its own legal status and assets." In a footnote the Government added, " . . .[U]nder Mexican law, CFE is a decentralized public entity, not a corporation." This request was astounding.

Throughout the hundreds of pages of argument and exhibits that were filed as part of motion practice, the Government never stated that CFE is not a corporation. Nor did it assert that view at the hearing on this motion. The First Superseding Indictment itself alleges that CFE is "an electric utility *company* owned by the government of Mexico." (Emphasis added.) Tucked away at the bottom of one page of its opposition papers, the Government did note that a Mexican statute defined CFE as a "decentralized public entity with legal personality and its own patrimony." But the Government's opposition papers consistently referred to CFE in other terms, such as: "a state-owned utility" (*e.g.*, Opp. at 9); a "state-owned entity" (*passim*); a "government instrumentality" (*e.g.*, *id.* at 19); and a "state-owned enterprise" (*e.g.*, *id.* at 15).

Indeed, in a lengthy footnote in its opposition papers the Government stressed that in more than a dozen FCPA prosecutions, "guilty pleas were accepted by U.S. District Courts, involved [sic] bribery of officials of *state-owned companies*." *Id.* at 19 n.6 (emphasis added). Elsewhere, it argued that this Court should take into account the definition of "instrumentality" in the Economic Espionage Act ("EEA") stressing, "Although, to date, no court has specifically interpreted 'foreign instrumentality' under the EEA, the statute's text is clear that the term *includes a 'corporation' that is 'substantially owned' by a foreign government*." *Id.* at 23 n.8 (emphasis added).

Furthermore, the Government cited two cases in which state-owned companies were found to fall within the scope of the FCPA. *Id.* at 27. Thereafter, it cited and attached jury instructions in yet two additional cases, to the effect that "the definition of government instrumentality *includes companies owned or controlled by the state*." *Id.* at 29 (emphasis added). Still later, the Government continued in this vein, purporting to refute the Defendants' legislative history analysis by stressing that the author of the declaration that the Defendants' cited "is unable to find a single reference . . . that Congress intended to exclude *state-owned companies* from the definition of instrumentality . . . ." *Id.* at 30 (emphasis added). Finally, the Government concluded, "[F]rom the FCPA's inception, *state-owned and state-controlled companies* were within Congress's intended definition of instrumentalities of a foreign government." *Id.* at 32 (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

There is nothing in the Government's peculiar request for judicial notice which warrants a change in the foregoing ruling.

|  | : |
|---|---|
| Initials of Deputy Clerk | SMO |

cc: