1   ANDRÉ BIROTTE JR.
United States Attorney
2   ROBERT E. DUGDALE
Assistant United States Attorney
3   Chief, Criminal Division
DOUGLAS M. MILLER (SBN: 240398)
4   Assistant United States Attorney
NICOLA J. MRAZEK
5   JEFFREY A. GOLDBERG
Senior Trial Attorneys
6        1300 United States Courthouse
7        312 North Spring Street
Los Angeles, California 90012
8        Telephone: (213) 894-2216
Facsimile: (213) 894-6436
9        Email: douglas.m.miller@usdoj.gov
10
11  Attorneys for Plaintiff
UNITED STATES OF AMERICA
12

13              UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15  UNITED STATES OF AMERICA,       )  CR No. 10-1031(A)-AHM
                                    )
16          Plaintiff,              )
                                    )  GOVERNMENT'S RESPONSE TO THE
17                                  )  DEFENDANTS' SUPPLEMENTAL BRIEF IN
        v.                          )  SUPPORT OF THEIR MOTION TO DISMISS
18                                  )  THE INDICTMENT WITH PREJUDICE DUE
                                    )  TO ALLEGED REPEATED AND
19  ENRIQUE FAUSTINO AGUILAR        )  INTENTIONAL GOVERNMENT
    NORIEGA, ANGELA MARIA           )  MISCONDUCT; MEMORANDUM OF POINTS
20  GOMEZ AGUILAR, KEITH E.         )  AND AUTHORITIES; DECLARATIONS;
    LINDSEY, STEVE K. LEE, and      )  EXHIBITS
21  LINDSEY MANUFACTURING           )
    COMPANY,                        )
22                                  )  Hearing: October 17, 2011, 3:00 p.m.
                                    )  (Courtroom 14)
23          Defendants.             )

24

25

26          Plaintiff United States of America, by and through its attorneys of record, the United

27  States Department of Justice, Criminal Division, Fraud Section, and the United States

28  Attorney for the Central District of California (collectively, "the government"), hereby files

1   its response to the defendants' July 25, 2011 supplemental brief (DE #632) in support of their

2   May 9, 2011 motion to dismiss the indictment with prejudice due to alleged repeated and

3   intentional government misconduct (DE #505).  The government's response is based upon

4   the attached memorandum of points and authorities, declarations, and exhibits; the files and

5   records in this matter; and any evidence or argument presented at any hearing on this matter.

6

    DATED:        September 5, 2011

7

8                                                  Respectfully submitted,

9                                                  ANDRÉ BIROTTE JR.
                                                   United States Attorney
10

11                                                 ROBERT E. DUGDALE
                                                   Assistant United States Attorney
12                                                 Chief, Criminal Division

13

14
                                                   _____/s/_____
15                                                 DOUGLAS M. MILLER
                                                   Assistant United States Attorney
16

17                                                 NICOLA J. MRAZEK
                                                   JEFFREY A. GOLDBERG
18                                                 Senior Trial Attorneys
                                                   Criminal Division, Fraud Section
19

20

21

22

23

24

25

26

27

28                                                 ii

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 1

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   The Government Did Not Commit Misconduct, Let Alone "Purposeful" and "Prejudicial" Misconduct That "Permeated" the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.   There Was No Misconduct During the Investigation . . . . . . . . . . . . . 7

            a.   Participation by the Prosecutors in the Drafting and Editing of Agent Binder's Search Warrant Affidavit Was Permissible, and Their Inadvertent Inclusion of an Inaccurate Statement Does Not Constitute Misconduct . . . . . . 8

            b.   The Government Did Not Lie to the Court about Particular ESI Language Contained in Agent Binder's Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            c.   The Government Did Not Suggest to the Grand Jury That Because ABB Had Engaged in Bribery Then LMC Must Have Also Engaged in Bribery . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.   The Government Did Not "Play Games" with its Witness Lists . . . . 15

            a.   The Government Was Not Required to Call Every Person Named on its Original Witness List, and Sufficient Notice Was Given Regarding the Five Witnesses Not Named on That List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            b.   The Government's Submission of an Over-Inclusive List of Possible Witnesses for the Purposes of Voir Dire Was Prudent and Not Misconduct . . . . . . . . . . . . . . . . . . . . . . . . 18

            c.   The Inclusion of One CFE Official's Name in the Government's Early Witness Lists Is Not "Emblematic" of Any Government "Deception" . . . . . . . . . . . . . . . . . . . . . . . 19

3.      The Government's Conduct with Respect to Lamarche and His
        Nonhearsay Writings Was Appropriate . . . . . . . . . . . . . . . . . . . . . 20

        a.      The Government Sought to Temporarily Protect
                Lamarche's Identity Because of Legitimate Concerns for
                His Safety and Not "to Prevent the Defense from
                Obtaining Timely Discovery" . . . . . . . . . . . . . . . . . . . . . . . 20

        b.      The Government Did Not Discourage Lamarche from
                Speaking with Defense Investigators . . . . . . . . . . . . . . . . . . 21

        c.      The Government Never Misrepresented Lamarche's
                Witness Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        d.      The Government Properly Used the Lamarche Writings
                in Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

4.      The Use of Agent Costley as the Summary Witness Was Proper . . . . 29

        a.      The Government Consistently Represented That Agent
                Costley Would Serve as the Summary Witness . . . . . . . . . . . 29

        b.      There Was Nothing Improper about Using Agent Costley
                Even Though He Was Not Significantly Involved in the
                Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        c.      The Defendants Were Not Prejudiced by Agent Costley's
                Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

5.      The Government's Brief Remarks in Closing Argument
        Regarding Willful Blindness Did Not Violate Any Court Ruling
        and Were Not Inconsistent with the Law . . . . . . . . . . . . . . . . . . . . 37

        a.      The FCPA Explicitly Provides for Criminal Culpability
                Based on Constructive Knowledge . . . . . . . . . . . . . . . . . . . . 37

        b.      The Court Did Not Issue Any Order Precluding the
                Government from Pursuing a Constructive Knowledge
                Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        c.      There Was Nothing Improper about the Government's
                Attempt to Briefly Explain the Rationale Behind the
                FCPA's Constructive Knowledge Provision . . . . . . . . . . . . . 39

ii

d.     The Defendants Were Not Prejudiced by the
       Government's Remarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

6.   The Government Permissibly Mentioned Basurto's Trial
     Testimony in Rebuttal Summation . . . . . . . . . . . . . . . . . . . . . . . . . 42

7.   The Government Did Not Commit Misconduct in Connection
     with its Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     a.     The Fact of the LMC-Sorvill Mistake in Agent Binder's
            Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

     b.     Drafts of Agent Binder's Affidavit . . . . . . . . . . . . . . . . . . . 45

     c.     CFE Meeting Memorandum . . . . . . . . . . . . . . . . . . . . . . . . 45

     d.     Henthorn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

     e.     Rowan's Interview Report and One of Basurto's Reports . . . 47

     f.     Evidence Related to the Military School Payments . . . . . . . . 48

     g.     Interview Reports of Garza, Serocki, and Zavaleta, and
            Any Related Brady Material . . . . . . . . . . . . . . . . . . . . . . . . 49

8.   The Government Did Not Improperly "Shield" the Investigation
     from Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

     a.     The Government Did Not Initially Produce Agent
            Guernsey's Grand Jury Testimony to the Defendants
            Because the Prosecutors Did Not Intend to Call Her as a
            Trial Witness, Not to Withhold Exculpatory Information
            Regarding the Investigation . . . . . . . . . . . . . . . . . . . . . . . . 53

     b.     The Government's Attempt to Limit the Defendants'
            Opportunities to Improperly Attack the Investigation
            During the Government's Case-in-Chief Was Permissible . . . 53

     c.     The Defendants Were Not Prejudiced Because They
            Were Able to Fully Put Forth Their "Inadequate
            Investigation" Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

iii

**B.**   **The Government's Mishandling of Agent Guernsey's Grand Jury Transcripts Does Not Warrant Setting Aside the Jury's Verdict** . . . . . . 60

    1.   <u>Legal Standard</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    2.   <u>The Government's Mistake Was Entirely Accidental and Therefore Does Not Constitute "Flagrant Misbehavior"</u> . . . . . . . . . 62

        a.   The Government Did Not "Directly Violate" Multiple Court Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        b.   The Defendants Mischaracterize Various Remarks by the Court as Constituting "Warnings" to the Government . . . 63

        c.   The Government's April 7 Oral Discovery Report Undercuts the Defendants' Claim of Reckless Disregard . . . . 64

        d.   <u>Chapman</u> and <u>Fitzgerald</u> Are Inapposite . . . . . . . . . . . . . . . . . 65

    3.   <u>The Defendants Were Not Prejudiced by the Government's Mistake, Let Alone "Substantially" Prejudiced</u> . . . . . . . . . . . . . . . . 67

        a.   The Government's Mistake Had No Impact on the Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

        b.   The Evidence of the Defendants' Guilt Was Strong . . . . . . . . 70

    4.   <u>The Extreme, Severe, Drastic, and Disfavored Sanction of Dismissal Is Not Warranted</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**C.**   **The Defendants' "Cumulative Effect" Argument Necessarily Fails** . . . . 75

**D.**   **Agent Guernsey Did Not Commit Perjury in the Grand Jury, and Any Misstatements Were Cured by the Guilty Verdict** . . . . . . . . . . . . . 77

**IV.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

iv

1

## TABLE OF AUTHORITIES

2
**PAGE**

3
**CASES:**

4
Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) . . . . . . . . . . . . . . . . . . . . . . 78-79

5
Barker v. Wingo, 407 U.S. 514 (1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

6
Berger v. United States, 295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

7
Bowen v. Maynard, 799 F.2d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

8
Brady v. Maryland, 373 U.S. 83 (1963)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

9
Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

10
Franks v. Delaware, 318 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10, 44

11
Giglio v. United States, 405 F.2d 150 (1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 69

12
Holt v. United States, 272 F.2d 272 (9th Cir. 1959)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

13
In re Slatkin, 525 F.3d 805 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

14
Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

15
Jones v. Basinger, 635 F.3d 1030 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

16
Kiley v. United States, 260 F. Supp. 2d 248 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . 57

17
Koon v. United States, 518 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

18
Kyles v. Whitney, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54-57

19
Lester v. United States, – A.3d – , 2011 WL 3190469 (D.C. July 28, 2011)  . . . . . . . . . . . 33

20
Midland Asphalt Corp. v. United States, 489 U.S. 794 (1989) . . . . . . . . . . . . . . . . . . . . . . 67

21
People of Territory of Guam v. Muna, 999 F.2d 397 (9th Cir. 1993) . . . . . . . . . . . . . . 77-78

22
Pursell v. Horn, 187 F. Supp. 2d 260 (W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

23
Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

24
Rochin v. California, 342 U.S. 165 (1952)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

25
Szeliga v. General Motors Corp., 728 F.2d 566 (1st Cir. 1984)  . . . . . . . . . . . . . . . . . . . . 11

26
Strunk v. United States, 412 U.S. 434 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

27

28
v

Tennessee v. Street, 471 U.S. 409 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Andrino, 501 F.2d 1373 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Amador-Galvan, 9 F.3d 1414 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . 34

United States v. Arboleda, 929 F.2d 858 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 76

United States v. Bagley, 473 U.S. 667, 669 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Baker, 10 F.3d 1374 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

United States v. Ballesteros-Acuna, 527 F.2d 928 (9th Cir. 1975) . . . . . . . . . . . . . . . . . 25

United States v. Barrera-Moreno, 951 F.2d 1089 (9th Cir. 1991) . . . . . . . . . . . . . . 61, 73-74

United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Behrens, 689 F.2d 154 (10th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Berry, 627 F.2d 193  (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

United States v. Bingham, – F.3d – , 2011 WL 3332325 (9th Cir. Aug. 4, 2011) . . . . . . . 77

United States v. Bond, 552 F.3d 1092 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 16-17, 48, 53

United States v. Bourke, 05-CR-518 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Bray, 139 F.3d 1104 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Briscoe, 896 F.2d 1476 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Campbell, 878 F.2d 170, 173 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Carona, 630 F.3d 917 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Chapman, 524 F.3d 1073 (9th Cir. 2008) . . . . . . . . . . . . . . . . . 61-63, 65, 67

United States v. Combs, 369 F.3d 925 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010);
    579 F.3d 989 (9th Cir. 2009) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Dearing, 504 F.3d 897 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Endicott, 869 F.2d 452 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Erickson, 75 F.3d 470 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Ferguson, – F.3d – , 2011 WL 3251464 (2d Cir. Aug. 1, 2011) . . . . . . 77-78

vi

1   United States v. Fernandez, 388 F.3d 1199 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 76

2   United States v. Fitzgerald, 615 F. Supp. 2d 1156 (S.D. Cal. 2009) . . . . . . . 62-63, 65-67, 82

3   United States v. Francis, 131 F.3d 1452 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 36

4   United States v. Frederick, 78 F.3d 1370 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 75-76

5   United States v. Freeman, 498 F.3d 893 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 32

6   United States v. Gardner, 611 F.2d 770 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 35

7   United States v. Gonzalez, 533 F.3d 1057 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 26

8   United States v. Green, 305 F.3d 422 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

9   United States v. Haynes, 216 F.3d 789 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 62

10  United States v. Hector, 2008 WL 2025069 (C.D. Cal. May 8, 2008) . . . . . . . . . . . . . 67-68

11  United States v. Henderson, 241 F.3d 638 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 28

12  United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 47

13  United States v. Hill, 643 F.3d 807 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

14  United States v. Hinton, 31 F.3d 817 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

15  United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

16  United States v. Jacobs, 855 F.2d 652 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 61, 73

17  United States v. Johnson, 529 F.3d 493 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 32, 57

18  United States v. Juvenile Male, 864 F.2d 641 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . 46, 48

19  United States v. Kearns, 5 F.3d 1251 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 61-62

20  United States v. Kimbrough, 69 F.3d 723 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 75

21  United States v. Kohring, 637 F.3d 895 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 69

22  United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 74-75

23  United States v. Larrazolo, 869 F.2d 1354 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 67

24  United States v. Leung, 351 F. Supp. 2d 992 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . 20

25  United States v. Lombardozzi, 491 F.3d 61 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 78

26  United States v. Lopez, 4 F.3d 1455 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

27

28                                              vii

*United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Marabelles*, 724 F.2d 1374 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Mechanik*, 475 U.S. 66 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 77-79

*United States v. Mincoff*, 574 F.3d 1186 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Moon*, 513 F.3d 527 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Morrison*, 449 U.S. 361 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Navarro*, 608 F.3d 529 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 41, 79

*United States v. Nivica*, 887 F.2d 1110 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Norton*, 867 F.2d 1354 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. O'Shea*, 09-CR-692 (S.D. Tex.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-49

*United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*United States v. Owen*, 580 F.2d 365 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Parker*, 364 F.3d 934 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 8, 37

*United States v. Pete*, 2008 WL 2019559 (9th Cir. May 8, 2008) . . . . . . . . . . . . . . . . . . . 32

*United States v. Phillips*, 577 F.2d 495 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Radseck*, 718 F.2d 233 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Ramirez*, 2009 WL 909645 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Rewald*, 889 F.2d 836 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Reyes-Echevarria*, 345 F.3d 1 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Rosado*, 728 F.2d 89 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

United States v. Sager, 227 F.3d 1138 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 58, 76

United States v. Scales, 594 F.2d 558 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Sitton, 968 F.2d 947 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Skalicky, 615 F.2d 1117 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Stinson, – F.3d – , 2011 WL 3374231 (9th Cir. Aug. 5, 2011) . . . . . . . 77-78

United States v. Struckman, 611 F.3d 560 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 67

United States v. Tamura, 694 F.2d 591 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . 7, 11-13, 64

United States v. Varoudakis, 233 F.3d F.3d 113 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . 72

United States v. Velarde-Gomez, 269 F.3d 1023 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . 72

United States v. Vincent, 416 F.3d 593 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Waters, 627 F.3d 345 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Washington v. Ollison, 2009 WL 3112088 (N.D. Cal. Sept. 23, 2009) . . . . . . . . . . . . . . 72

White v. Lewis, 874 F.2d 599 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987) . . . . . . . . . . . . . 16

**STATUTES AND RULES:**

15 U.S.C. § 78dd-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 3144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-50, 53

Fed. R. Crim. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Evid. 806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Fed. R. Evid. 1006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

This case involved a seven-year bribery conspiracy involving the payment of millions of dollars in cash and gifts to high-ranking officials of Comisión Federal de Electricidad ("CFE"), the state-owned electric utility company in Mexico, in exchange for $19 million in contracts with the defendant LINDSEY MANUFACTURING COMPANY ("LMC").  In October 2010, after a complex multi-year grand jury investigation with international dimensions that involved, among other things, the collection of millions of documents, the accumulation of vast amounts of electronic data, and the interviews of numerous potential witnesses, LMC and two of its executives, the defendants KEITH E. LINDSEY and STEVE K. LEE, were indicted.  All of the defendants were charged with one count of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and five counts of substantive FCPA violations.[1]

On May 10, 2011, after a five-week trial and less than seven hours of deliberations, a jury unanimously found the defendants guilty of all charges brought against them.  One day earlier (May 9), soon after the jury began its deliberations, the defendants filed a motion to dismiss the indictment with prejudice due to alleged "repeated" and "intentional" government misconduct.  (DE #505).  The government responded to the motion on June 6 (DE #600), the defendants replied on June 17 (DE #614), and a hearing was set for June 27.

---

[1] The indictment was actually a first superseding indictment.  The original indictment was returned one month before, in September 2010, and it charged only Enrique Faustino Aguilar Noriega ("Enrique Aguilar") and his wife, Angela Maria Gomez Aguilar ("Angela Aguilar").  Enrique Aguilar is a fugitive.  Angela Aguilar was arrested and detained in August 2010, pursuant to a complaint, and she was tried and convicted in this same case. She has since been sentenced and released, and is no longer a party to this litigation.  For the purposes of this memorandum, "the defendants" refers to LMC, LINDSEY, and LEE, and "the indictment" refers to the first superseding indictment.

On the morning of June 27, the government realized that it had not disclosed certain grand jury testimony by Special Agent Susan Guernsey of the Federal Bureau of Investigation ("FBI"), despite being ordered during the trial to do so. The government immediately produced the testimony (which consisted of a 19-page transcript and two accompanying exhibits) and notified the Court. (DE# 616).[2]  Later that day at the hearing, the Court, after discussing the issue with the parties, invited the defendants to supplement their prior submissions in light of the government's disclosure. The Court specifically asked the defendants to address the viability of an "aggregate" or cumulative effect claim. (RT 6/27/11: 28-29, 37).

On July 25, the defendants filed a 63-page supplemental brief (DE #632), in which they argued that "[e]very aspect of this case was infected by purposeful prosecutorial misconduct — conduct that did not comply with the law and was contrary to orders of this Court." (Br. at 4).[3]  This response memorandum answers that brief and incorporates by reference the government's June 6 filing.

As discussed herein, although the government did make some mistakes during its investigation and prosecution of this case, they were inadvertent and non-prejudicial errors made during a complex matter. The defendants not only unfairly and improperly characterize these honest mistakes as "misconduct," but the defendants often go even further, alleging misconduct where the government made no error at all. For example, the defendants have accused the prosecutor who delivered the government's closing argument of committing misconduct by displaying to the jury documents that had been underlined admitted into evidence. (See part III.A.3.d, page 26).

---

[2] Per the Court's order, the government had produced during the trial the bulk of Agent Guernsey's grand jury testimony — more than 160 transcript pages from three days.

[3] Unless otherwise indicated, references in this memorandum to the defendants' "brief" or citations to "Br." correspond to the defendants' July 25, 2011 supplemental brief (DE #632).

In addition, the defendants were not prejudiced by the alleged misconduct, either separately or in the aggregate.  Particularly with respect to the portion of Agent Guernsey's grand jury testimony that was not disclosed until after the trial, all of the matters covered therein were duplicative of grand jury testimony by Agent Guernsey that was disclosed during the trial, and she was cross-examined on virtually all of those topics at trial.  (See part III.B.3.a, pages 68-70).  Thus, although the government acknowledges its mishandling of Agent Guernsey's grand jury transcripts, the defendants suffered no prejudice.

As the government demonstrates below, the defendants strain to find misconduct where there is none, and they try to transform honest, non-prejudicial mistakes into something they are not.  Moreover, many of the defendants' claims have already been considered and resolved by the Court without any finding of misconduct or bad faith.  In the argument section of this memorandum, the government addresses and refutes each of the defendants' allegations of misconduct by adhering to and fairly recounting the record, and by grounding arguments in the law and evidence.

In short, the defendants stand fairly convicted, and the jury's unanimous verdict is amply supported by the evidence and free of prejudicial error.  Whether assessed individually or cumulatively, the defendants' claim that "[e]very aspect of this case was infected by purposeful prosecutorial misconduct," (Br. at 4), cannot withstand scrutiny and is simply not true.  Accordingly, for all of the reasons set forth below and in the government's June 6 response, the record does not support a finding of flagrant misbehavior by the government causing substantial prejudice to the defendants and warranting the extreme sanction of dismissal.  The defendants' motion should therefore be denied.

## II.

## SUMMARY OF ARGUMENT

The defendants have alleged eight separate but related categories of what they claim is government misconduct.  None has merit:

- *First*, there was no misconduct associated with the prosecutors' drafting and editing of FBI Special Agent Farrell Binder's search warrant affidavit, and the government did not suggest to the grand jury that ABB's wrongdoing was proof of LMC's crimes.[4]  (Part III.A.1; pages 7-15).

- *Second*, the government issued its witness lists in good faith and gave far more notice than that required by law.  (Part III.A.2; pages 15-19).

- *Third*, the government at all times acted appropriately with respect to Jean-Guy Lamarche (an individual who did not testify at trial), and when it used his nonhearsay writings during the trial, it did so in conformity with the Court's limiting instructions.  (Part III.A.3; pages 20-28).

- *Fourth*, it was the government's prerogative to select FBI Special Agent Dane Costley as its summary witness, and the decision to use him was permitted by the Court and caused no prejudice.  (Part III.A.4; pages 29-36).

- *Fifth*, the government's brief remarks in closing argument regarding willful blindness were permissible and not inconsistent with the law.  (Part III.A.5; pages 37-42).

- *Sixth*, the government was entitled to mention the admissible portions of Fernando Maya Basurto's trial testimony in its rebuttal summation.  (Part III.A.6; pages 42-43).

- *Seventh*, the government committed no misconduct in connection with its disclosures.  (Part III.A.7; pages 43-52).

- *Eighth*, the government's attempt to limit the defendants' opportunities to improperly attack the investigation during the government's case-in-chief was permissible, and in any event, the defendants were able to fully put forth their "inadequate investigation" defense.  (Part III.A.8; pages 52-60).

---

[4] For the purposes of this memorandum, "ABB" is used in the same manner as in the defendants' brief, to refer generally to an entity separate from LMC that also conducted business with CFE.  (See DE #511 at 21).

4

Notwithstanding the lack of misconduct in this case, the government did inadvertently neglect to disclose a small portion of Agent Guernsey's grand jury testimony despite being ordered during the trial to produce all of her transcripts.  But the oversight does not warrant setting aside the jury's verdict:

- *First*, the government's mistake does not constitute "flagrant misbehavior" because it was entirely accidental.  (Part III.B.2; pages 60-67).

- *Second*, the defendants were not prejudiced and certainly were not "substantially prejudiced" because the matters covered in the undisclosed testimony were duplicative of grand jury testimony that was timely disclosed.  (Part III.B.3.a; pages 67-73).

- *Third*, no remedial measures are necessary in this matter, let alone the drastic and disfavored sanction of dismissal.  (Part III.B.4; pages 73-75).

Moreover, there is no legal or factual basis in this case for a finding of cumulative prejudicial effect:

- *First*, although the government made some mistakes in this case, because none rises to the level of misconduct and none prejudiced the defendants, as a matter of law and logic there can be no cumulative prejudice.  (Part III.C; pages 75-76).

- *Second*, there appears to be no legal authority for dismissing an indictment based on the type of accidental or negligent government action in this case, a point the defendants seem to concede.  (Part III.C; pages 75-76).

- *Third*, the mishandling of Agent Guernsey's grand jury transcript, which resulted in no prejudice, does not support a cumulative effect finding.  (Part III.C; pages 75-76).

Lastly, the defendants' due process claim based on alleged grand jury perjury by Agent Guernsey has no merit:

- *First*, Agent Guernsey did not commit perjury in the grand jury.  (Part III.D; pages 77-79).

5

- *Second*, any grand jury misstatements by Agent Guernsey cannot serve as a basis for dismissal because the trial jury's guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty beyond a reasonable doubt.  (Part III.D; pages 77-79).

\*   \*   \*

To assist the Court in evaluating the defendants' various claims, the government provides below an abbreviated chronology of this case:

| Date (2010-2011) | Event (docket entry) |
| --- | --- |
| September 15 (Wednesday) | Indictment (Enrique & Angela Aguilar only)  (11) |
| October 21 (Thursday) | First superseding indictment (adding the defendants) (48) |
| December 14 (Tuesday) | Motion hearing (bill of particulars, etc.) (104) |
| January 18 (Tuesday) | Status conference (protective order, etc.) (146) |
| January 24 (Monday) | Motion hearing (discovery, etc.) (170) |
| February 22 (Tuesday) | Motion hearing (discovery, etc.) (206) |
| March 23 (Wednesday) | Motion hearing (<u>Franks</u>, suppression, etc.) (333) |
| March 25 (Friday) | Motion hearing (suppression, etc.) (359) |
| March 28 (Monday) | Motion hearing (suppression, etc.) (369) |
| March 29 (Tuesday) | Motion hearing (suppression, etc.) & pretrial conference (377) |
| March 30 (Wednesday) | Jury selection (380) |
| April 1 (Friday) | Motion hearing (various) (407) |
| April 5 (Tuesday) | Start of trial (opening statements; first witness) (409) |
| May 3 (Tuesday) | End of government's case-in-chief (490) |
| May 4 (Wednesday) | Start of defendants' case (496) |
| May 5 (Thursday) | End of defendants' case (498) |
| May 6 (Friday) | Summations (504) |
| May 9 (Monday) | Jury deliberations; motion to dismiss (505 & 506) |
| May 10 (Tuesday) | Guilty verdict (9:00 a.m.) (507) |
| June 27 (Monday) | Motion hearing (motion to dismiss) (619) |

6

1

**III.**

2

**ARGUMENT**

3

**A.     The Government Did Not Commit Misconduct, Let Alone "Purposeful" and**
**"Prejudicial" Misconduct That "Permeated" the Case**

4

5

The defendants contend that this case was "permeated with instances of purposeful,

6

prejudicial government misconduct," (Br. at 2), and they have alleged eight separate but

7

related categories of government action (or inaction).  As demonstrated below, however, the

8

government did not commit misconduct in this matter, let alone "purposeful" and

9

"prejudicial" misconduct that "permeated" the case.[5]

10

**1.     There Was No Misconduct During the Investigation**

11

The defendants claim that the government committed misconduct during the

12

investigation in three ways.  (Br. at 29-35, 54-55).  First, they claim that the prosecutors

13

inserted a "patently" false statement into a November 14, 2008 search warrant affidavit

14

(DE #209-2) without first consulting with the affiant (FBI Special Agent Farrell Binder) to

15

"check the veracity" of the statement.  (Br. at 29-31, 54-55).  Second, the defendants contend

16

that the government "affirmatively modif[ied]" the electronically stored information ("ESI")

17

aspect of the search warrant affidavit for the purpose of "specifically circumventing" the

18

"requirements" set forth in United States v. Tamura, 694 F.2d 591 (9th Cir. 1982), and then

19

lied to the Court about it during the hearing on the defendants' related motion to suppress.

20

21

22

_____

23

[5] In both their June 17 reply, (DE #614 at 3), and their supplemental brief, (Br. at 6),
the defendants take issue with the government's "point-by-point" method of addressing (and

24

refuting) the defendants' various allegations.  Such an approach, however, is appropriate and
necessary to address the defendants' arguments.  It is also a required step in analyzing and

25

rebutting the defendants' "cumulative effect" argument (part III.C).  Indeed, on June 27, the
Court observed in response to the defendants' challenge to Agent Guernsey's grand jury

26

testimony that the government was entitled "to take a fact-specific, point-by-point analysis of

27

[that] testimony."  (RT 6/27/11: 28).

28

(Id. at 55).  Third, the defendants continue to argue that Agent Guernsey's grand jury

testimony was improper.  (Id. at 55).  As explained below, none of these claims has merit.[6]

         **a.**     **Participation by the Prosecutors in the Drafting and Editing of Agent Binder's Search Warrant Affidavit Was Permissible, and Their Inadvertent Inclusion of an Inaccurate Statement Does Not Constitute Misconduct**

First, the defendants attempt to resurrect their pretrial claim that the inclusion in

Agent Binder's 31-page search warrant affidavit of an inaccurate statement — that LMC had

made payments directly to Sorvill International S.A. ("Sorvill") — amounted to government

misconduct.  This claim formed the basis of the defendants' motion pursuant to Franks v.

Delaware, 318 U.S. 154 (1978) (DE #222), which was denied prior to the start of the trial

(DE #333).  In so ruling, the Court expressly declined to find any misconduct by Agent

Binder or by the prosecutors:

---

[6] The defendants also allege that the government committed misconduct by obtaining the defendant Angela Aguilar's prison emails without court authorization.  (Br. at 9, 13-14, 55).  But, as an initial matter, this allegation has no relevance to the instant motion because Angela Aguilar is not a party to the present dispute.  See, e.g., United States v. Parker, 241 F.3d 1114, 1117 (9th Cir. 2001) (holding that admission of tape recording was "not prejudicial to Parker's case" because the recording was "admitted against co-defendant Sawyer, but not against Parker").  Even if she were, the Court never made a finding of any misconduct in this regard.  The defendants further allege that the government committed misconduct by searching two buildings without a warrant, (Br. at 55), but they offer no support for this claim other than citing the Court's June 27 preliminary views on that subject.  (Id. at 9).  In any event, the government lawfully obtained consent to search those buildings, (DE #251 at 8, 19-20), a fact the defendants do not now dispute.  Lastly, the defendants include in their brief the government's recalling of witness Alma Patricia Cerdan Saavedra, (Br. at 10, 20), but they do not explain how that action constituted "misconduct."  In any event, there is nothing inherently improper about recalling a witness, see, e.g., United States v. Erickson, 75 F.3d 470, 480 (9th Cir. 1996), and the defendants could not possibly have been prejudiced by it because the testimony by Cerdan, a close friend of the Aguilars, was only relevant to the case against Angela Aguilar, see Parker, 241 F.3d at 1117.

> THE COURT:  I can't make a finding as to the presence or
> absence of good faith, or more precisely bad faith, in the
> drafting and seeking of the affidavit . . . . [I]nvestigations don't
> take place in a vacuum.  They are not the only ones that a
> particular agent works on.  They are not the only ones that a
> particular team of AUSAs work on. . . . [The prosecutors and
> agents] weren't acting in a blind and reckless way . . . .

(RT 3/23/11: 70-71).  The Court's subsequent formal order made clear that "[t]here was no bad faith, dishonesty, or recklessness on the part of [Agent] Binder in the preparation of the search warrant affidavits."  (DE #439 ¶ 4; emphasis added).[7]

The defendants nonetheless try to fashion misconduct from mistake.  They have analyzed the many drafts of the affidavit (which were produced before the trial) and write that the inaccurate LMC-Sorvill statement was "inserted" by an "unidentified prosecutor (or prosecutors)" and "did not appear" until the latest versions.  (Br. at 30).  The defendants then cite Agent Binder's testimony at the Franks hearing, during which she indicated that although she reviewed the affidavit before signing it, she did not notice the LMC-Sorvill statement and therefore did not discuss it with the prosecutors.  (Id. at 30; RT 3/23/11: 58-60).  Based on this record, the defendants contend that the government committed prosecutorial misconduct.  But their argument has no merit.

First, it is of no moment that the LMC-Sorvill statement was added to the affidavit by a prosecutor as opposed to Agent Binder.  Prosecutors are almost always involved in the drafting and editing of agents' search warrant affidavits.  Cf. United States v. Campbell, 878 F.2d 170, 173 (6th Cir. 1989) (rejecting defendant's contention that search warrant affidavit should be held to higher standard because the affidavit was drafted by an agent who had gone to law school and the agent was "aided by a federal prosecutor" in writing the affidavit).

---

[7] Indeed, on June 27, the Court told defense counsel that "I think a lot of your allegations of misconduct" related to Agent Binder's affidavit "are either strained or unfounded."  (RT 6/27/11: 37).

9

1    Second, aside from the fleeting reference to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963),

2    the defendants cite no legal authority whatsoever in support of their claim that a prosecutor

3    commits misconduct when he or she inadvertently includes an inaccurate statement in a draft

4    search warrant affidavit, and that inaccuracy is not noticed by the affiant prior to the

5    affidavit's execution.  <u>Cf., e.g.</u>, <u>United States v. Lowe</u>, 516 F.3d 580, 584 (7th Cir. 2008)

6    ("The record reflects that the inaccuracies contained in the affidavit solely arose from poor

7    editing on the part of the District Attorney's Office.  <u>While careless drafting by government</u>

8    <u>attorneys is indeed problematic, it is not tantamount to police misconduct</u> that rises to the

9    level of disregard for citizens' Fourth Amendment rights.") (emphasis added).

10    Even assuming that the government somehow committed misconduct (it did not), the

11    defendants were not prejudiced because the circumstances surrounding the mistake — and

12    particularly the prosecutors' involvement — were known to the defendants prior to the trial,

13    and because the error was not material (i.e., there was still sufficient probable cause without

14    the inaccurate representation).  During the pretrial <u>Franks</u> hearing, Agent Binder testified as

15    follows:

16        AGENT BINDER:  [D]rafts were sent back and forth between
         the [prosecutors] and myself . . . .  In the draft that appears to
17       have been emailed in late October [2008], this reference was not
         in the draft.  And then when I received the return draft from the
18       [prosecutor], I noticed in a November 11th email —
         approximately November 11th email that this appeared.  In my
19       review of the final draft before the search, I did not catch that
         this was in the search warrant.  It was my mistake, and I did not
20       — I reviewed it, I read it, and I did not catch this error.

21

22    (RT 3/23/11: 13-15).  Later that same day, the Court directed the government to disclose all

23    existing draft affidavits.  (<u>Id.</u> at 58; DE #333).  The government did so the following day,

24    March 24, which was two weeks before opening statements.[8]

25    ───────────────

26        [8] The defendants suggest that the government's production was unmanageable
     because the drafts were produced "without tabs or description."  (Br. at 31).  But the drafts
27   were furnished in chronological order, and the defendants never said they were unable to

28                                    10

## b.     The Government Did Not Lie to the Court about Particular ESI Language Contained in Agent Binder's Affidavit

The defendants also use the draft search warrant affidavits to accuse the government — and specifically Mr. Miller — of lying to the Court during a pretrial motion hearing to suppress ESI evidence. (Br. at 31-33). This allegation is meritless and unfair.

In Tamura, the Ninth Circuit suggested that the government follow certain procedures when items to be seized are "so intermingled that they cannot be feasibly sorted on site." 694 F.2d at 595. To comply with Tamura in this case, the government included in the search warrant affidavit detailed procedures for obtaining and reviewing any ESI found during the LMC search. Prior to trial, the defendants moved to suppress ESI evidence, primarily alleging that the government conducted an unlawful "general" search, that ESI seized from two of LMC's buildings was the result of a warrantless search, and that the government failed to timely review the ESI it had seized. (DE #211).

During the motion hearing on March 25, the Court informed the parties that it had identified an additional possible problem: the inconsistent use on one occasion of the terms "computer personnel" and "case agents." (RT 3/25/11: 33-38). Both parties acknowledged that they had not previously noticed that potential issue. Counsel for LEE said:

---

review the materials and never requested more time. See Szeliga v. General Motors Corp., 728 F.2d 566, 568 (1st Cir. 1984) (noting, in a civil case, that "the remedy for coping with surprise is not to seek reversal after an unfavorable verdict, but a request for continuance at the time the surprise occurs"); Holt v. United States, 272 F.2d 272, 278 (9th Cir. 1959) (finding no prejudice where, among other things, "there was no motion made for a continuance based on a claim of surprise or a need for further preparation"). The defendants are also wrong to suggest that the government had an obligation to produce the drafts earlier. Aside from Brady, they cite no authority in support of this proposition. Moreover, Brady only requires the government to disclose favorable evidence that is "material either to guilt or punishment," including evidence tending to impeach the government's witnesses. United States v. Bagley, 473 U.S. 667, 669 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972). The draft affidavits did not constitute material exculpatory evidence under Brady, and they could not have been used to impeach any government witness at trial.

11

1   "MS. LEVINE:  I have read this [affidavit] maybe a hundred times, and I don't think that

2   that's honestly something I picked up on, candidly."  (<u>Id.</u> at 39).  Later in the hearing, the

3   government echoed those remarks in the context of discussing the agents' good faith:

4   "MR. MILLER:  Ms. Levine acknowledged no one caught this — and I don't think it would

5   be fair to the agents to have [expected them to catch] something that one [defense] attorney in

6   this courtroom says she read a hundred times and did not catch."  (<u>Id.</u> at 43).

7          The Court ultimately denied the defendants' motion to suppress, finding that "because

8   it is evident that the search protocols the FBI agents used attempted to comply with <u>Tamura</u>

9   and [because] <u>they were not acting willfully or in bad faith</u> when they deviated from its

10  guidance, the search of the digital devices was <u>reasonable</u> under the Fourth Amendment."

11  (DE #439 ¶ 8; emphasis added).  Notably, in rejecting the defendants' assertion that the

12  government "paid no attention to the Fourth Amendment," the Court observed that the

13  prosecutors and agents did not act "in a way reflecting willfulness or even ignorance, [and]

14  certainly [did not act in] bad faith."  (RT 3/25/11: 45-46; emphasis added).  The Court later

15  found that the agents "acted in good faith."  (<u>Id.</u> at 51).

16         As they did with the LMC-Sorvill issue, the defendants now attempt to get around this

17  Court's prior finding by focusing on Mr. Miller's accurate observation during the hearing

18  that "no one caught" the additional issue identified by the Court (i.e., the issue concerning

19  "computer personnel" and "case agents").  The defendants claim that a comparison of the

20  various affidavit drafts shows a "deliberate wording change" proving that the term "case

21  agents" was "purposely inserted" into the affidavit in "bad faith" to allow the agents to search

22  the ESI.  (Br. at 32-33).  But the affidavit drafts show nothing of the sort.  At most, they

23  show that two <u>standardized</u> ESI warrant provisions appeared in the various drafts, some of

24  which used the term "case agents."  Indeed, the standardized language contained in the final

25  version was the same as that included in other search warrant affidavits executed in the

26  Central District of California during the relevant time period.  The standardized language

27

28                                                    12

appearing in drafts 1-9 and 11-12 was generally in use in affidavits executed in earlier years. Thus, contrary to their assertion, the defendants have not identified "another example of bad faith and purposeful concealment."  (Br. at 33).  Instead, they have improperly characterized a prosecutor's accurate representation to the Court as misconduct.

In any event, the defendants fail to address prejudice, and for good reason: this Court made clear at the pretrial motion hearing that the limited way in which the computer language in the defendants' search warrant deviated from Tamura and CDT "was not sufficient to quash [the ESI that was found]."  (RT 3/25/11: 52).[9]

### c.   The Government Did Not Suggest to the Grand Jury That Because ABB Had Engaged in Bribery Then LMC Must Have Also Engaged in Bribery

The defendants next argue that the government committed misconduct during the investigation by presenting allegedly false testimony by Agent Guernsey in the grand jury and by using her to "connect[] the wrongdoing of ABB to the allegations against the [defendants]."  (Br. at 33).  For the reasons set forth in the government's June 6 submission, the defendants' "false testimony" claim has no merit.  Moreover, the defendants' claim regarding the manner in which evidence relating to ABB was used in the grand jury is not faithful to the record.[10]

---

[9] United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010); 579 F.3d 989 (9th Cir. 2009) (en banc).

[10] Despite the defendants' claims that the government repeatedly "attempt[ed] to link [LMC] with ABB" and that this "linkage" was of paramount "importance" to the prosecution, (Br. at 33), the government never once mentioned ABB (or Basurto) in its opening statement or closing argument.  When the government did talk about ABB in rebuttal, it did so (1) in fair response to the defendants' closing arguments and (2) for the purpose of making clear that ABB was a separate matter: "MR. MILLER: This is not [the] ABB [case].  No one said it was ABB."  (RT 5/6/11: 4341).  The government even went so far as to remind the jury that its verdict should not be influenced by ABB's bribery: "MR. MILLER:  ABB is a different animal altogether.  The government is not suggesting that you should in any way factor in what happened at ABB into your analysis in this case.  And I think there's an instruction on that."  (Id. at 4342; emphasis added).  The defendants omit this portion of the government's

Contrary to the defendants' contentions, Agent Guernsey did not try to connect ABB's "wrongdoing" to the conduct of the defendants during her October 14, 2010 grand jury appearance. Rather, she simply recounted how the investigation originated, and she merely explained the relationships (or lack thereof) between various entities:

> AGENT GUERNSEY: [T]he SEC and DOJ were able to identify three companies that were actually facilitating the bribes between ABB and CFE. . . . [A]nd one of those companies was Sorvill International.
>
> *   *   *
>
> [I]n the investigation that the SEC and DOJ did with ABB, in looking into Sorvill they found Sorvill had ties to another company called Grupo . . . . That they had money going between the two companies, and that it was actually Grupo that had the relationship with [LMC].

(RT 10/14/10: 5-6; emphasis added).[11]  In fact, when a grand juror asked if LMC was providing services "to ABB directly," Agent Guernsey definitively said "no" and added that although LMC and ABB were "the same type of company," they were providing CFE with "different" services.  (Id. at 8.)  It is clear from this portion of the grand jury exchange — which the defendants do not mention in their brief — that Agent Guernsey did not suggest

remarks from their brief.  (Court's Instruction No. 20 was entitled "Identity of ABB Incorporated" and made no link between ABB and LMC.  (DE #511 at 21; RT 5/6/11: 4048).)

[11] "Grupo" refers to Grupo Internacional De Asesores S.A., an entity that maintained a brokerage account in Houston, Texas, at Global Financial Services, Inc.

that ABB's conduct formed part of the evidence against LMC.[12]  Accurately informing the grand jury about the origins of an investigation is not misconduct.[13]

## 2.   The Government Did Not "Play Games" with its Witness Lists

The defendants repeatedly argue that the government "played games" with its witness lists.  (Br. at 4, 8-9, 12, 14, 19, 27-28, 36, 47, 49-50, 55, 58).  They are wrong.

### a.   The Government Was Not Required to Call Every Person Named on its Original Witness List, and Sufficient Notice Was Given Regarding the Five Witnesses Not Named on That List

First, the defendants make the unremarkable observation that the government eventually called a relatively small subset of the 78 witnesses identified on the government's original February 15 witness list.  (Br. at 49-50).[14]  The defendants also complain that the government called five additional witnesses who were not on the February 15 list.  (Br. at 49-50).  But the defendants fail to identify any rule or case that supports the novel proposition that the government commits misconduct when the witnesses the government actually calls at trial do not exactly match the witnesses named on its pretrial witness list.  As the Ninth Circuit has explained:

---

[12] The defendants make much of the fact that the government displayed a chart to the grand jury that, in the defendants' view, "connect[ed]" ABB and LMC through Grupo and Sorvill.  (Br. at 35).  But the exhibit is clearly titled the "Origins of the Investigation" and nowhere suggests that because ABB broke the law then LMC must have committed a crime as well.

[13] In support of their argument, the defendants reprint Ms. Mrazek's October 10, 2010 email to the attorney of cooperating witness Fernando Maya Basurto.  They claim that the email demonstrates that Ms. Mrazek "asked Mr. Basurto to cooperate against [the defendants]" even though "he knew nothing" about them.  (Br. at 34).  But fairly read, Ms. Mrazek's email does not support that accusation.  In any event, when Basurto testified at trial, he was cross-examined about his dealings with Ms. Mrazek in general and about the email in particular.  (RT 4/7/11: 808-14; DX 3004).

[14] The February 15 list had 77 names and then indicated "custodians of records."

15

> [I]t is elementary that litigants are not <u>required</u> to call every witness identified on their witness lists.  The witness list simply provides notice to the court and to opposing counsel of the witnesses who <u>may</u> be presented at trial.  Whether a litigant actually calls all, or any, of the witnesses on its witness list is purely a matter of trial strategy.  <u>Brady</u> does not, as a general matter, supplant the prosecutor's ability to make strategic choices during litigation.

<u>United States v. Bond</u>, 552 F.3d 1092, 1097 (9th Cir. 2009) (emphasis in original); <u>see also</u> <u>Young v. United States ex rel. Vuitton et Fils S.A.</u>, 481 U.S. 787, 807 (1987) (observing that the determination of "which persons should be utilized as witnesses" is a decision over which the prosecutor "exercises considerable discretion," and a decision that is "critical to the conduct of a prosecution" and "made outside the supervision of the court").

Moreover, the defendants omit the fact that one week after the government submitted its 78-person February 15 list, the Court made clear that the government would not be permitted to call that many witnesses:

> THE COURT:  And I want [the parties] to start exchanging [stipulation] proposals that will narrow the scope.  I don't take seriously 78 witnesses.  I know what's going on.  I know that [the government] didn't want to be precluded from calling somebody who might have some kind of peripheral value that you see, but <u>there ain't going to be 78 witnesses.</u>  And you already said that some of them are dispensable or disposable if there are stipulations on chains of custody and authenticity and anything else, so you start proposing those.  Okay?
>
> MR. MILLER:  Yes, Your Honor.
>
> THE COURT:  And then <u>narrow the witness list.</u>

(RT 2/22/11: 30; emphasis added).

In any event, in this case it was hardly surprising that many of the individuals on the government's original list never testified, as nearly three months passed between the filing of the government's original list (February 15) and the day the government rested its case (May 3).  During that time (as happens in almost every trial) there were numerous legal and

16

1   factual developments that led the government — "as a matter of trial strategy," <u>Bond</u>, 552

2   F.3d at 1097, but also for other legitimate reasons — to drop some witnesses and add

3   others.[15]

4          The defendants also fail to acknowledge that after February 15, the government

5   frequently told the defendants whom it expected to call and when, including daily written

6   notices during the trial naming the expected witnesses for the next trial day.  (Ex. 1).[16]  Thus,

7   even for the five witnesses who were not on the government's original list, there was more

8   than sufficient notice.  Concepcion Delgado, who mainly testified to one telephone

9   conversation that she had with Enrique and Angela Aguilar, was first listed as a witness on

10  March 31, two weeks before she testified on April 14.  April Buell, Monica Guerra, and

11  Shauna Wilson — all chain-of-custody or authentication witnesses — testified on April 20,

12  and each was identified on witness lists at least one full day earlier.  (<u>Id</u>.).[17]  Lastly, there can

13  be no serious claim of surprise with respect to Agent Guernsey, especially given that the

14  defendants themselves — as early as April 5 (more than two weeks before her April 20

15  testimony) — formally requested that she appear as a defense witness.  (Govt.'s 4/5/11 Let.;

16  Defs.' 4/6/11 Let.; Ex. 2).

17

18

19          [15] For example, the February 15 witness list included Robin Goodman, who was
20  Bruce Killebrew's supervisor at South Shore Yacht Sales.  The government eventually
    decided not to call Goodman because his brother was gravely ill and because the government
21  determined that testimony by Killebrew (who also was on the February 15 list) would be
    sufficient.  By any standard, such decisions cannot be considered misconduct.

22          [16] The Court rightly acknowledged during the trial that the government had "the right
23  to change [its daily written notices] as it sees fit."  (RT 4/13/11: 1477).

24          [17] An argument can be made that Buell, Guerra, and Wilson <u>were</u> on the government's
25  original witness list because that list identified "custodians of records."  Indeed, they were
    only called because the defendants declined to stipulate to the authenticity of certain
    documents, as was their right.  In any event, Buell, Guerra, and Wilson — and Delgado —
26  were brief and relatively insignificant witnesses.  In fact, neither Buell, Wilson, nor Delgado
27  ever even mentioned any of the defendants.

28                                           17

**b.**     **The Government's Submission of an Over-Inclusive List of Possible Witnesses for the Purposes of Voir Dire Was Prudent and Not Misconduct**

Second, the defendants suggest that the government committed misconduct by submitting a slightly larger witness list for the purposes of the March 30 voir dire.  (Br. at 50).  This particular contention ignores the fact that when this issue was discussed on March 30: (1) the government assured the Court that the number of actual witnesses would be much lower, (2) the government explained that the large list was submitted in a good-faith effort to avoid having to excuse jurors mid-trial, and (3) the Court said it understood the government's prudence:

> THE COURT:  I was given the witness list to go over with the jurors from the government.  Now the numbers are 80.  I realize the government said some of these names may be unnecessary because of stipulations relating to documents and authentication, but this staggers me. . . .  What's the realistic number of government witnesses?
>
> MR. MILLER:  Your Honor, 35.  And I have come to that by analyzing what the government believes it needs to . . . put on to prove its case, and the Court's consideration of making this a very focused trial.  But even with those considerations, we're at 35.  <u>The witness list that I gave to your Honor has more to do with unexpected events that, you know, if we have to call a witness, we all feel confident that none of the jurors know that witness.</u>
>
> THE COURT:  <u>Okay.  Well, that's reassuring and more consistent . . . with what I had understood was the government's expectation.</u>

(RT 3/30/11: 4-5; emphasis added).  In addition to this courtroom exchange, the defendants also ignore the fact that the government — consistent with its representation to the Court — filed a revised, 37-person witness list later that same day.  (Ex. 1).

18

c.    **The Inclusion of One CFE Official's Name in the Government's Early Witness Lists Is Not "Emblematic" of Any Government "Deception"**

Third, the defendants assert that "[t]he lists" contained the name of one person (Abel Huitron) who the government "knew could not and would [not]" be a trial witness, and that the naming of Huitron was "emblematic of the government's deception." (Br. at 50). This argument should be rejected. Huitron was one of the CFE officials who met with the government on February 10. (Ex. 3). He was included only on the government's February 15 and February 28 lists — not on all "the lists" — because even though the government had been told by a Mexican official that Huitron would not be able to testify, the government nonetheless intended to try to secure his appearance. The effort was later abandoned.

\*    \*    \*

On the issue of the witness lists, it is worth noting that if the government was really "playing games" with its witness lists, then it would have ignored the Court's standing order requiring all parties to complete the Court's Joint Trial Witness Time Estimate Form before opening statements. That form calls for the names of the witnesses, the nature of their testimony, and other information. On March 31, the week before opening statements, the government completed its portion of the form (including, among others, Delgaldo, but excluding Huitron and many of the other individuals listed on the government's early lists) and requested that the defendants fill in their part of the form. (Ex. 4). The defendants chose not to comply with the Court's order. (Id.) On April 4, the day before the trial started, the government repeated its request. (Ex. 4). Again, the defendants opted not to comply. (Id.) The government's full compliance with the Court's standing order regarding this joint witness form, and the government's good-faith but rebuffed attempts to facilitate the defendants' compliance, runs counter to the defendants' accusation that the government was not being transparent about which witnesses it intended to call at trial.

19

3.      **The Government's Conduct with Respect to Lamarche and His Nonhearsay Writings Was Appropriate**

The defendants next assert that the government committed misconduct with respect to Jean-Guy Lamarche, a witness who never testified at the trial but who authored a number of documents that were admitted into evidence.  (Br. at 4, 27, 46-49, 55-58).[18]  They first contend that the government interfered with the defendants' access to Lamarche by (1) delaying disclosure of his identity based on "dubious" assertions concerning his safety, (2) discouraging him from speaking with defense investigators, and (3) misrepresenting his witness status.  The defendants also assert that the government committed misconduct during its closing argument by allegedly misusing Lamarche's writings.  All of these allegations are unfounded.

a.      **The Government Sought to Temporarily Protect Lamarche's Identity Because of Legitimate Concerns for His Safety and Not "to Prevent the Defense from Obtaining Timely Discovery"**

The defendants first contend that the government sought to delay disclosure of Lamarche's identity not because of legitimate concerns for his safety, but rather "to prevent the defense from obtaining timely discovery."  (Br. at 46).  In making this claim, the defendants acknowledge that Lamarche claimed to feel threatened, but they argue that the threat "has never been described" and "[n]ot a shred of evidence" has been disclosed either supporting the threat or suggesting that the government investigated any threat.  (Id.).  Their claim, however, overlooks key facts.

---

[18] The only case cited by the defendants in support of this particular misconduct allegation is United States v. Leung, 351 F. Supp. 2d 992 (C.D. Cal. 2005), (Br. at 48), but that case is inapplicable because it arose out of a finding that the government intentionally included in a cooperation agreement a provision precluding the cooperating witness from sharing information with his co-defendant or the co-defendant's attorney.  Here, the government did not in any way discourage Lamarche from providing information to the defendants or their lawyers.  (See part III.A.3.b).

First, the defendants omit the fact that on February 1, 2011, the government disclosed a 16-page report of Lamarche's December 21, 2010 interview in Los Angeles, and that the report described — in detail — several incidents underlying Lamarche's well-founded safety concerns.  (Ex. 6).[19]  Second, the defendants ignore the fact that one of these incidents — Lamarche's suspicious arrest and weeks-long detention by Mexican police — was directly corroborated by Alma Patricia Cerdan Saavedra, a close friend of the Aguilars.  Cerdan confirmed that Lamarche had sued Enrique Aguilar and that in retaliation for that suit, Aguilar "had [Lamarche] put in jail for almost a month."  (Ex. 7).[20]  Third, this Court expressly noted during the January 18, 2011 status conference regarding the protective order that even though it had some questions about the need for the order, the Court was not "question[ing] the good faith of the government in expressing a concern."  (RT 1/18/11: 13).

### b.    The Government Did Not Discourage Lamarche from Speaking with Defense Investigators

Equally meritless is the defendants' claim — raised for first time in their July 25 supplemental brief — that the government discouraged Lamarche from speaking with defense investigators.  (Br. at 48-49).  The only support for this charge is the declaration of Alain Brunelle, (id. at 64-66), who interviewed Lamarche and his wife on March 23, 2011,

---

[19] The December 21, 2010 report recounted how shortly after Lamarche told Enrique Aguilar that Lamarche would not agree to pay $50,000 demanded by Aguilar, several events transpired.  First, armed men entered Lamarche's home when only his wife was there, and they threatened her and stole several items.  Second, Lamarche was kidnapped by three men who held Lamarche against his will for several hours, all while telling him they would take everything he had.  Third, Lamarche was kidnapped again after moving his residence.  This time, he was taken by two individuals who said they were policemen and who drove Lamarche several hours to Cuernavaca, where he was arrested for and charged with stealing a laptop computer that Lamarche had taken with him after ending his work with Aguilar.  Lamarche was detained for six weeks.

[20] On April 14, in one of their own filings, the defendants unwittingly corroborated that Lamarche did in fact report the kidnapping to the Canadian embassy in Mexico and that an individual was arrested.  (DE #450 at 5 (noting that, according to the defendants, the arrested individual was later "cleared")).

21

and then apparently called Lamarche six weeks later and one day after the government rested its case, on May 4.

But nothing about Brunelle's declaration establishes that any of the prosecutors or agents discouraged Lamarche from speaking with the defense or attempted to interfere with the defendants' access to him.  Brunelle simply states in his declaration that Lamarche told him on May 4 that (1) after the March 23 interview, an FBI agent told Lamarche that he, the agent, was "furious" with Lamarche for speaking with the defense, and (2) Lamarche did not want any further contact with Brunelle.  (Id. at 65).  Thus, even assuming for the sake of argument that the facts set forth in Brunelle's declaration are accurate, they do not establish that anyone from the government discouraged Lamarche from speaking with the defense.[21]

The defendants' claim of interference is further undermined by the fact that Brunelle acknowledges in his declaration that he had no trouble interviewing Lamarche on March 23 despite identifying himself as a defense investigator, and that Lamarche was "cooperative and cordial" and never "expressed any resistance to being interviewed nor asked [Brunelle] to stop or leave at any time."  (Id. at 65).[22]

It is also telling that while Brunelle clearly identifies in his declaration the precise date of his call to Lamarche (May 4), the defendants vaguely describe it as occurring "[s]ometime after March 23."  (Id. at 48).  Perhaps the defendants realize that by May 4, the government had rested its case and the defendants had called their first (and only) defense witness.  Thus, even if the government had instructed Lamarche not to speak to the defense

_____

[21] Even though Brunelle's declaration falls short of establishing the defendants' claim, the government recently consulted with agents who had contact with Lamarche in connection with this case, and each denied ever expressing "fury" or anger towards Lamarche, and each denied ever discouraging Lamarche from speaking with the defense.  Their sworn declarations are attached.  (Ex. 8).

[22] In another example of the defendants mischaracterizing the record, Lamarche never reported that he felt threatened by "the investigator."  (Br. at 46 n.9).  Rather, Lamarche told the government that he felt threatened by the mere fact of "the visit" because it showed that he could be easily located.  (Ex. 9).

1   (it did not), the defendants were not prejudiced because, apparently, at no time between

2   March 23 and May 4 (after the government had rested its case) did the defendants contact

3   Lamarche and get rebuffed.  As indicated below, the government made clear that Lamarche

4   would not be a government witness as early as April 1, more than a month before May 4.[23]

5        Finally, it is revealing that even though Lamarche allegedly told Brunelle on <u>May 4</u>

6   that Lamarche did not want to speak with Brunelle because the FBI was "furious" at

7   Lamarche for doing so in late March, this incident was omitted from the defendants' <u>May 9</u>

8   motion to dismiss, filed just five days later.  If the defendants truly believed that the May 4

9   exchange between Brunelle and Lamarche proved or even suggested that the government had

10  interfered with the defendants' access to Lamarche, they surely would have said so in their

11  May 9 papers.

12          c.    <u>**The Government Never Misrepresented Lamarche's Witness**</u>
               <u>**Status**</u>

13

14       The defendants further complain about "[m]isrepresentations and incomplete

15  representations" concerning Lamarche's witness status, (Br. at 27), but they do not identify

16  any offending statements by the prosecutors.  At most, they contend that the government did

17  not "level" with the Court and the defendants "in a timely fashion" because, according to the

18  defendants, "[t]he government never said why, apparently having first learned of Mr.

19  LaMarche's <u>reluctance</u> to testify two weeks before trial, it delayed in revealing this

20  information until obtaining Mr. LaMarche's presence or testimony had become impossible."

21  (<u>Id.</u> at 47-48; emphasis added).  This claim is unfounded and does not support a finding of

22  misconduct.

23

24

25  _____

26       [23] Nothing in Brunelle's declaration indicates that the defendants actually wanted
    Lamarche to testify.  Brunelle writes that he contacted Lamarche on May 4 only to "confirm
27  certain facts," (Br. at 65), not to try to secure his appearance as a defense witness.

28                                        23

1  First, although the defendants do not identify the factual basis for this assertion, the

2 government assumes they are referring to Lamarche's March 18 email (sent approximately

3 two weeks before jury selection) in which Lamarche told the government that he and his wife

4 were "nervous" about testifying, were "afraid," and "would like to leave all [of] this behind

5 [them]."  (Ex. 10).  As is evident, however, there was nothing about that email to suggest that

6 Lamarche's concerns could not be alleviated or that he would later refuse to comply with his

7 trial subpoena.  But more to the point, the defendants fail to cite any authority (again) in

8 support of the proposition that the government commits misconduct when it does not inform

9 a defendant — or, as in this case, does not immediately inform a defendant — that a

10 government witness is "reluctant" to testify.  Indeed, in most instances, such concerns can be

11 overcome.[24]

12  Second, even if the government was obligated to make such a disclosure (it was not),

13 it is undisputed that the government did so on April 1 — well before opening statements and

14 soon after March 26, when Lamarche told the government that he "could not travel to Los

15 Angeles to testify."  (Ex. 12).  Thus, the defendants were not prejudiced.[25]

16

17

18

19  [24] The defendants are so predisposed to their view that the government committed
misconduct that they cannot even bring themselves to accept that the government actually
20 served Lamarche with a subpoena.  Instead, they are only willing to acknowledge that the
government "represented" that Lamarche was subpoenaed, and yet in the same breath they
21 feel compelled to point out that the government "did not say when or where this was done."
(Br. at 47).  Needless to say, the government, in fact, subpoenaed Lamarche on December 21,
22 2010, in Los Angeles.  (RT 4/29/11: 3203; Ex. 11).

23  [25] The defendants' citation to the witness list that was read to the jury pool on
24 March 30, (Br. at 47), does not support their position.  As explained in part III.A.2.b, the
government made clear at the time that this was an overly inclusive list designed to determine
25 if jurors might know either a potential witness or someone whose name might be frequently
mentioned during the trial.  Given the high probability that Lamarche's name would come up
26 during the trial even if he did not appear as a witness, it was plainly appropriate during voir
27 dire to determine whether prospective jurors might have any connection to him.

28         24

1        Third, contrary to the defendants' suggestion, the government wanted Lamarche to

2   testify.  Indeed, the government made every effort to secure Lamarche's appearance after he

3   indicated on March 26 that he "could not" travel to Los Angeles.  On April 4, the government

4   emailed Lamarche and told him that the government understood his safety concerns and took

5   them seriously.  (Ex. 13).  The government also told Lamarche that he was an important

6   witness and encouraged him to tell "the jury . . . the truth about what happened."  (Id.).  To

7   make sure Lamarche knew that the government still wanted him to testify, the government

8   emailed him in three different languages.  This effort seemed to succeed, as Lamarche

9   indicated on April 6 that he had changed his mind and would appear.  The government

10  immediately provided Lamarche with information about witness safety programs and granted

11  him limited immunity from prosecution.  (Id.).  The following day, April 7, the government

12  made travel and hotel arrangements for Lamarche.  (Id.).  But despite these extensive and

13  good-faith efforts to secure his appearance, Lamarche told the government the next day,

14  April 8, that he would not testify, and he asked the government to not contact him further.

15  (Id.).[26]

16

17

18

19  _____

20      [26] Citing 18 U.S.C. § 3144 (release or detention of a material witness) and Rule 15 of
    the Federal Rules of Criminal Procedure (depositions), the defendants suggest that the
21  government failed to take "the appropriate measure" to secure Lamarche's appearance and
    "could have taken additional steps" to secure his testimony.  (Br. at 47).  But because
22  Lamarche was served with a subpoena on December 21, 2010, and gave no indication that he
    would not comply with that subpoena, there were no "exceptional circumstances" justifying a
23  Rule 15 deposition, Fed. R. Crim. P. 15(a)(1), and there was no basis for concluding that it
    might become "impracticable to secure the presence of the person by subpoena," 18 U.S.C.
24  § 3144.  Moreover, the defendants were never precluded from making their own effort to
    secure Lamarche's testimony.  See United States v. Ballesteros-Acuna, 527 F.2d 928, 930
25  (9th Cir. 1975) ("[T]he Government is under no obligation to look for a defendant's
    witnesses, in the absence of a showing that such witnesses were made unavailable through
26  the suggestion, procurement, or negligence of the Government.").

27

28                                          25

### d.   The Government Properly Used the Lamarche Writings in Closing Argument

Lastly, the defendants claim that the government improperly used the Lamarche writings during closing argument and that such misuse constituted misconduct.  (Br. at 4, 20-21, 27, 49, 56-58).[27]  The defendants did not object contemporaneously, and they now fail to cite a single rule or case in support of their argument.  Regardless, their contention has no merit.

First, the defendants complain that the Lamarche writings were "displayed" to the jury, "quoted" by the government, "woven throughout [its] closing," and used "substantively."  (Id. at 49).  But this objection is frivolous, given that the writings had been admitted into evidence.  See, e.g., United States v. Rosado, 728 F.2d 89, 95 (2d Cir. 1984) (labeling as "frivolous" defendant's claim that the government committed misconduct by reciting a document that was in evidence).  Furthermore, because the writings were not hearsay, they "constitute[d] substantive evidence."  United States v. Gonzalez, 533 F.3d 1057, 1061 (9th Cir. 2008).  Lastly, the defendants' own transcript citations — referencing just nine of 109 pages of closing argument and rebuttal summation — undermine the defendants' exaggerated statement that the writings were used "throughout" the government's jury addresses.[28]

---

[27] The defendants primarily refer to Lamarche's "emails," but the writings at issue included emails, faxes, and a letter.

[28] The defendants rely heavily on the Court's criticism of summary exhibit 1013, which consisted of excerpts from 24 communications (including some of Lamarche's writings) placed in chronological order next to individual photographs of Enrique Aguilar, Arturo Hernandez, LINDSEY, and LEE.  (Br. at 20-21, 49).  But the Court was troubled by the layout of exhibit 1013 (i.e., how it was "arrayed").  (RT 4/21/11: 2337).  Moreover, exhibit 1013 was never seen by the jury, and the Court made clear at the time that despite the adverse ruling, the government would be free to do exactly what it eventually did in closing argument:

> THE COURT:  If you want to introduce these [underlying]
> exhibits and authenticate them in the way that we would discuss

26

Second, the defendants accuse the government of "ignoring" the Court's limiting instructions — court exhibits D and E — in referring to Lamarche's writings in closing argument.  (Br. at 49).  But the opposite is true, as the government cited those instructions, quoted from them, stressed their importance, and explicitly urged the jury to abide by them:

> MR. GOLDBERG:  It's very important when we talk about Jean-Guy Lamarche that you pay heed to Court Exhibits D and E.  You don't have to look at them now, but those were the limiting instructions that the Court carefully crafted with respect to those exchanges [between Lamarche and Mr. Lee].
>
> \*    \*    \*
>
> Now, with respect to the communications by Lamarche to Lee, we want to be very accurate in this regard.  You don't have to go to it, but I have Exhibit D in front of me.  And it says: "You may consider the contents of these exhibits in deciding whether the government has proven that Mr. Lee has the knowledge and criminal intent the government is required to prove."  "You may not assume from these exhibits that the facts and statements" contained therein "are necessarily true," but you are not precluded from determining, based on all of the evidence, that they are true.  You just can't "assume" it.

(RT 5/6/11: 4089-90; emphasis added).  In between the government's and the defendants' closing arguments, the Court said the government's paraphrase of exhibit D was "fair":

> THE COURT:  Mr. Goldberg said something about Court Exhibit D. . . .  He referred to the instruction that the jurors may not assume from the exhibits that were specified in that exhibit that the facts and statements they contain are necessarily true or accurate, and then he said something to the effect . . . that, "But they could still find them to be true."  I think that's a fair paraphrase.

---

> (sic) and then argue exhibit by exhibit on closing argument, or however you want, something that has to do with Lee's knowledge, you are welcome to do that.

(Id.; emphasis added).  The defendants omit from their brief these comments by the Court.

27

(Id. at 4233; emphasis added).  In any event, a prosecutor does not commit misconduct when he highlights a cautionary instruction restricting the use of incriminating evidence.

Third, the defendants insist that despite the government's discussion of the Court's limiting instructions, the government used the Lamarche writings for a "broader" purpose than that permitted by the Court.  (Br. at 49).  But again putting aside the defendants' failure to timely object, the excerpts they now cite do not support their argument.  The following citations by the defendants are examples:

| Page:Lines | Government's Closing Argument (emphasis added) |
| --- | --- |
| 4106:1-4 | "Now, when we talk about a document being offered for the truth of the matter asserted like this, was there 'a big investigation coming'?  This document [Exhibit 954] is not proof of that, standing by itself, but it's something that Steve Lee is told." |
| 4106:13-14 | "These documents you can consider for the truth, standing by themselves.  What is 959 telling you — Exhibit 959?  It tells you how important Steve Lee considers Nestor Moreno and Enrique Aguilar." |

The first excerpt is in full compliance with the limiting instructions because the government was telling the jury that exhibit 954 (written by Lamarche) could not be considered by itself as proof of the matter asserted therein but could be considered as evidence of what LEE was told and, thus, some evidence of what LEE understood.  The defendants' citation to the second excerpt is blatantly misleading because the government was referring to statements by LEE (such as exhibit 959), not writings by Lamarche.  Those exhibits, which were statements of a defendant, see Fed. R. Evid. 801(d)(2)(A), could be considered for their truth.[29]

---

[29] The defendants also allege that the government improperly "used [the Lamarche writings] against all of the defendants."  (Br. at 49; emphasis added).  But their vague record citations do not support this claim.  In any event, the jury was entitled to draw the reasonable inference that, in light of all of the evidence, LEE discussed with LINDSEY the information provided by Lamarche.  See United States v. Henderson, 241 F.3d 638, 652 (9th Cir. 2000) ("Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence.") (emphasis added).

### 4.     The Use of Agent Costley as the Summary Witness Was Proper

Next, the defendants assert that even though the Court permitted FBI Special Agent Dane Costley to testify, the government committed misconduct by presenting him — as opposed to someone else — to authenticate and testify about summary exhibits, and to assist the government in publishing other admissible materials.  (Br. at 4, 25-26, 39-44, 56, 58).  The defendants argue that Agent Costley was not used in a "legitimate manner" and that his role in the trial is "cause alone" to dismiss the indictment.  (Id. at 43).  To the contrary, the selection of Agent Costley was proper, and the use of a different witness would not have made any difference.

### a.     The Government Consistently Represented That Agent Costley Would Serve as the Summary Witness

At the outset, the defendants wrongly suggest that they had inadequate notice of Agent Costley's role as the summary witness.  (Br. at 9).  In fact, Agent Costley's name was on each and every one of the government's witness lists, including the first list disclosed on February 15.[30]

On June 27, the Court stated that it "recall[ed] . . . that the government played games with the inclusion or absence of Mr. Costley on the witness list."  (RT 6/27/11: 27).  The government respectfully submits that, in this regard, the Court was mistaken.  These comments apparently stem from the omission of Agent Costley from a March 11 joint filing of relevant "names and entities," an issue that was discussed and resolved during the trial.  As the government explained at the time (DE #368), the March 11 submission was not a witness list.  Rather, it was filed in response to an order that sought a listing of "entities and individuals" and "dates" that would assist the Court in ruling on motions that were pending at

---

[30] Agent Costley's status as the summary witness was also confirmed in a March 19 letter to the defendants, three weeks prior to opening statements and more than a month before he took the stand.  (Govt.'s 3/19/11 Let.; Ex. 14).  The letter even included a description of Agent Costley's expected testimony.

29

the time.  Agent Costley was <u>not</u> a subject of those motions, and that is why his name did not appear in the March 11 joint filing.

Indeed, when this issue was discussed four days before opening statements, the Court gave no indication that it viewed the government to be "playing games."  Rather, it said the government's construction of the Court's order may have been "reasonable."  (RT 4/1/11: 63-64).  When the Court denied a motion to exclude Agent Costley on that basis, the Court characterized the March 11 mix-up as a "glitch."  (<u>Id.</u> at 64).[31]

### b. <u>There Was Nothing Improper about Using Agent Costley, Even Though He Was Not Significantly Involved in the Investigation</u>

Aside from notice, the defendants argue that the government's "use of a patently unqualified FBI agent as a 'summary' witness" constitutes misconduct.  (Br. at 3-4.)  As the Court recognized during the trial, however, there was nothing improper about presenting Agent Costley — who previously worked as a certified public accountant — as the summary witness, even though he was neither the case agent nor significantly involved in the investigation.

The Federal Rules of Evidence provide that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.  To authenticate a Rule 1006 summary, all that is required is that the underlying records be admissible and that the witness be able to testify as to the summary's accuracy.  <u>See</u> <u>United States v. Briscoe</u>, 896 F.2d 1476, 1495 (7th Cir. 1990); <u>see, e.g.</u>, <u>United States v. Nivica</u>, 887 F.2d 1110, 1125 (1st Cir. 1989) ("A summary admitted under Rule 1006 must be based upon evidence independently established in the record.  That threshold was crossed: [the agent] testified at length concerning his reliance upon various business records, all of which had

---

[31] The fact that the March 11 joint submission was not a "witness list" is made plain by the inclusion of individuals who were obviously not going to be trial witnesses, such as corrupt CFE officials Nestor Moreno and Arturo Hernandez.

been independently admitted into evidence.").  Agent Costley's testimony clearly met that standard because the underlying records were properly admitted and because Agent Costley testified that he had confirmed the accuracy of the exhibits that summarized information from those underlying records.

Contrary to the defendants' suggestion, (Br. at 39), there is no requirement that a summary witness be one of the case agents.  Although the defendants claim that summary witnesses in criminal cases are "typically" case agents, (id.), they offer no support for this proposition.  Instead, they only cite to a treatise that merely observes that summary witnesses are sometimes case agents.  (Id.).

The defendants also maintain that Agent Costley's summary testimony was improper because he "knew nothing about this case."  (Id. at 40).  This is factually incorrect and legally irrelevant.  As an initial matter, Agent Costley did have some involvement in the investigation: as a member of the FBI squad that investigated this case, he took part in the search of LMC's offices in 2008, and on occasion, he would discuss the case with one of the lead agents.  (RT 4/26/11: 2816).  But even if Agent Costley had not participated in the investigation at all, his testimony would still have been proper.  The defendants cite no case, and the government is aware of none, that says a federal agent must have been involved in the investigation in order to testify at trial.[32]

In fact, the Ninth Circuit and other courts have expressed concern with the use of case agents as trial witnesses precisely because of how much knowledge the case agent has acquired during the investigation and the possibility that such extensive knowledge could

---

[32] The defendants' argument in this regard is interesting, given that counsel for LINDSEY and LMC criticized the government in summation for using a federal agent (let alone one of the case agents) to ensure the accuracy of the summary exhibits: "MR. HANDZLIK:  You take a look at the government's own exhibit where Agent Costley — I don't know why they need a special agent of the FBI to do this, but he goes through the statements and he gives you the month-end balances in the Grupo Global account."  (RT 5/6/11: 4276; emphasis added).

1   form an improper basis for the agent's testimony.  See United States v. Johnson, 529 F.3d

2   493, 499-500 (2d Cir. 2008) (discussing ways in which a case agent's testimony can be

3   problematic); United States v. Freeman, 498 F.3d 893, 902-03 (9th Cir. 2007); United States

4   v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003) (observing, in the context of expert witness

5   testimony, that when the government uses a case agent, "[s]ome jurors will find it difficult to

6   discern whether the witness is relying properly on his general experience and reliable

7   methodology, or improperly on what he has learned of the case").[33]

8          The defendants proclaim that "[i]t is at odds with basic constitutional principles of

9   confrontation of witnesses and the right to cross-examine to allow someone as uninvolved

10  and uninformed as Agent Costley to testify as a summary witness."  (Br. at 42-43).  But the

11  defendants cite no legal support for this assertion.  At best, they contend that the Supreme

12  Court's recent decision in Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011), "strongly

13  suggests" that Agent Costley's testimony violated the Confrontation Clause.  (Br. at 39 n.2).

14  But they are wrong.

15         In Bullcoming, the Supreme Court held that the Confrontation Clause is violated

16  when the prosecution is permitted "to introduce a forensic laboratory report containing a

17  testimonial certification — made for the purpose of proving a particular fact — through the

18  in-court testimony of a scientist who did not sign the certification or perform or observe the

19  test reported in the certification."  Id. at 2710.  Here, however, the issue involves not a

20  laboratory report but rather summary exhibits that were based on admissible underlying

21

22         [33] The defendants complain in particular about Agent Costley's unfamiliarity with
    Lamarche and about the government's efforts to preclude the defendants from questioning
23  Agent Costley about Lamarche's credibility.  (Br. at 42 n.4-5).  But as explained previously,
    because Lamarche's writings were not offered for their truth, Lamarche's credibility was
24  irrelevant and not properly subject to attack.  See Fed. R. Evid. 801(c), 806; see, e.g., United
    States v. Pete, 2008 WL 2019559, *2 (9th Cir. May 8, 2008) (holding that district court did
25  not err when it prevented defendant from introducing prior convictions of out-of-court
    declarant, because the admitted statements were not hearsay and thus the declarant's
26  credibility "ha[d] no bearing" on whether the declarant actually made the statements).
27

28                                                32

1  evidence, and the government did not introduce, through Agent Costley, a testimonial

2  statement that another individual had prepared.  Rather, Agent Costley participated in and

3  observed the making of the summary exhibits, he carefully reviewed the summaries and

4  reviewed them thoroughly for accuracy, and he was subject to extensive cross-examination

5  about that process.  See Lester v. United States, – A.3d – , 2011 WL 3190469, *5 n.2 (D.C.

6  July 28, 2011) (distinguishing Bullcoming on a similar basis); see, e.g., Tennessee v. Street,

7  471 U.S. 409, 413-14 (1985) (reasoning that police officer was the proper witness for

8  defendant to confront at trial because the relevant evidence consisted of the officer's own

9  observations).[34]

10     In fact, when the Court asked the defendants during trial to identify a legal basis for

11  precluding someone like Agent Costley from testifying as a summary witness, the defendants

12  could not do so:

13         THE COURT:  What would be the legal basis [for prohibiting
           the government from using Agent Costley as its summary
14         witness]?

15         MS. LEVINE:  Your Honor, trials proceed in a certain way.
16         They all —

17         THE COURT:  What would be the legal basis?

18         MS. LEVINE:  It's the manner in which trials proceed.  This
19         man has no percipient knowledge.  He's simply here to do
           something I've never seen anyone do.  He's not an expert.  He
20         has no knowledge of the case.  He is up to read documents, and I
           see no basis in law to allow somebody to do that.  It denies
21         confrontation.  It allows the government three chances to argue,
22         which is improper.  It does not allow any cross-examination or

23

24     [34] The defendants write that Agent Costley "made only one suggestion to the
       'prosecution team' which was rejected."  (Br. at 41; emphasis added; citing RT 5/3/11:
25     3461).  But Agent Costley's testimony cannot be fairly read to mean that he suggested only
       one change to the summary exhibits, and the fact of the matter is that his role in the
26     preparation of the summaries resulted in multiple changes — all designed to make sure that
27     the summaries were accurate.

28                                  33

> confrontation about these exhibits whatsoever.  It takes a trial
> out of the realm of an adversary proceeding on which one could
> be cross-examined, and puts it in the realm of a government
> creating some story through somebody that's immune to any
> questioning in an order that is purely argument.
>
> THE COURT:  Well, I think you're really overstating what
> would happen.

(RT 4/27/11: 2975).  It turned out that defense counsel was indeed overstating what would

happen.  Agent Costley was not "immune" to questioning.  He was cross-examined and

confronted at length and in depth by the defendants, who highlighted perceived imperfections

in the summary exhibits and pointed out alleged flaws in Agent Costley himself.[35]

Finally, the defendants complain that Agent Costley did not exclusively "prepare" the

summary charts.  (Br. at 39-42).  But this is of no moment.  Agent Costley made clear that he

assisted in the preparation of the charts, a fact the defendants reluctantly concede in their

brief and acknowledged in summation.  (Id. at 39; RT 4/26/11: 2818; RT 5/6/11: 4277,

4314).  Regardless, just because a summary witness does not exclusively create or prepare a

summary exhibit does not mean that he is incapable of authenticating it.  See, e.g., United

States v. Moon, 513 F.3d 527, 546 (6th Cir. 2008) (ruling that proper foundation was laid by

witness even though the witness only "supervised" preparation of summary); United States v.

Bray, 139 F.3d 1104, 1110 (6th Cir. 1998) (same); United States v. Behrens, 689 F.2d 154,

161 (10th Cir. 1982) (same).

---

[35] Defense counsel's personal representation that she had "never seen" a person
without "percipient knowledge" testify as a summary witness, (RT 4/27/11: 2975), was, and
still is, irrelevant.  Suffice it to say, because summary witnesses are often law enforcement
officers, they will rarely (if ever) have first-hand or personal knowledge of the offense
conduct.  See United States v. Amador-Galvan, 9 F.3d 1414, 1417 (9th Cir. 1993) (describing
"percipient" witnesses as individuals who can provide "eyewitness" testimony).  They will,
however, have percipient knowledge of the accuracy of the summaries they are
authenticating.  See, e.g., United States v. Scales, 594 F.2d 558, 563 (6th Cir. 1979)
(rejecting defendant's claim that summary witness's "authenticating testimony" was
insufficient: "As the one who supervised the compilation of [the summary], [the agent] was
the proper person to attest to the authenticity and accuracy of the chart.").

34

### c.    The Defendants Were Not Prejudiced by Agent Costley's Testimony

In any event, the defendants fail to demonstrate how they were prejudiced by Agent Costley's testimony. See, e.g., United States v. Hill, 643 F.3d 807, 843 (11th Cir. 2011). In Hill, the defendants asserted that they were improperly subjected to a "trial by charts" when the government was allowed to introduce summary charts and accompanying testimony. After noting that the government complied with the requirements of Rule 1006, the Eleventh Circuit addressed the issue of prejudice:

> Even if the charts were improperly admitted, . . . the . . . appellants have failed to demonstrate how they were prejudiced by the error. All of the defendants had access to the government's documentary evidence months before trial and to the marked and numbered exhibits themselves before trial, the underlying documents were admitted into evidence before the summaries, and each of the defendants had an opportunity to cross-examine the government's witnesses about the summaries.
>
> Not only that, but [the] . . . defendants also used the government's charts at various times during the trial — during direct examination, cross-examination, and in their closing arguments. Finally, the district court gave several cautionary instructions regarding the use of the summary charts, and we presume that the jury followed those instructions.

Id. at 843.

Here, as in Hill, the defendants were not prejudiced. First, the defendants had access to the relevant documents before trial. Second, the underlying documents were properly admitted into evidence at trial. See, e.g., United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980). Third, the defendants had ample opportunity to cross-examine Agent Costley.[36] See, e.g., United States v. Olano, 62 F.3d 1180, 1204 (9th Cir. 1995); United

---

[36] Indeed, this Court repeatedly told the defendants that cross-examination, not exclusion, was the proper solution to their various complaints. (RT 4/1/11: 66; 4/13/11: 1259; 4/21/11: 2356). For example, when the defendants argued during the trial, as they now, that Agent Costley had an insufficient connection to this case, the Court told them: "If

35

States v. Baker, 10 F.3d 1374, 1412 (9th Cir. 1993); United States v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989); Gardner, 611 F.2d at 776; United States v. Radseck, 718 F.2d 233, 238 (7th Cir. 1983).  Fourth, the defendants used some of the government's summary charts during the trial for their own benefit.[37]  Fifth, the Court gave a cautionary instruction.[38]  See, e.g., United States v. Francis, 131 F.3d 1452, 1458 (11th Cir. 1997); Olano, 62 F.3d at 1204; Baker, 10 F.3d at 1412-13; Norton, 867 F.2d at 1363; United States v. Skalicky, 615 F.2d 1117, 1120-21 (5th Cir. 1980).

In the end, the defendants fail to explain (or even suggest) how requiring someone else to testify about the summary exhibits would have made any difference.  The admissibility of the documents that formed the basis for the summaries was not seriously in question, and so having another law enforcement officer (such as a case agent) testify to the accuracy of the summaries would not have prevented their admission.[39]

---

you've got a problem with Costley and he's brought in as a helicopter witness, establish that on cross-examination."  (RT 4/14/11: 1493).

[37] For instance, in closing argument, counsel for LINDSEY and LMC used the government's "own exhibit" in support of the defendants' "tracing" defense.  (RT 5/6/11: 4276).  In another example, counsel for LEE used the government's own summaries to argue that from 2007 to 2009, "there really weren't many orders from CFE to [LMC]."  (Id. at 4315).  It is also noteworthy that the defendants were able to present their own summary exhibits through their defense witness (Ronald Durkin) who, needless to say, played no role in the investigation of the defendants.  Baker, 10 F.3d at 1413; Norton, 867 F.2d at 1363.

[38] Court's Instruction No. 19, entitled "Charts and Summaries in Evidence," advised the jury as follows: "Certain charts and summaries have been admitted into evidence.  Charts and summaries are only as good as the underlying supporting material.  You should, therefore, give them only such weight as you think the underlying material deserves."  (DE #511 at 20; RT 5/6/11: 4048).  The Court also gave a cautionary instruction during Agent Costley's testimony.  (RT 4/28/11: 3065).

[39] In a further effort to manufacture misconduct, the defendants complain about the innocuous footers that were barely visible on the courtroom monitors during Agent Costley's direct examination.  (Br. at 25, 43-44).  They claim — without any basis whatsoever — that Ms. Mrazek "feigned ignorance" about the footers and that Mr. Miller lied about them.  (Id. at 43-44).  Both of these allegations are patently untrue.  In any event, the footers were so tiny that even the Court did not initially notice them.  (RT 4/27/11: 2891 ("MS. LEVINE:

**5.      The Government's Brief Remarks in Closing Argument Regarding Willful Blindness Did Not Violate Any Court Ruling and Were Not Inconsistent with the Law**

Next, the defendants argue that the government committed misconduct during its closing argument by "violating the Court's order excluding willful blindness as a basis for culpability." (Br. at 4, 27, 50-53, 56). As explained below, the government did not violate any court ruling, and its arguments regarding willful blindness were not inconsistent with the law.

**a.      The FCPA Explicitly Provides for Criminal Culpability Based on Constructive Knowledge**

The FCPA provides, in pertinent part, that a defendant is guilty of a crime if he pays an intermediary "while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official" for certain improper purposes. 15 U.S.C. § 78dd-2(a)(3). With respect to this provision, the FCPA makes clear that <u>actual</u> knowledge is not required and that <u>constructive</u> knowledge is sufficient: "When knowledge of the existence of a particular circumstance is required for an offense, <u>such knowledge is established if a person is aware of a high probability of the existence of such circumstance,</u> unless the person actually believes that such circumstance does not exist." 15 U.S.C. § 78dd-2(h)(3)(B) (emphasis added); <u>cf.</u> <u>United States v. Parker</u>, 364 F.3d 934, 946 (8th Cir. 2004) ("[T]he evidence showed actual, not constructive, knowledge.").

There's something on the screen, but not in evidence. THE COURT: Nothing is on the screen.")). Moreover, after the Court identified the footers, it gave a robust cautionary instruction to the jury. (<u>Id.</u> at 2993 ("THE COURT: Disregard the footer. . . . It has no bearing whatsoever on the strength or weakness of the government's case. It has no bearing whatsoever on the guilt or innocence of any defendant. It is totally irrelevant.")).

**b.**   **The Court Did Not Issue Any Order Precluding the Government from Pursuing a Constructive Knowledge Theory**

As an initial matter, the defendants are wrong to suggest that there was an "order" prohibiting the government from arguing constructive knowledge.  (Br. at 50, 56).  No such order exists.  To be sure, in formulating the jury instructions, the Court decided not to give two separate, generalized, and stand-alone "deliberate ignorance" instructions with respect to the FCPA charges and the money laundering charges.  (DE #319 at 39, 48; RT 5/4/11: 3816-27; 5/5/11: 3833).  But that determination did not, and as a matter of law could not, prevent the government from proving the defendants' knowledge under the FCPA's constructive knowledge provision.  See United States v. Ramirez, 2009 WL 909645, *3 (2d Cir. 2009) ("[T]here is nothing inappropriate or inconsistent in the government arguing actual and constructive knowledge in the alternative.") (internal quotations and citation omitted).[40]  Indeed, the Court properly rejected the defendants' effort to remove the constructive knowledge provision from the final jury charge.  (DE #332 at 25 (Defs.' Proposed Jury Instructions); DE #511 at 35 (Ct.'s Final Jury Instructions)).

It was therefore entirely proper for the government to highlight in summation this available basis for finding "knowledge" by referencing the relevant jury instruction:

> MR. GOLDBERG:  But even if you think that [the defendants] didn't actually know — and you'll take a look at this [jury] instruction.  It's a very important instruction.  I don't have [the page number] on the tip of my tongue, but it's "knowledge" under the FCPA.  Please look at it closely in the jury room.  It says, "a person is deemed to have such knowledge for the purposes of the FCPA if the evidence shows he," the defendant, "was aware of a high probability of the existence of such circumstance, unless he actually believes such circumstance does not exist" — there is no evidence of that, okay?  So under the FCPA, even if you have some doubt — and we submit there is no doubt, but if you have some doubt that Keith Lindsey and Steve Lee actually knew that bribes were going to be paid or

---

[40] During the charge conference, the Court recognized this distinction.  (RT 5/4/11: 3817-18).

38

bribes were paid, the FCPA says knowledge . . . can be something different.  It can be you are "aware of a high probability of the existence of such circumstances."

(RT 5/6/11: 4153).[41]  The defendants did not object to this portion of the government's closing argument, and there would have been no legitimate basis for doing so.[42]

### c.  There Was Nothing Improper about the Government's Attempt to Briefly Explain the Rationale Behind the FCPA's Constructive Knowledge Provision

The defendants, however, make much of the fact that after delivering the remarks set forth above, (1) the government attempted to briefly explain the rationale behind the constructive knowledge provision, (2) the defendants objected several times, and (3) the Court sustained one objection:

> MR. GOLDBERG:  And why is that [provision] in [the FCPA]?  Why is that in the law?  It's because the law is saying you can't turn a blind eye to what is —
>
> MS. LEVINE:  Objection.  Misstates the law, Your Honor.
>
> THE COURT:  Sustained.  The law does not say anything other than what the instructions say.
>
> MR. GOLDBERG:  Okay.  Thank you, Your Honor.  I'm sorry.  Defendants like Keith Lindsey and Steve Lee cannot see all of this smoke and all of these red flags and then close their eyes.
>
> MS. LEVINE:  Objection, Your Honor.  Misstates the law.

---

[41] The government used a PowerPoint presentation during its closing argument.  While making the above-referenced remarks, the government displayed a verbatim excerpt from the jury charge.  (Ex. 15).

[42] The defendants seem to think it is significant that the prosecutor asked the jury, "How could [the defendants] not know?"  (Br. at 51-52).  But "[t]here is nothing improper about posing rhetorical questions within the broad scope of a closing argument," United States v. Green, 305 F.3d 422, 430 (6th Cir. 2002), and when read in context, the question was posed primarily to urge a jury finding of actual knowledge, not constructive knowledge.  (RT 5/6/11: 4148-52).

THE COURT:  [He]'s not stating the law; he's arguing what he thinks the evidence may have shown and to what extent it complies with the requirements of knowledge.  There is no requirement like the one that Mr. Goldberg first alluded to.  And keep that in mind, Mr. Goldberg.

MR. HANDZLIK:  May I also state an objection, Your Honor.  It's inconsistent with the instructions that this Court is going to give the jury.

THE COURT:  The instructions about knowledge are on page 35.  [The jurors] are welcome to review those.  And you must adhere to those, Mr. Goldberg.

(RT 5/6/11: 4154-55).

As the record shows, the government merely attempted to explain why the constructive knowledge provision exists, the defendants interrupted before the point could be made, the Court told the jury that "the law" consisted exclusively of the jury instructions, and then — as the Court observed at the time — the government permissibly argued what "the evidence may have shown and to what extent [the evidence] complies with the requirements of knowledge."  Furthermore, after the Court directed the government to "adhere" to jury instructions concerning "knowledge," the government immediately and fully complied:

THE COURT:  The instructions about knowledge are on page 35. [The jurors] are welcome to review those.  And you must adhere to those, Mr. Goldberg.

MR. GOLDBERG:  Yes.  <u>Let me be more direct.</u>  We submit that all of the evidence in this case proves beyond a reasonable doubt that Keith Lindsey was <u>aware of a high probability of the existence that some of the money that they were paying to Enrique Aguilar would be used to pay foreign officials.</u>  We submit that all of the evidence when taken together proves that Steve Lee was also <u>aware of a high probability of the existence of that circumstance.</u>

40

(RT 5/6/11: 4155; emphasis added).[43]

### d.     The Defendants Were Not Prejudiced by the Government's Remarks

As for prejudice, the defendants assert that "[g]iven that this case consisted of entirely circumstantial evidence, evidence that was weak at best, the improper willful blindness argument by Mr. Goldberg undoubtedly affected the jury to the prejudice of the defense." (Br. at 53).  But as demonstrated in part III.B.3.b, the evidence was strong.  Moreover, the government's remarks were not "improper" because they were grounded in the jury instructions and based on the provisions of the FCPA itself.[44]  The government (1) highlighted the jury instruction defining "knowledge," (2) attempted to briefly explain the rationale behind the constructive knowledge provision, and (3) immediately shifted back to the precise language of the instructions when directed by the Court to do so.  The defendants cite no authority in support of their prejudice argument, let alone authority supporting the proposition that highlighting and reciting a portion of the jury instructions during closing argument results in any harm to a defendant.  Cf., e.g., United States v. Navarro, 608 F.3d 529, 536 (9th Cir. 2010) ("[A]ny error the prosecutor may have made in defining duress was

---

[43] The prosecutor's words matched the jury instructions (and the statute): "A person is deemed to have such knowledge for the purposes of the FCPA if the evidence shows he was aware of a high probability of the existence of such circumstance, unless he actually believes such circumstance does not exist."  (DE #511 at 35).

[44] It is noteworthy that during the litigation of this case, even the defendants themselves referred to the FCPA's constructive knowledge provision as a "willful blindness" concept.  For example, during the December 14, 2010 motion hearing, counsel for LEE observed that the FCPA case of United States v. Bourke, 05-CR-518 (S.D.N.Y. 2009), "involve[d] a willful blindness instruction."  (RT 12/14/10: 44).  The only instruction in Bourke to which counsel could have been referring was the one covering the FCPA's constructive knowledge provision.  (Ex. 16 at 27).

41

neutralized by the judge's immediate reminder that the court's instructions controlled.  Thus the argument did not prejudice Navarro.").[45]

### 6.   The Government Permissibly Mentioned Basurto's Trial Testimony in Rebuttal Summation

The defendants claim that the government committed misconduct by mentioning Fernando Maya Basurto's trial testimony during its jury addresses "in violation of the Court's order."  (Br. at 4, 34, 44-46, 56).  Again, they are wrong.  In support of this contention, the defendants identify only two sentences from the government's two-hour closing argument and 30-minute rebuttal summation:

> MR. MILLER:  The reason [Sergio Cortez, Lindsey, and Lee] were talking about Nestor Moreno is because they knew what Fernando Mayo Basurto testified to, that he could make things happen at CFE. . . .  Basurto testified that Nestor Moreno had access to the money.

(RT 5/6/11: 4337).  The defendants argue that this referenced testimony, which was given on the first day Basurto appeared as a witness (April 6), had been "stricken" by the Court.  (Br. at 4, 44, 56).  To the contrary, the Court never struck this testimony and certainly never told the jury to "ignore anything Basurto testified to that did not relate to the role Sorvill played in this case."  (Id. at 45).

In an attempt to create a ruling that does not exist, the defendants point to comments made by the Court the following day (April 7), when it gave a limiting instruction regarding Basurto's additional testimony:

> THE COURT:  The sole basis for allowing further testimony from [Basurto] in answer to questions that the government may pose will be about the role that a company known as Sorvill International allegedly played in this case and whether Enrique Aguilar, who is a defendant in this case, but not here, had

---

[45] The defendants also suffered no prejudice because they timely interrupted, the Court sustained their objection, and the government stopped describing "the law" beyond reciting the jury instructions.  See, e.g., United States v. Hinton, 31 F.3d 817, 825 (9th Cir. 1994) (finding no prejudice where "the bell to be unrung bode little ill" for the defendant).

42

anything to do with whatever role that Sorvill International may have played in this case. So that's going to be the limit of the inquiry into the relevance.

(RT 4/7/11: 785; emphasis added). Thus, the Court's instruction related only to Basurto's "further" testimony, not the testimony he had given the day before and later mentioned in the government's rebuttal. In fact, the Court immediately thereafter made clear that Basurto's first day of testimony had <u>survived</u> the Court's limiting instruction:

THE COURT: Now, [Basurto] did testify yesterday, and the defense attorneys will have the right, if they choose to, to cross-examine him about his testimony yesterday . . . .

(RT 4/7/11: 785). If, as the defendants misleadingly argue, the Court had actually instructed the jury to "ignore anything Basurto testified to" other than Sorvill, the Court would not have invited the defendants to cross-examine Basurto about his first day of testimony.[46]

### 7.   <u>The Government Did Not Commit Misconduct in Connection with its Disclosures</u>

The defendants next argue that there has been a "history" of "untimely and incomplete" disclosures in this case and that the government "abused" its discovery obligations "from pretrial to post-trial." (Br. at 35-37). In support of this argument, the defendants make seven specific discovery complaints. (<u>Id.</u> at 26-27, 35-37). Each is addressed below.[47]

---

[46] The government's accurate interpretation of the Court's April 7 limiting instruction is confirmed by the context in which it was given. The day before, on April 6, after the government elicited testimony from Basurto, the Court said it did <u>not</u> consider his testimony "inherently irrelevant." (RT 4/6/11: 717). But the Court nonetheless expressed concern about the relevance of any <u>additional</u> testimony. (<u>Id.</u> at 717-20). The Court then directed the government to submit an offer of proof by the following morning, (<u>Id.</u> at 720), which it did. (DE #412). That filing addressed Basurto's <u>remaining</u> testimony, which was the focus of the Court's April 7 instruction.

[47] The defendants also include in this portion of their brief the mishandling of Agent Guernsey's grand jury transcripts. That matter is fully addressed below, in part III.B.

43

### a.   The Fact of the LMC-Sorvill Mistake in Agent Binder's Affidavit

First, contrary to the defendants' contention, the government did not delay disclosing "until the [March 23] Franks hearing" the fact that Agent Binder's affidavit incorrectly stated that LMC had made payments to Sorvill.  Rather, the government said as much six weeks earlier, when it stated in its February 10 response to a defense discovery motion that the government did not have evidence of such payments:

> [T]he defendants request that the Court issue an order directing the government to disclose any evidence establishing that [LMC] did not make any payments to the Sorvill account.  This request is puzzling at best, given that it would seem impossible to produce evidence showing that an event did not occur.

(Govt.'s 2/10/11 Opp'n at 3 (filed under seal); second emphasis added).[48]

In any event, and as explained in the government's June 6 filing, the defendants fail to demonstrate any prejudice from the timing of the government's disclosure in this regard.  The defendants relied upon the LMC-Sorvill mistake in the affidavit as the basis for their Franks motion (and related motions), which were denied by the Court because the mistake was immaterial and because there was no finding of bad faith or dishonesty on the part of the government.  (DE #600 at 28-29.)  Furthermore, the defendants were able to use the LMC-Sorvill mistake at trial, as illustrated in LEE's summation:

> MS. LEVINE:  What did [the government] do?  They didn't bother to do anything about learning about [LMC] before they banged down their doors.  We know their search warrants were based on the false statement that Lindsey made payments into Sorvill.  And we know that they were made by Agent Binder, the co-case agent . . . .

(RT 5/6/11: 4317; emphasis added).

---

[48] Indeed, well before the Franks hearing, the defendants themselves read this statement as confirming the inaccuracy of the LMC-Sorvill statement.  Specifically, on February 28 (more than three weeks before the March 23 Franks hearing), the defendants wrote that "[t]he government has now acknowledged that no evidence of any [LMC] payments to Sorvill exists."  (DE #222 at 3 n.5).

### b.   Drafts of Agent Binder's Affidavit

Second, the government did not "delay" producing drafts of Agent Binder's affidavit. As explained in the government's June 6 response, because the drafts did not contain any Brady material, the government had no legal obligation to produce such internal, unsworn, and preliminary work product.  (DE #600 at 29).  But when the Court ordered disclosure, the government immediately complied.

### c.   CFE Meeting Memorandum

Third, the government did not "delay" production of an Internal Revenue Service ("IRS") memorandum concerning the February 10, 2011 meeting between the government and certain CFE officials.  As explained when this same claim was raised one week before jury selection, the memorandum was disclosed shortly after it was finalized.  (DE #321 at 3).[49]

In making this particular allegation, the defendants ignore the fact that this same complaint formed the basis of a pretrial motion to dismiss (DE #317), which the Court denied (DE #374).  Significantly, the Court concluded at the time that the defendants had failed to establish that they were harmed by the timing of the disclosure in large part because of the "important" fact that the supposed Brady information in the IRS memorandum was "not quite as 'devastating[ly] exculpatory' as defendants claim."  (Id. at 2).[50]

The defendants still do not address how they were prejudiced by any delay in the memorandum's disclosure.  As noted, the document was produced two weeks before opening

---

[49] The CFE meeting memorandum was completed on March 14 (Ex. 17), sent via Federal Express on March 18 (Ex.18), and received by the defendants on March 19 (DE #317 at 3).

[50] The Court explained that "the CFE representatives disclosed that the contracts 'did not trigger any suspicion from CFE because at face value nothing seemed out of order with the contracts,'" but the CFE officials also reported that CFE was "investigating the matter and ha[d] filed a formal complaint."  (DE #374 at 2).  Moreover, the facial regularity of the contracts was not inconsistent with the allegations in the indictment or with the government's theory of the case.

45

1  statements.  In addition, the allegedly exculpatory information (and some of the CFE

2  documents) were admitted into evidence, put before the jury, and cited by the defendants

3  during closing arguments.  See United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir.

4  1988) ("No [Brady] violation occurs if the evidence is disclosed to the defendant at a time

5  when the disclosure remains of value.").[51]

6

_____

7      [51] The IRS memorandum was admitted as DX 2524 and some of the materials from
8  the CFE meeting were admitted as DX 2525 and DX 3021.  (RT 4/26/11: 2780-81).  Counsel
   for LINDSEY and LMC used the memorandum in summation:
9

10          MR. HANDZLIK:  There was a memorandum of a day-long
            meeting that was held in this building with representatives of
11          [CFE] . . . .  Of course, the memo itself is only about three or
            four paragraphs, so — but it's in evidence.  And what did . . .
12          the high officials of CFE tell them?  The contracts were
            authorized.  They were justified.  There is nothing wrong with
13          the contracts on their face . . . .  All of the contracts, the 25
            contracts, the direct purchase contracts were justified and
14          authorized.  That's what CFE told them when they finally talked
            to them.
15

16  (RT 5/6/11: 4259-61; emphasis added).  Similarly, counsel for LEE argued as follows:

17          MS. LEVINE:  Reasonable doubt number 6: CFE reviewed the
18          [LMC] sales and found them conforming and legitimate.  And
            this is key, because CFE has the records, and they have the
19          documents, and they have the access to the people that signed
            the contracts, and they made the purchases.  And [CFE] looked
20          at the contracts from 2002 to 2009 — a couple before that, but
            the entire period of this Indictment, and [CFE] said that all of
21          them, with one tiny exception that has nothing to do with the
            charges in this case, all of them were legitimate, appropriate,
22          and rightly issued. . . .  [The government] ignored this chart, and
            they ignored what CFE said, but you can't, because it's in
23          evidence, and it puts the lie to the government's case.
24

25  (Id. at 4311-12; emphasis added).  In light of the jury's swift guilty verdict, it appears that the
26  Court was right when it opined six weeks earlier that the information provided by CFE on
    February 10 was "not quite as 'devastating[ly] exculpatory' as defendants claim."  (DE #374
27  at 2).

28                                            46

1

        **d.**     ***Henthorn***

2          Fourth, the defendants claim that the government "delayed notifying the Court and the

3 defense" of the possibility of a Henthorn issue until after one particular agent had testified at

4 the suppression hearing.  (Br. at 36).[52]  This contention is frivolous.  As the government

5 explained at the time, the prosecutors did not even know of the Henthorn issue until

6 March 31, which was after the witness had testified.  (RT 4/1/11: 69-70).  Once the issue was

7 discovered, the government immediately informed the Court, (RT 4/5/11: 297), which

8 reviewed the material and concluded "there's nothing further that requires disclosure under

9 any concept at all."  (RT 4/8/11: 4).[53]

10

        **e.**     **Rowan's Interview Report and One of Basurto's Reports**

11          Fifth, the defendants assert that the government "delayed production" of one of

12 Basurto's interview reports as well as the only interview report of Patrick Rowan, a former

13 LMC employee whom neither side called as a witness.  (Br. at 37).  But as the government

14 explained in its June 6 response, the government believed that these reports were disclosed

15 on April 4 (before opening statements), but because of a record-keeping inaccuracy the

16 government produced them — perhaps for a second time — on May 3 (before the defense

17 case).  (DE #600 at 31-32).  The government's second production, undertaken in an

18 abundance of caution, evinces the seriousness with which it took its discovery obligations

19 and undermines the defendants' accusations of misconduct.

20

21

---

22      [52] United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) (holding that district court
23 erred in denying defendant's request for impeachment materials contained in testifying
officers' personnel files).

24

25      [53] The defendants also assert that the prosecutors "misrepresent[ed] that Henthorn
inquiries were made by January 3, 2011."  (Br. at 26).  But the defendants offer no support
26 whatsoever for this particular accusation.  To the extent the defendants are referring to the
January 3 "meet and confer" session, the prosecutors' representation that day concerning
27 Henthorn (that such inquiries had been made) was truthful and accurate.

28

                         47

1      In any event, as the government further explained on June 6, the Basurto report was

2  only one half of a page and dealt only with the ABB matter, (id. at 32-34), and even if the

3  Rowan report was "potentially exculpatory," (Br. at 37), the government disclosed the report

4  in time for the defendants to make use of it.  See Juvenile Male, 864 F.2d at 647; see also,

5  e.g., Bond, 552 F.3d at 1097 (finding no Brady violation where the defendant "could have

6  subpoenaed [the witness] on his own had he thought that the witness had anything

7  exculpatory to say").  Moreover, the defendants' failure to lodge a complaint when the

8  materials were produced subverts their current claim.[54]

9           **f.**    **Evidence Related to the Military School Payments**

10      Sixth, the defendants claim that the government "never produced evidence underlying

11  their theory in the O'Shea prosecution that the 2004 military school payments for the tuition

12  for Nestor Moreno's son made from the Sorvill account came from funds provided by ABB,

13  not LMC."  (Br. at 37).[55]  First of all, nothing in O'Shea undermines what the government

14  argued and proved in this case.

15      With respect to the defendants' disclosure claim, if the defendants are referring to the

16  records of such payments, those documents (both from St. John's Military Academy and

17  from Dresdner Bank) were produced on December 23, 2010, months before the trial.

18  (Ex. 19).  To the extent the defendants are suggesting that the government was required to

19  disclose the O'Shea grand jury testimony, the defendants have not demonstrated how that

20  testimony — to which they do not have access — "contradicts" Agent Costley's trial

21  testimony in this case, (Br. at 37), nor have they identified any legal basis for obtaining those

22  grand jury materials.  The O'Shea grand jury testimony was not discoverable pursuant to 18

23

24

_____

25     [54] Presumably, the defendants were aware of Rowan's existence well before the trial,
as he worked for LMC, which LMC's own attorney described to the jury as a "small"

26  company with "[a] small American work force."  (RT 4/5/11: 330-332).

27     [55] United States v. O'Shea, 09-CR-692 (S.D. Tex.).

28                             48

U.S.C. § 3500, and any claim that it constitutes <u>Brady</u> material would be speculative and wrong.

Furthermore, this allegation based on <u>O'Shea</u> appears to be premised on the misplaced notion that the government asserted at trial in the present case that the military school payments were made using the same actual dollars that LMC paid to Aguilar.  On the contrary, Agent Costley merely testified that the military school payments came from Sorvill, (RT 4/28/11: 3077, 3081-84, 3138, 3167), a point that was confirmed during cross-examination, (RT 4/28/11: 3182-85; 4/29/11: 3562-68).  In any event, the government's theories of prosecution in <u>O'Shea</u> and in the present case are not inconsistent.

### g. Interview Reports of Garza, Serocki, and Zavaleta, and Any Related *Brady* Material

Lastly, the defendants allege that the government committed misconduct by producing the interview reports of Laura Garza, Richard Serocki, and Jose Zavaleta, and any related <u>Brady</u> material "late."  (Br. at 26).  But as illustrated by the following chart (organized by date of testimony), the government's disclosures for these witnesses were never late and, in fact, early:[56]

| Witness | Interview Date | Report Prepared | Report Disclosed | Date of Testimony |
|---|---|---|---|---|
| Richard Serocki | 1/31/11 | 2/20/11 | 2/22/11 | 4/5/11 |
| | 3/21/11 | 3/22/11 | 3/24/11 | |
| | 3/31/11 | 4/2/11 | 4/2/11 | |
| Jose Zavaleta | 1/25/11 | 2/8/11 | 2/15/11 | 4/6/11 |
| | 3/15/11 | 3/15/11 | 3/16/11 | |
| Laura Garza | 9/23/10 | 9/28/10 | 11/30/10 | 4/14/11 |
| | 4/7/11 | n/a* | 4/8/11* | |
| | 4/10/11 | n/a* | 4/11/11* | |

[56] No formal reports of the April 7 and April 10 "interviews" with Garza were ever prepared, so the government produced the agents' original notes (hence the asterisks).

49

Indeed, throughout this case the defendants have ignored an explicit provision of the Jencks Act: "[N]o statement or report in the possession of the United States which was made by a Government witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."  18 U.S.C. § 3500(a) (emphasis added); see United States v. Rewald, 889 F.2d 836, 865-66 (9th Cir. 1989) (noting that the Jencks Act "prohibits" a defendant from compelling the production of a prior statement until after direct examination).  Because the statements for Garza, Serocki, and Zavaleta were disclosed days — and in most instances weeks — before these witnesses took the stand, the government did much more than that required by § 3500(a), and certainly committed no misconduct.[57]

The defendants do not specify how the government violated Brady with respect to Serocki and Zavaleta, and any such contention would be meritless.[58]  As for Garza, she never once mentioned the defendants during her testimony and talked only about Angela Aguilar

---

[57] Moreover, because neither Garza, Serocki, nor Zavaleta ever "signed or otherwise adopted or approved" the government's reports or notes, and because those reports and notes were not "substantially verbatim recital[s]" of their interviews, the reports and notes were technically not subject to disclosure at all.  See, e.g., United States v. Mincoff, 574 F.3d 1186, 1200 (9th Cir. 2009) (holding that FBI agents' notes of witness's interviews were not discoverable under the Jencks Act, even though witness testified at trial).

[58] The government is at a loss to determine how the defendants could possibly allege a Brady violation involving Serocki.  To the extent they are relying on the Court's comment during a break in his testimony that the government was "bound by the rules," (RT 4/5/11: 448; Br. at 16), the government broke no disclosure rule with respect to Serocki.  The Court simply decided in its discretion to prohibit Serocki from testifying to matters that, in the Court's view, the FBI had not adequately documented in Serocki's witness reports.  Even if this incident constituted some sort of disclosure violation (it did not), the defendants endured no harm because the jury never heard the proffered testimony.  As for Zavaleta, the defendants seem to be suggesting that the government violated Brady by not taking notes during his witness preparation sessions, something they complained about in a sidebar during Zavaleta's testimony.  (Br. at 16-17; RT 4/6/11: 662-67).  But the Court made no finding of any violation on the government's part, and the decision not to do so was correct.  See, e.g., United States v. Rodriguez, 496 F.3d 221, 224 (2d Cir. 2007) (rejecting defendant's contention that Brady or the Confrontation Clause requires the government to take notes during witness interviews).

1   (who is not a party to the present dispute).  Regardless, the defendants' <u>Brady</u> claim with

2   respect to Garza's notary book, (Br. at 9-10 n.7), was raised during the trial and rejected by

3   the Court:

4               MR. LARSON (counsel for Angela Aguilar):  The issue is . . .
                the agent back in September of 2010 looking at the [notary]
5               book, realizes it had not been properly notarized, and not
                disclosing that fact. . . .
6

7               THE COURT:  Okay.  <u>Brady</u> requires that there be prejudice.
                As to the second prong, there isn't any prejudice here.  I'm not
8               going to make a finding as to whether or not it is <u>Brady</u>, in the
                sense of it being exculpatory or consistent with innocence, but
9               as the prosecutor has just pointed out, the lawyers are very
                skillful, even before this witness testified established (sic), to the
10              clear understanding of every juror and to the Court, what
                happened with respect to the belated entry.  <u>So, the notion that</u>
11              <u>there could be some kind of misconduct</u> generating, I suppose
                — I'm not sure what remedy, on the theory of Brady, <u>has not</u>
12              <u>been established.</u>
13

14   (RT 4/14/11: 1531-32; emphasis added).[59]

15                                  *      *      *

16          On the issue of disclosure, the defendants have even alleged misconduct in instances

17   where the government was clearly being fully faithful to its ethical obligations.  For example,

18   during a pretrial suppression hearing, FBI Special Agent Carlos Narro testified on cross-

19

20          [59] The government recognizes that on June 27 the Court called the Garza notary book
21   issue "real troubling" and rhetorically questioned how the government could "screw up on
     [her] signing" of that book.  (RT 6/27/11: 27).  But a fair reading of Garza's testimony
22   reveals that she was plainly confused and flustered by the defendants' aggressive cross-
     examination on this subject.  For example, when asked if she informed the government
23   during her initial meeting in September 2010 that she had not recorded the Angela Aguilar
     notarization in her book, she said: "Yes," (RT 4/14/2011: 1511, 1513, 1521); "No. I didn't
24   tell them, but I had to do it," (<u>Id.</u> at 1512); "I believe so.  I'm not sure.  I don't recall the
     details at this moment." (<u>Id.</u>); "No. I didn't tell them.  I did it after they left." (<u>Id.</u>); and "I'm
25   not quite understanding," (<u>Id.</u> at 1521).  Thus, Garza's testimony on this point does not
     establish, or even suggest, that the government violated <u>Brady</u> in any manner with respect to
26   her notary book.
27

28                                           51

examination to certain facts that the prosecutor responsible for preparing Agent Narro for the hearing had not remembered Agent Narro raising prior to his testimony.  Immediately after that day's proceedings, all of the prosecutors recognized that they needed to alert the defendants to this potential discrepancy.  The prosecutors wrote a letter that same day disclosing the matter, and the defendants' motion to suppress eventually was granted.  In their brief, the defendants now cite that disclosure decision as an instance in which the government "failed to comport with the Court's expectations or settled rules for prosecutorial conduct."  (Br. at 11-13).[60]

### 8. The Government Did Not Improperly "Shield" the Investigation from Scrutiny

Lastly, the defendants claim that the government "called certain witnesses, omitted others, withheld discovery, and modeled its trial strategy with the intent of shielding its investigation from defense and jury scrutiny."  (Br. at 37-38).  Despite this sweeping statement, the defendants make only two specific complaints.  They assert that the prosecutors (1) "purposely" did not disclose Agent Guernsey's grand jury testimony "in order to shield [the] investigation from scrutiny," and (2) opted not to call a case agent as the summary witness in order "to shield its investigation and to prevent the defense from presenting a legitimate and effective defense."  (Id. at 3, 6, 26, 38-39, 56, 58).  This "shielding" claim has no merit.[61]

_____

[60] When the Court was provided a copy of the letter the next day, the Court found the letter "a little ambiguous" and then considered it "an . . . effort on the part of the government to buttress [the agent]'s testimony."  (RT 3/29/11: 31).  Notwithstanding this impression (which was not the government's intent), the Court also recognized that the decision to send the letter to the defendants was "an effort by the government to comply with its ongoing duties of discovery and disclosure."  (Id.).

[61] The defendants also claim as part of their shielding argument that the government "withheld" Brady material, citing Rowan's interview report and one of Basurto's reports. (Br. at 38).  But as noted in part III.A.7.e, the Basurto and Rowan reports were produced to the defendants in time for the defendants to use them, and the reports did not contain any exculpatory information.  In addition, and of particular relevance here, the reports did not

### a.   The Government Did Not Initially Produce Agent Guernsey's Grand Jury Testimony to the Defendants Because the Prosecutors Did Not Intend to Call Her as a Trial Witness, Not to Withhold Exculpatory Information Regarding the Investigation

At the outset, the defendants are factually wrong about why the prosecutors decided to not initially disclose Agent Guernsey's grand jury testimony, and they offer no evidence in support of their view that her testimony was withheld in order "to shield [the] investigation from scrutiny."  (Br. at 38).  In fact, the explanation is simple and sound: the prosecutors did not produce Agent Guernsey's testimony because they did not intend to call her as a witness, and it is well settled that in such circumstances disclosure of grand jury testimony is not required under 18 U.S.C. § 3500(a).  See, e.g., United States v. Murphy, 768 F.2d 1518, 1533 (7th Cir. 1985) (holding that government was not required to disclose FBI agent's grand jury testimony because "the agent did not testify at trial" and therefore the Jencks Act was "inapplicable").[62]

### b.   The Government's Attempt to Limit the Defendants' Opportunities to Improperly Attack the Investigation During the Government's Case-in-Chief Was Permissible

As a matter of trial strategy, Bond, 552 F.3d at 1097, the government chose Agent Costley and not a case agent to serve as its summary witness.  Explaining its decision, the government candidly stated during the second week of trial as follows:

> MR. MILLER:  [W]e anticipate that the defense will likely try to put the investigation on trial, about how the government went about conducting its investigation.  In order to limit the ability to introduce that type of a defense, which we believe is irrelevant to the facts before the jury, we wanted [Agent Costley to serve as the summary witness].

---

contain any information about the nature of the government's investigation.

[62] The government did disclose most of Agent Guernsey's grand jury testimony to the Court for in camera inspection.  As discussed in part III.B, testimony from a fourth day was not identified until after the trial.

53

(RT 4/15/11: 1697-98).  The government also openly acknowledged that it did not select one of the case agents to be the summary witness because it wanted to limit the defendants' ability to cross-examine the agents about the propriety of the investigation, (id. at 1698), a matter the government believed to be — as noted above — "irrelevant to the facts before the jury."[63]  The government also pointed out that regardless of the government's witness selections, the defendants themselves could "call whoever they want[ed] in their case." (Id.).[64]

Based on this record, the defendants claim a "clear violation" of Brady and Kyles v. Whitney, 514 U.S. 419 (1995), arguing that the prosecutors' comments "demonstrate[] a willful attempt to deny the defense their constitutional right to raise the inadequacies of the investigation as a defense."  (Br. at 39, 58).  Their complaints are unfounded.

Central to the defendants' "shielding" claim is their contention that "[w]eaknesses and holes in the evidence, inconsistencies in proof, and other problems with the government's investigation are highly relevant."  (Br. at 38; emphasis added).  They cite only Kyles in support of this expansive proposition, quoting selectively from the opinion.  The defendants state that the Supreme Court in Kyles "noted that had the defense been provided Brady materials, the defense could have challenged 'the thoroughness and even good faith of the investigation,' and that '[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in

---

[63] In an effort to portray the government as not being forthcoming, the defendants write that the government "admitted" its strategy "[u]nder close questioning" by the Court. (Br. at 37).  As the record plainly indicates, however, the government made no effort whatsoever to conceal its reasoning, and it did not hesitate to explain its thinking in an open and straightforward manner.  Indeed, the government's honest and forthright answers run counter to the defendants' claims that the prosecutors in this case did not "level" with the Court and the defendants.  (Id. at 47).

[64] Indeed, as early as April 5, the defendants had requested Agent Guernsey as a defense witness, and the government confirmed that it would make sure that she was available.  (Govt.'s 4/5/11 Let.; Defs.' 4/6/11 Let.; Ex. 2).

1   assessing a possible <u>Brady</u> violation.'" (<u>Id.</u>).  But properly read, <u>Kyles</u> does not support the

2   defendants' overbroad position because investigative flaws can be exculpatory in some

3   circumstances yet irrelevant and prejudicial in others.

4        <u>Kyles</u> involved the shooting murder of a woman in a grocery store parking lot.  Two

5   days after the murder, a man known as "Beanie" contacted the police and became an

6   informant against the defendant.  Beanie told the police, among other things, that he

7   suspected the defendant was the person who murdered the woman and that the defendant

8   carried two guns, one of which might have been used in the murder.  Sometime later, the

9   police executed a search warrant at the defendant's residence and found, among other

10  evidence, the murder weapon.  They also found the victim's purse in the garbage placed

11  outside of the defendant's building.  At trial, the defendant claimed he was framed by Beanie,

12  who, the defendant argued, planted the evidence in his apartment and in the garbage.  The

13  defendant was nevertheless convicted.  514 U.S. at 423-31.

14       Following the defendant's unsuccessful direct appeal, it was revealed that the

15  prosecution had failed to disclose several types of evidence favorable to the defense,

16  including "many inconsistencies and variations among Beanie's statements" and other

17  evidence indicating that Beanie, and not the defendant, had committed the murder.  <u>Id.</u>

18  at 430.  The Supreme Court analyzed all of the withheld information and concluded that

19  "disclosure of the suppressed evidence to competent counsel would have made a different

20  result reasonably probable."  <u>Id.</u> at 441.  With respect to Beanie's undisclosed statements, the

21  Supreme Court explained as follows:

22        Beanie's various statements would have raised opportunities to
          attack not only the probative value of crucial physical evidence
23        and the circumstances in which it was found, but the
          thoroughness and even the good faith of the investigation, as
24        well.  By the State's own admission, Beanie was essential to its
          investigation and, indeed, "made the case" against Kyles.
25        Contrary to what one might hope for from such a source,
          however, Beanie's statements to the police were replete with
26        inconsistencies and would have allowed the jury to infer that
27

28                                    55

1
2

> Beanie was anxious to see Kyles arrested for [the] murder.
> Their disclosure would have revealed a remarkably uncritical
> attitude on the part of the police.

3
4
5
6
7

Id. at 445.  The Supreme Court further explained that "the defense could have examined the police to good effect on their knowledge of Beanie's statements and so have <u>attacked the reliability of the investigation</u> in failing even to consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted."  <u>Id.</u> at 446 (emphasis added).

8
9
10
11
12
13
14
15
16
17
18
19

In an exchange with the dissent, the <u>Kyles</u> majority explained why an "attack" on "the reliability of the investigation" could well be exculpatory under <u>Brady</u>.  The dissent pointed out that a jury would not be acting rationally or in accordance with the law if the jury were to "punish sloppy investigative techniques by setting the defendant free."  <u>Id.</u> at 464.  Such a defense, the dissent observed, would not have any "bearing on the guilt or innocence of the accused."  <u>Id.</u>  In response, the majority explained that in some circumstances, an attack on the reliability of an investigation could properly be considered at trial, without inviting the type of jury nullification mentioned in the dissent.  <u>Id.</u> at 446 n.15.  Thus, the majority explained: "When . . . the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it."  <u>Id.</u>

20
21
22
23
24

As this portion of the Court's opinion demonstrates, <u>Kyles</u> stands for the proposition that information concerning the nature of the investigation can be exculpatory within the meaning of <u>Brady</u> (1) "[w]hen . . . the probative force of evidence depends on the circumstances in which it was obtained," or (2) when "the thoroughness and even the good faith of the investigation" is lacking in that the investigators failed to "even consider"

25
26
27
28

56

information indicating that the defendant is innocent.[65]  Thus, <u>Kyles</u> does not hold, as the

defendants in this case maintain, that a defendant's right to due process is violated any time

the defendant is deprived of some opportunity "to raise the inadequacies of the investigation

as a defense" during the government's case-in-chief.  (Br. at 58).  To the contrary, as the

exchange between the majority and dissent in <u>Kyles</u> showed, the Supreme Court in <u>Kyles</u>

was not interpreting <u>Brady</u> to authorize defendants to attack investigations for improper

reasons.

Indeed, the government's purpose for not calling a case agent to serve as the summary

witness in this case was to forestall an <u>improper</u> attack on the investigation.  <u>See, e.g.</u>, <u>United</u>

<u>States v. Waters</u>, 627 F.3d 345, 353 (9th Cir. 2010) (distinguishing <u>Kyles</u> and affirming the

district court's decision to not permit the defendant to introduce evidence of "government

misconduct"); <u>United States v. Regan</u>, 103 F.3d 1072, 1081-82 (2d Cir. 1997) (allegation that

the government had engaged in outrageous misconduct and had misused the grand jury

process was an issue for the court's consideration, not the jury's); <u>see also</u> <u>Jones v. Basinger</u>,

635 F.3d 1030, 1045 (7th Cir. 2011) ("[T]he details of an investigation are generally of only

minimal consequence to the determination of the action.") (internal quotations and citations

omitted); <u>Johnson</u>, 529 F.3d at 501 ("[T]he issue to be tried is not how the investigation was

conducted, but whether the evidence proves the defendant's guilt beyond a reasonable

doubt."); <u>United States v. Reyes</u>, 18 F.3d 65, 71 (2d Cir. 1994) (noting that while the "history

---

[65] One of the two statements that the defendants attribute to <u>Kyles</u> is actually from <u>Bowen</u>
<u>v. Maynard</u>, 799 F.2d 593, 613 (10th Cir. 1986), a case that is easily distinguishable.  In <u>Bowen</u>,
the Tenth Circuit found a <u>Brady</u> violation when the prosecution ignored and withheld evidence
indicating that another individual had "motive, opportunity, and ability" to commit the crime for
which the defendant was convicted.  <u>Id.</u> at 613.  Thus, <u>Bowen</u> is factually similar to <u>Kyles</u> and
unlike this case.  <u>See</u> <u>Kiley v. United States</u>, 260 F. Supp. 2d 248, 273-74 (D. Mass. 2003)
(focusing on the "plausible nexus linking the other suspect to the crime"); <u>Pursell v. Horn</u>, 187
F. Supp. 2d 260, 329 (W.D. Pa. 2002) (focusing on the fact that the undisclosed evidence
"directly undercut" the case against the defendant and "undermined confidence in the verdict").

of [an] investigation" can be a useful narrative device, it is "not relevant" to the defendant's guilt or innocence).[66]

### c.   The Defendants Were Not Prejudiced Because They Were Able to Fully Put Forth Their "Inadequate Investigation" Defense

Even if there were legal support for the defendants' position, there is no dispute that the defendants were able to fully "raise the inadequacies of the investigation as a defense" during the trial.  (Br. at 58).  The defendants were provided with almost all of Agent Guernsey's grand jury transcripts on April 15, five days before the start of her direct testimony and weeks before the end of the trial, and then the defendants cross-examined Agent Guernsey for almost two full court days, on April 22 and 26.[67]

No significant limits were placed on the defendants during Agent Guernsey's cross-examination, as they went beyond the scope of direct and even questioned her about matters

––––––––––––––––––––

[66] United States v. Sager, 227 F.3d 1138 (9th Cir. 2000) (holding that the district court committed plain error and abused its discretion by telling the jury not to "grade" the investigation), is not contrary to the government's position.  In Sager, the district court told the jury that it was to decide questions of fact, but then "muddled the issue" by barring the jury from considering "possible defects" in the investigation.  Id. at 1145.  The Ninth Circuit, relying on Kyles, found error in these conflicting instructions because "[t]o tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information."  Id.  Thus, the district court's instructions in Sager contradicted the statement in Kyles that "[w]hen . . . the probative force of evidence depends on the circumstances in which it was obtained," the nature of the investigation is a proper subject to challenge.  In this case, again, the defendants' attack on the investigation did not go to the probative force of evidence presented.  See, e.g., United States v. Carona, 630 F.3d 917, 923-24 (9th Cir. 2011) (distinguishing Sager and rejecting the defendant's complaint that he was not permitted to introduce evidence of the lead prosecutor's alleged misconduct for the jury to consider).

[67] Agent Guernsey was the last witness called on Wednesday, April 20, and her direct testimony that day lasted about 30 minutes.  The Court heard motions on Thursday, April 21.  On Friday, April 22, Agent Guernsey's direct testimony continued, and it was finished about 30 minutes later.  She was then cross-examined for the remainder of that day.  When trial resumed three days later on Tuesday, April 26, she was cross-examined for about four more hours.

1   as to which she had no personal knowledge (such as the February 10, 2011 CFE meeting that

2   she did not attend).  (RT 4/22/11: 2505-26; 4/26/11: 2701-02).  More importantly, the

3   defendants were not, in fact, prevented from fully challenging Agent Guernsey (one of the

4   case agents), as well as the other testifying law enforcement officers, as to the "adequacy" of

5   the investigation.  As counsel for LEE fully and forcefully (but unsuccessfully) argued in

6   summation:

7           MS. LEVINE:  Reasonable doubt number 10: The government's
            evidence and its job. What it did and didn't do. . . .  I'd suggest
8           to you that the evidence that was submitted in this case is a lot
            about choices, about the choices the government made about the
9           kind of evidence they would present, about who they would
            bring to you as witnesses, about how they would investigate this
10          matter, about whether they would go to the reasonable doubt, to
            the place where they wouldn't have a hesitation to act before
11          they brought this case, and before they took someone's life and
            put it in jeopardy.  What did they do?  They didn't bother to do
12          anything about learning about [LMC] before they banged down
            their doors.  We know their search warrants were based on the
13          false statement that Lindsey made payments into Sorvill.
14
                              *    *    *
15

16          And what else didn't they do?  They didn't bring other key
            percipient witnesses.  They have the burden.  Kellie Hua, the
17          IRS auditor, the IRS agent that did the tax returns.  CFE
            personnel.  What about [LMC]'s customers?  They didn't even
18          interview them. . . .  They didn't interview competitors.
19
                              *    *    *
20

21          They never interviewed customers . . . .  I could go on, but the
            pattern is clear. . . .  The thing about . . . a criminal trial, is there
22          are no time limits on the government.  If it has evidence, it can
            bring it.  If it has witnesses, it can bring them.  If there's holes,
23          the prosecution can fill them.  And the failure to do so is a
            failure to bring proof beyond a reasonable doubt.  And here, if
24          there was evidence beyond a reasonable doubt that Mr. Lee
            knowingly, and willfully, and corruptly, and intentionally paid
25          bribes to get contracts from CFE, the prosecution had the time
            . . . , and they certainly had the resources to do it.
26

27

28                                      59

1  (RT 5/6/11: 4316-18, 4320; emphasis added).  Thus, regardless of the merits (or lack thereof)

2  of their legal position, as a factual matter the defendants were able to fully put forth their

3  "inadequate investigation" defense, and therefore they suffered no prejudice.

4  **B.**   **The Government's Mishandling of Agent Guernsey's Grand Jury Transcripts**
   **Does Not Warrant Setting Aside the Jury's Verdict**

5

6      As demonstrated above, there was no misconduct in this case.  Nevertheless, the

7  government unintentionally did not comply with a court order because the government

8  inadvertently neglected to disclose <u>all</u> of Agent Guernsey's testimony despite being ordered

9  during the trial to do so.  Although the government timely produced 166 pages of her grand

10  jury testimony, the government did not identify (and therefore did not timely produce) 19

11  additional transcript pages until June 27, well after the trial.

12      At the ensuing June 27 hearing, the government — and in particular Mr. Miller —

13  accepted full responsibility for this oversight and expressed deep regret for the error:

14          MR. MILLER:  It was something that I overlooked in preparing
            this, Your Honor.  I just wanted to make that clear.  And it was

15          not something that I believe was prejudicial to the defendants.
            And the only reason I bring that up — not to escape, Your

16          Honor, in any way that <u>this was something that should have</u>
            <u>been turned over</u> and that the Court had directed the government

17          to turn it over, the reason I bring that to the Court's attention is,
            obviously, because I want the Court to understand there was no

18          flagrant misconduct or intentional behavior by the government.
            <u>It was an oversight and one that should not have been made</u>

19          <u>given the history of this case.</u>

20

21                          *    *    *

22          <u>I think what there was was a violation, if any, of the</u>
            <u>government's obligation to comply with the Court's order, and I</u>

23          <u>sought to do that and I did not.</u>

24                          *    *    *

25
            <u>I regret more so than in my career that this took place, but that</u>
26          <u>I'm dealing with.</u>

27

28                          60

1   (RT 6/27/11: 11-12; emphasis added).  The government, and specifically Mr. Miller (Ex. 20),

2   reiterates those sentiments now because the government in this case has always recognized

3   the importance of its obligations, and it has understood that the Court expects the government

4   to meet its duties.  Indeed, the Court is right to expect diligence and thoroughness by the

5   government.  But as explained below, the government's mishandling of Agent Guernsey's

6   grand jury transcripts does not warrant setting aside the jury's verdict.

7   **1.  Legal Standard**

8   A district court may dismiss an indictment for government misconduct under either of

9   two theories.  First, dismissal can be based "on the ground of outrageous government conduct

10  if the conduct amounts to a due process violation."  United States v. Chapman, 524 F.3d

11  1073, 1084 (9th Cir. 2008).  Second, "if the conduct does not rise to the level of a due

12  process violation, the court may nonetheless dismiss under its supervisory powers."  Id.  In

13  this case, the defendants seek dismissal pursuant to this Court's supervisory powers.[68]

14  To warrant such a dismissal, the government's misconduct must (1) constitute

15  "flagrant misbehavior" and (2) cause "substantial prejudice" to the defendant.  Chapman, 524

16  F.3d at 1085; United States v. Kearns, 5 F.3d 1251, 1253 (9th Cir. 1993); United States v.

17  Jacobs, 855 F.2d 652, 655 (9th Cir. 1988).  Even if misconduct amounts to flagrant

18  misbehavior and caused substantial prejudice, dismissal is warranted only if "no lesser

19  remedial action is available."  United States v. Barrera-Moreno, 951 F.2d 1089, 1092

20  (9th Cir. 1991).

21  The Supreme Court has made clear that dismissal of an indictment is an "extreme"

22  and "severe" remedy.  Strunk v. United States, 412 U.S. 434, 439 (1973); Barker v. Wingo,

23  407 U.S. 514, 522 (1972).  For its part, the Ninth Circuit has observed that dismissal is

24

25  [68] The defendants hint at the first theory by citing Rochin v. California, 342 U.S. 165
    (1952), (Br. at 53), but they do not pursue it.  Indeed, despite the defendants' penchant for
26  hyperbole, there can be no serious argument that the government has engaged in
    "outrageous" conduct (let alone the sort that would give rise to a due process violation), and
27  the government explains elsewhere why there was no prosecutorial misconduct at all.

28                                                    61

1  "drastic, disfavored, and thus used only in the most egregious cases."  United States v.

2  Haynes, 216 F.3d 789, 796 (9th Cir. 2000); see also United States v. Isgro, 974 F.2d 1091,

3  1097 (9th Cir. 1992) ("most severe sanction possible"); United States v. Owen, 580 F.2d 365,

4  367 (9th Cir. 1978) ("extreme sanction" that should be "infrequently utilized").

5
6   **2.    The Government's Mistake Was Entirely Accidental and Therefore Does Not Constitute "Flagrant Misbehavior"**

7   It is well settled that "accidental or merely negligent governmental conduct is

8  insufficient to establish flagrant misbehavior."  Chapman, 524 F.3d at 1085.  In this case, the

9  government's mishandling of Agent Guernsey's grand jury transcripts was regrettable, but it

10  was entirely accidental and — at worst — negligent.  As Mr. Miller explained on June 27,

11  the October 14, 2010 transcript was inadvertently placed with materials from another case,

12  and therefore when the Court ordered that the transcripts be disclosed to the defendants, the

13  October 14 transcript was not among the testimony produced.  (RT 6/27/11: 7-9; Ex. 20).[69]

14   Recognizing that an inadvertent misstep cannot serve as a basis to dismiss an

15  indictment, the defendants try to show that the government in this case has acted

16  "recklessly."  Chapman, 524 F.3d at 1085 (stating that flagrant misbehavior includes reckless

17  disregard for constitutional obligations).  In support of this contention, the defendants repeat

18  all of their meritless claims, such as their complaint about the innocuous footers that barely

19  appeared on the monitors during Agent Costley's testimony.  (Br. at 54-56).  In addition, the

20  defendants (1) allege that the government "directly violated" four court orders, (2) assert that

21  the Court gave the government "numerous warnings" about its "conduct," (3) claim that the

22  government lied to the Court on April 7 when it stated that it believed it had complied with

23

24   [69] Notwithstanding the government's error, the fact that the government immediately

25  disclosed it to the defendants and notified the Court weighs against a finding of flagrant misbehavior.  Kearns, 5 F.3d at 1254 ("[A] written copy of the agreement was turned over to [the defendant] before the end of trial and within hours of the prosecution's receipt of it.

26  This demonstrates that the federal officials involved did not engage in flagrant

27  misbehavior.").

28   62

its discovery obligations, and (4) liken this case to <u>Chapman</u> and <u>United States v. Fitzgerald</u>, 615 F. Supp. 2d 1156 (S.D. Cal. 2009).  (Br. at 57-58).  But as demonstrated below, these arguments are unavailing.

### a.  The Government Did Not "Directly Violate" Multiple Court Orders

The defendants identify four specific instances where, in their view, the government "directly violated" a court order: (1) the introduction of ABB evidence, (2) the use of the Lamarche writings, (3) the "willful blindness" argument, and (4) the mishandling of Agent Guernsey's transcripts.  As previously demonstrated, the government acted properly with respect to the first three matters.

The government has acknowledged that it unwittingly did not comply with the court directive to disclose all of Agent Guernsey's grand jury testimony, but the defendants' claim that the government "directly violated" the Court's order suggests a total lack of compliance and a disregard for the Court's authority.  On the contrary, the government had timely produced approximately 90% of Agent Guernsey's testimony and believed at the time that it had fully complied with the Court's directive.  It was only after the trial ended that it realized that it had overlooked an additional small portion of her testimony.

### b.  The Defendants Mischaracterize Various Remarks by the Court as Constituting "Warnings" to the Government

The defendants also label certain remarks by the Court as "warnings" to the government, but a review of the supporting record citations shows that the defendants have taken the Court's comments out of context.  For example, the Court never said "throughout the case" that the government's conduct was "sloppy."  (Br. at 57).  Rather, the Court's comment about being sloppy related to <u>one</u> issue — the inclusion of an incorrect sentence in Agent Binder's 31-page search warrant affidavit.  In fact, in rejecting the defendants' challenge to that affidavit, the Court explicitly found that the prosecutors and agents had <u>not</u>

1   acted recklessly.  (RT 3/23/11: 71); cf. Chapman, 524 F.3d at 1085 (reckless conduct

2   constitutes flagrant misbehavior).

3         Nor did the Court say "throughout the case" that the government's conduct was

4   "clumsy."  (Br. at 57).  The Court's comment about being clumsy was directed only to the

5   government's good faith efforts to abide by United States v. Tamura, 694 F.2d 591 (9th Cir.

6   1982), and this Court made clear that the "bottom line" was that the government acted

7   "reasonably" with respect to the procedures set forth in that case.  (RT 3/25/11: 49).  The

8   Court also never concluded that the "flow of information" from the government was

9   "extremely troubling."  (Br. at 57).  Rather, the Court said "[t]he interruptions in this case

10   and before the trial began that have to do with the government's flow of information are

11   extremely troubling."  (RT 4/6/11: 722).  Thus, the Court's remark was not a "warning to the

12   government" but rather a comment on the many "interruptions," and in particular the

13   defendants' meritless request for a sidebar to discuss Jose Zavaleta's pretrial interviews.  (Id.

14   at 658, 662-672; see part III.A.7.g).

15         Lastly, the Court never made a finding that the government's disclosures were

16   "'incomplete,' 'inconsistent' and untimely."  (Br. at 57).  The entire excerpt is as follows:

17   "[T]here has to be . . . compliance on both sides about discovery.  And there have been a very

18   disappointing and surprising proliferation of disputes . . . about late-coming, incomplete,

19   supposedly sometimes inconsistent disclosures."  (RT 4/5/11: 446-47).  When viewed in

20   context, the Court's comment — made on the first day of trial in connection with a limited

21   issue — shows that it was simply addressing the nature of the "disputes."  In addition, it was

22   plainly not a warning to the government, but rather a comment to "both sides."

23         **c.**     **The Government's April 7 Oral Discovery Report Undercuts the
Defendants' Claim of Reckless Disregard**

24

25         The defendants describe as "[p]erhaps most troubling" the government's April 7

26   comments about its discovery compliance.  (Br. at 57).  On that day, the government reported

27   to the Court that the government (1) had convened the entire prosecution team to review its

28

1  discovery obligations, (2) had re-examined the status of discovery, and (3) believed that it

2  had met and exceeded its obligations.  (RT 4/7/11: 880-83).[70]  The defendants now cite the

3  government's April 7 statement as proof of flagrant misbehavior because, in their view, the

4  government at the time was "concealing" Agent Guernsey's grand jury testimony, Rowan's

5  interview report, and one of Basurto's reports.  (Br. at 57).

6        But the government's comments undercut the defendants' claim of reckless disregard

7  because they demonstrates that the government took its discovery obligations seriously.

8  Moreover, the government was not "concealing" anything.  As explained previously, most of

9  Agent Guernsey's testimony had been furnished to the Court by April 7, and the government

10  had a proper legal basis for not disclosing it to the defendants.  Moreover, the government

11  was not hiding the Basurto and Rowan reports because they were believed to have been

12  disclosed three days earlier, on April 4 (see part III.A.7.e).  Even if they were not produced

13  until May 3, there is no basis for the defendants' claim that the government "concealed"

14  them.[71]

15              d.    ***Chapman* and *Fitzgerald* Are Inapposite***

16        Fourth, Chapman and Fitzgerald are inapposite.  In Chapman, the Ninth Circuit held

17  that dismissal was warranted due to the government's failure to timely disclose 650 pages of

18  materials related to "numerous" government witnesses, including at least three "important"

19  witnesses who had already testified.  524 F.3d at 1079.  The court found "recklessness"

20  because of the following: (1) the government did not keep a log indicating disclosed and

21

22        [70] The government also informed the Court that it had voluntarily produced additional
       materials that were not necessarily discoverable.  (RT 4/7/11: 881).

23

24        [71] Even if one were as willing as the defendants to so readily ascribe improper motives
       to the government, there is nothing about the nature of the reports themselves that would
25     suggest that the government would have an interest in "concealing" them.  As explained
       previously, the information contained therein was neither exculpatory nor otherwise helpful
26     to the defendants.  The defendants specifically describe Rowan's information as "potentially
       exculpatory," (Br. at 57), but as explained in the government's June 6 filing, (DE #600 at 32-
27     34), Rowan would have bolstered the government's case, not diminished it.

28                                          65

undisclosed materials; (2) it was determined that the prosecutor repeatedly represented that he had complied with his discovery obligations "when he knew full well" that he could not verify such claims; (3) the prosecutor attempted to "paper over" his mistake instead of admitting that he had no proof of prior disclosure; (4) the government did not readily concede that some documents were "material documents relevant to impeachment of witnesses" who had already testified; and (5) the government "did nothing" to ensure that it had provided full disclosure despite receiving several indications that there were discovery problems. Id.

In Fitzgerald, the defendant was indicted on tax charges arising out of his work for Kawesch, who testified at trial and was the prosecution's "key" witness. 615 F. Supp. 2d at 1158. After the verdict, the district court dismissed the indictment due to the government's failure to disclose transcripts of recorded conversations between Kawesch (who died after the trial) and Kawesch's tax attorney. Id. In finding the government's failure to be "reckless," the district court noted as follows: (1) the recordings were not produced until after trial, even though the defense had requested them before trial; (2) the government had deemed the recordings irrelevant when, in fact, they were relevant; (3) the government refused to disclose the recordings even after trial; (4) the government's "belief" that the recordings had been disclosed before trial was "not supported by the record;" (5) the government did not keep a discovery log; and (6) the government did not "own up" to its conduct. Id. at 1159-60.

In this case, by contrast, (1) only 19 pages were not disclosed;[72] (2) the materials related only to Agent Guernsey and were not relevant to her direct testimony; (3) despite the fact that she was one of the case agents, Agent Guernsey's trial testimony was not a "key" or "important" component of the government's case; (4) the government did maintain a

---

[72] Recognizing how relatively few pages were not disclosed, the defendants resort to exaggeration by referring to the undisclosed testimony as "an entire session" of the grand jury. (Br. at 37). The defendants' embellishment is not only an indication of the weakness of their legal position, but it is also factually incorrect: the "entire session" of the October 14, 2010 grand jury appearance consisted of Agent Guernsey and Philip Spillane, and Spillane's testimony (which comprised the bulk of the session) was disclosed well before trial.

discovery log; (5) the government never knowingly made a misrepresentation to the Court; (6) the government never attempted to "paper over" or hide the fact that it mishandled Agent Guernsey's grand jury transcripts; (7) the government immediately disclosed the misplaced materials and "owned up" to its oversight; and (8) the government acted upon the Court's discovery concerns.  Thus, the defendants are wrong when they equate <u>Chapman</u> and <u>Fitzgerald</u> to this case.[73]

### 3.   The Defendants Were Not Prejudiced by the Government's Mistake, Let Alone "Substantially" Prejudiced

Even assuming that the government's mishandling of Agent Guernsey's transcripts constituted "flagrant misbehavior" (it did not), the defendants' motion should be denied for the independent reason that they endured no prejudice and certainly suffered no "substantial" prejudice.  <u>Chapman</u>, 524 F.3d at 1085.  The Ninth Circuit has explained that "the idea of prejudice entails that the government's conduct 'had at least <u>some</u> impact on the verdict and thus redounded to [the defendant's] prejudice.'"  <u>United States v. Lopez</u>, 4 F.3d 1455, 1464 (9th Cir. 1993) (quoting <u>Owen</u>, 580 F.2d at 367).  Moreover, "a defendant must be <u>actually</u> prejudiced in order for the court to invoke its supervisory powers to dismiss an indictment for prosecutorial misconduct."  <u>United States v. Larrazolo</u>, 869 F.2d 1354, 1358 (9th Cir. 1989), overruled on other grounds by <u>Midland Asphalt Corp. v. United States</u>, 489 U.S. 794 (1989),

---

[73] As part of their "flagrant misbehavior" argument, the defendants contend that the government "openly admitted that [its] intent in keeping Agent Guernsey off the witness list, and thus off the stand, and utilizing Agent Costley as its 'summary' witness was to shield the government's investigation from defense scrutiny."  (Br. at 58).  But as explained in part III.A.8.a, the government never said that it did not intend to call Agent Guernsey as a witness to "shield" the investigation, and the government's decision to use Agent Costley was proper. Therefore, none of these matters support a finding of "willful" conduct, let alone willful misconduct.

1  (emphasis added).  The burden of establishing substantial prejudice is on the defendants.  <u>See</u>

2  <u>United States v. Struckman</u>, 611 F.3d 560, 574-75 (9th Cir. 2010).[74]

3          **a.**    **<u>The Government's Mistake Had No Impact on the Verdict</u>**

4        It is noteworthy that the defendants' brief contains only a single assertion regarding

5  the content of Agent Guernsey's October 14, 2010 grand jury testimony.  Specifically, they

6  argue that the undisclosed testimony was significant because it showed that the government

7  "presented evidence and argument" connecting ABB's wrongdoing to the conduct of the

8  defendants.  (Br. at 33).  But as explained in part III.A.1.c, and as the record confirms, the

9  government did nothing of the sort.  Agent Guernsey merely recounted how the investigation

10  originated and explained the relationships between various entities.

11        Aside from their mischaracterization of Agent Guernsey's testimony concerning

12  ABB, the defendants make no other attempt in their brief to establish prejudice from the

13  government's lack of complete disclosure.  Nor could they, as a careful analysis of Agent

14  Guernsey's October 14 transcript reveals that all of the matters covered therein were

15  duplicative of grand jury testimony that <u>was</u> timely disclosed, and Agent Guernsey was

16  cross-examined on virtually all of those topics during trial:[75]

17

18

19

20

21       [74] Apparently recognizing the lack of "actual" and "substantial" prejudice, the
defendants cleverly attempt to lower their burden.  Quoting from <u>United States v. Hector</u>,

22  2008 WL 2025069, *18 (C.D. Cal. May 8, 2008), the defendants assert that "the prejudice
standard is low."  (Br. at 58).  But the defendants misleadingly omit the rest of that sentence:

23  "<u>Once egregious government conduct has been established</u>, the prejudice standard is low."
<u>Id.</u> (emphasis added).  In this case, there was no "egregious" government conduct and

24  therefore <u>Hector</u> is inapplicable.

25       [75] Because the Court received the October 14, 2010 grand jury transcript for the first

26  time right before the June 27, 2011 hearing, the Court understandably indicated during the
hearing later that day that it had not read the transcript, (RT 6/27/11: 13), and therefore had

27  not reached any conclusions concerning the significance (or lack thereof) of its contents.

28

| Undisclosed Grand Jury Testimony (10/14/10; pages) | Corresponding Disclosed Grand Jury Testimony | Related Cross-Examination |
|---|---|---|
| Personal background (2-3) | 9/8/10: 3-4 | 4/22/11: 2400-01 |
| Involvement in the investigation (3) | 9/8/10: 4 | 4/22/11:2490; 4/26/11: 2694-80 |
| Origins of the investigation (4-8) | 9/8/10: 4-9; 10/21/10: 3-4 | 4/22/11: 2465-70 |
| The nature of CFE (9) | 9/8/10: 8-9; 10/21/10: 4 | 4/22/11: 2494; 2497-98 |
| The Aguilars and Grupo (9-11) | 9/8/10: 10-14; 10/21/10: 5 | 4/22/11: 2416; 2421; 2431-32 |
| The nature of LMC (11-12) | 9/8/10: 10-12; 10/21/10: 4-5 | 4/22/11: 2496-97 |
| CFE-LMC contracts (9, 12-13) | 9/8/10: 26-27 | 4/22/11: 2473-2525; 2586-89 |
| Commissions paid to Grupo (13-15) | 9/8/10: 15-16, 23, 27-28 | 4/22/1: 2555-56; 2577-79 |
| Hermosillo (16-19) | 9/8/10: 19-23; 10/21/10: 6-10 | N/A |

Again, the government's mishandling of Agent Guernsey's transcripts was regrettable, but because (1) the undisclosed testimony consisted of a brief introduction to the case, (2) the substance of the testimony was contained in transcripts that <u>were</u> timely produced, and (3) Agent Guernsey was thoroughly cross-examined regarding those matters, the defendants endured no prejudice whatsoever.  As the Ninth Circuit recently explained:

> We have previously held that when defense counsel sufficiently impeaches a government witness in cross-examination and closing argument, the defendant cannot later claim a <u>Brady/Giglio</u> violation on account of additional undisclosed evidence supporting the impeachment.  In such circumstances, the evidence is cumulative because the grounds for impeachment are "no secret" to the jury.

<u>United States v. Kohring</u>, 637 F.3d 895, 908 (9th Cir. 2011); <u>see, e.g.</u>, <u>United States v. Marashi</u>, 913 F.2d 724, 732 (9th Cir. 1990) (holding that interview notes produced six months after verdict constituted "merely cumulative impeachment evidence" and did not violate <u>Brady</u> because the government had timely disclosed a separate document that

69

1   contained a reference "virtually identical" to that in the notes); United States v. Phillips, 577

2   F.2d 495, 503 (9th Cir. 1978) (rejecting alleged Jencks Act error because undisclosed

3   materials would have been cumulative and therefore defendant suffered no prejudice); see

4   also United States v. Endicott, 869 F.2d 452, 456 (9th Cir. 1989) ("[N]ewly discovered

5   evidence to impeach a government witness does not warrant a new trial when the evidence

6   would not have affected the jury's assessment of the witness' credibility and when the

7   witness was subjected to vigorous cross-examination.").

8                    **b.      The Evidence of the Defendants' Guilt Was Strong**

9          As with the applicable legal standard, the defendants try to lower their burden by

10  asserting that the evidence in this case was "entirely circumstantial" and "weak."  (Br. at 29,

11  38, 53, 60, 62-63).  They are wrong.[76]

12         First, whether the case was "entirely circumstantial" is of no moment, especially given

13  that this case turned on the defendants' knowledge and intent.  See In re Slatkin, 525 F.3d

14  805, 812 (9th Cir. 2008) (noting that direct evidence of fraudulent intent is "rarely"

15  available); United States v. Dearing, 504 F.3d 897, 901 (9th Cir. 2007) ("As we have

16  acknowledged in connection with other statutes containing a willfulness requirement, 'direct

17  proof' of one's specific wrongful intent is 'rarely available.'") (quoting United States v.

18  Marabelles, 724 F.2d 1374, 1379 (9th Cir. 1984)).  In fact, this Court itself noted during the

19  December 14, 2010 hearing: "[K]nowledge is always something that can be proven and

20  sometimes necessarily has to be proven through inferences and not necessarily through

21

22         [76] Apparently seizing on the Court's view of the government's proffer early in the trial
23  about the relevance of Basurto's testimony, (Br. at 18), the defendants also maintain that the
    case was "very confusing."  (Id. at 61).  Whether the defendants and/or their attorneys
24  personally found the evidence difficult to comprehend, or had a tactical interest in professing
    confusion, is obviously irrelevant.  Clearly, the jury had no trouble understanding the
25  evidence and the law, especially considering that they asked for no guidance during their
    deliberations.  And even this Court observed during the government's closing argument that
26  despite a "complicated" case, the government was "doing a better than okay job" of
27  "distilling it."  (RT 5/6/11: 4141).

28                                             70

1  confessions or explicit admissions and concrete tangible evidence like memos or emails or

2  the like."  (RT 12/14/10: 24; emphasis added).

3         Second, just because evidence is circumstantial does not mean it is "weak."  <u>See</u>

4  <u>United States v. Andrino</u>, 501 F.2d 1373, 1378 (9th Cir. 1974) ("Circumstantial evidence is

5  not less probative than direct evidence, and, in some instances, is even more reliable."); <u>see,</u>

6  <u>e.g.</u>, <u>White v. Lewis</u>, 874 F.2d 599, 604 (9th Cir. 1989) ("Even if there was an inconsistency

7  which might have worked to White's disadvantage, in light of the other <u>strong circumstantial</u>

8  <u>evidence</u> of guilt, the possibility of prejudice is remote at best.") (emphasis added).  Indeed,

9  this Court properly instructed the jury that direct and circumstantial evidence have <u>equal</u>

10  force under the law: "You are to consider both direct and circumstantial evidence.  Either can

11  be used to prove any fact.  The law <u>makes no distinction</u> between the weight to be given to

12  either direct or circumstantial evidence."  (RT 5/6/11: 4044; emphasis added).

13         Third, despite the defendants' continued adherence to their view that "there's not one

14  shred of evidence" supporting criminal intent, (<u>Id.</u> at 4275), the evidence of the defendants'

15  guilt proved to be strong.  Through the use of uncontroverted testimony, the defendants' own

16  documents, the government's summary exhibits, LEE's interview statements, and other

17  evidence, the government convincingly demonstrated that in the years leading up to

18  February 2002, the defendants came to understand that Enrique Aguilar was a corrupt sales

19  representative who had been bribing CFE officials.  The defendants conceded that they

20  eventually agreed to hire Enrique Aguilar and pay him a 30% "commission," and the

21  evidence established beyond a reasonable doubt that the defendants knew that Enrique

22  Aguilar would use all or part of that money to bribe CFE officials on their behalf.

23         The government's evidence of the defendants' knowledge and intent was particularly

24  strong in light of the uncontroverted testimony of Jose Zavaleta, a former LMC employee

25  who worked closely with LINDSEY and LEE.  Zavaleta testified about, among other things,

26  how both LINDSEY and LEE believed as of January 2002 that Enrique Aguilar was bribing

27

28                                              71

CFE officials on behalf of Acier Profilé SBB Inc. ("SBB"), LMC's competitor.  (RT 5/6/11:

4109-35).[77]  Significantly, the defendants in their closing arguments never questioned

Zavaleta's credibility and even embraced it:

> MR. HANDZLIK:  We have no difficulty with Mr. Zavaleta
> whatsoever. . . .  [W]e have no problem with Mr. Zavaleta.
> We believe he was a credible person. . . .  [W]ith regard to
> Mr. Zavaleta, there is nothing to challenge in his testimony.

(Id. at 4245).  For her part, LEE's attorney said Zavaleta "ha[d] no reason to lie," (Id.

at 4308), and agreed with everyone's assessment that he was credible: "You hear from Jose

Zavaleta, and everyone said today how credible he was as a witness.  No axe to grind,

nothing to say to suggest that he was here with any motive, whatsoever."  (Id. at 4296).[78]

Lastly, the strength of the government's case was illustrated by how quickly the jury

returned its verdict — less than seven hours despite a five-week trial.[79]  See United States v.

Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001) ("[L]engthy deliberations suggest a

difficult case.") (quoting United States v. Varoudakis, 233 F.3d F.3d 113, 126 (1st Cir.

2000)); see, e.g., Washington v. Ollison, 2009 WL 3112088, *5 (N.D. Cal. Sept. 23, 2009)

(noting that the "relatively short" deliberations of less than seven hours after a 10-day trial

---

[77] The defendants inexplicably have alleged that the government violated Brady with
respect to incriminating evidence that was obtained from SBB after the trial had commenced
but ultimately excluded by the Court.  (Br. at 11, 22-24).  This meritless claim is refuted in
the government's June 6 filing.  (DE #600 at 30-31).

[78] It is legally significant that the mishandling of Agent Guernsey's grand jury
transcripts had nothing to do with Zavaleta.  See, e.g., United States v. Ross, 372 F.3d 1097,
1111 (9th Cir. 2004) (finding no prejudice where the conduct complained of "lack[ed] a
probative relationship" to the merits of the defense); Quigg v. Crist, 616 F.2d 1107, 1112
(9th Cir. 1980) (holding that newly discovered evidence did not warrant relief because even
if it had been introduced at trial, "[s]trong circumstantial evidence of Quigg's guilt would
have been left uncontradicted").

[79] The jurors began deliberating at 10:12 a.m. on May 9, (RT 5/9/11: 4402), and
recessed around 4:00 p.m.  They resumed their deliberations at approximately 8:30 a.m. the
next day and reached their verdict by 9:00 a.m.  (RT 5/10/11: 4411).

did not "suggest a close case"); cf., e.g., Jennings v. Woodford, 290 F.3d 1006, 1019 (9th Cir. 2002) (noting that "[b]ecause the jury spent as long as it did deliberating, it is reasonably probable that, apprised of all of the mental health and drug abuse evidence, it would have found a reasonable doubt").[80]

### 4.   The Extreme, Severe, Drastic, and Disfavored Sanction of Dismissal Is Not Warranted

Even if this Court were to conclude that there was flagrant misbehavior that caused substantial prejudice (there was not), the defendants' motion to dismiss should still be denied because they have failed to demonstrate that "no lesser remedial action is available." Barrera-Moreno, 951 F.2d at 1092.  The defendants subtly concede this point by arguing not that dismissal is the "only available" remedy, but rather that dismissal is "the appropriate" remedy.  (Br. at 63).

It is well settled that "[i]n cases involving prosecutorial misconduct which is neither flagrant nor prejudicial, a district judge can still sanction the misconduct, but the sanction chosen must be proportionate to the misconduct." Jacobs, 855 F.2d at 655 (emphasis added); see also United States v. Morrison, 449 U.S. 361, 364 (1981) (referencing the "general rule" that "remedies should be tailored to the injury suffered").  "In determining the proper remedy, [courts] must consider the government's willfulness in committing the misconduct

---

[80] In support of their "weak case" argument, the defendants have apparently combed the record for any conceivable negative statement by the Court regarding the strength of the government's evidence.  (Br. at 29 n.17).  And yet they found only four comments, all of which were made before the government began presenting its evidence.  Moreover, all of the Court's comments were neutral and/or predictive: (1) "the defendants may have a very triable case;" (2) "we'll see whether or not [the government will] carry the day at trial;" (3) "I think it's a very triable case, and I think you [the government] got your work cut out for you, but we'll see what you come up with;" and (4) "it may be a precursor of a lot of problems that could arise — I don't know if they will — in further proceedings, possibly motions, certainly if there's a trial, as to whether or not the government has the goods."  Needless to say, the Court never opined — before, during, or after the trial — that the government's FCPA evidence was, in fact, weak.

1  and its willingness to own up to it."  United States v. Kojayan, 8 F.3d 1315, 1318 (9th Cir.

2  1993).

3         In this case, as demonstrated above, there was no misconduct.  The government did,

4  however, make some mistakes, such as inadvertently neglecting to disclose all of Agent

5  Guernsey's testimony despite being ordered to do so.  But as explained previously, the

6  government's misstep was entirely accidental and by no means "willful."  In addition, once

7  the government realized the mistake, it immediately produced the 19-page transcript and

8  accompanying exhibits, notified the Court, accepted full responsibility, and expressed deep

9  regret.[81]  Given these facts, there is no need for a remedy that overturns the jury's verdict in

10 this case.

11        Importantly, the Ninth Circuit has explained that a court's supervisory powers may be

12 exercised "to remedy a constitutional or statutory violation; to protect judicial integrity by

13 ensuring that a conviction rests on appropriate considerations validly before a jury; or to

14 deter future illegal conduct."  Barrera-Moreno, 951 F.2d at 1091.  In this case, the defendants

15 have failed to establish any constitutional or statutory violation, judicial integrity has not

16 been impinged because the conviction was based on appropriate considerations validly before

17 the jury, and the defendants make no claim — nor could they — that the government did

18 anything illegal.

19

20

21 _____

22 [81] In an effort to unfairly undermine the sincerity of the government's contrition, the
   defendants cite Ms. Mrazek's statement during the June 27 hearing that Agent Guernsey
23 became a trial witness essentially because the defendants refused to stipulate to the
   authenticity of certain exhibits.  The defendants characterize Ms. Mrazek's comment as an
24 attempt to "shift blame" to the defendants for the government's disclosure error.  (Br. at 7-8).
   But Ms. Mrazek was not talking about the disclosure mistake at the time she made the above-
25 referenced remark.  Rather, she was answering the Court's questions about when and why the
   government decided to call Agent Guernsey as a trial witness.  (RT 6/27/11: 14-17).
26 Moreover, the relatively limited scope of Agent Guernsey's direct testimony confirms the
27 truthfulness of Ms. Mrazek's representation.

28                                         74

1    The only circuit case cited by the defendants in support of their proposed remedy,

2 Kojayan, 8 F.3d 1315, is quite different.[82]  In Kojayan, the Ninth Circuit, in what it called a

3 "close" case, remanded for dismissal or a new trial because the government did not disclose

4 an agreement it had with a co-conspirator whose statements were admitted at trial.  Id.

5 at 1317.  Moreover, the prosecutor made misleading statements at trial about the co-

6 conspirator's ability to testify, and the government later chose not to accept responsibility for

7 its wrongdoing.  Id. at 1322-23.  Nothing comparable, however, occurred here.[83]

8 **C.**      **The Defendants' "Cumulative Effect" Argument Necessarily Fails**

9    The defendants argue that "the instances of misconduct, when viewed in [the]

10 aggregate, most certainly impacted the jury."  (Br. at 61; citing United States v. Frederick, 78

11 F.3d 1370, 1381 (9th Cir. 1996) ("In some cases, although no single trial error examined in

12 isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple

13 errors may still prejudice a defendant.")).  As explained below, however, the defendants'

14 claims fare no better cumulatively than they do separately.[84]

15    As the government has shown, although the government made some mistakes in this

16 case, none rises to the level of misconduct and none prejudiced the defendants.  Therefore, as

17

18      [82] The defendants also cite Fitzgerald, but as explained in part III.B.2.d, that case is
19 inapposite.

20      [83] To the extent that the defendants argue in reply that Kojayan applies here because
of the introduction of the Lamarche writings through Agent Costley, the government
21 reiterates that the writings were not hearsay and, in any event, the government did not
attempt to prevent the defendants from accessing Lamarche (see part III.A.3.b).
22

23      [84] Aside from setting forth some relevant legal standards, (Br. at 59-61), the
defendants do not explain how they were prejudiced in the "aggregate."  Rather, their
24 cumulative effect argument consists of nothing more than a relisting of their individual
meritless allegations.  (Br. at 54-56).  Such an approach is insufficient to meet their burden.
25 See, e.g., United States v. Kimbrough, 69 F.3d 723, 735 (5th Cir. 1995) ("Kimbrough's
current argument merely restates arguments we have already rejected and completely fails to
26 specify how the cumulative effects of these events prejudiced him.  We therefore reject this
27 argument.").

28                                              75

a matter of law and logic, there can be no cumulative prejudice.  See, e.g., United States v. Arboleda, 929 F.2d 858, 864 (1st Cir. 1991) ("What ultimately dooms the defendants' argument is their failure to identify any prejudice."); cf., United States v. Fernandez, 388 F.3d 1199, 1256 (9th Cir. 2004) (noting that cumulative error was "simply inapplicable" to claims that did not result in findings of error).[85]

Regarding the non-disclosure of some of Agent Guernsey's grand jury testimony, as the government has explained, the oversight was entirely accidental and, perhaps more importantly, it did not prejudice the defendants.  An inadvertent non-prejudicial error does not warrant dismissal of an indictment.  See United States v. Sager, 227 F.3d 1138, 1149 (9th Cir. 2000) ("One error is not cumulative error.").  In addition, as noted previously, Agent Guernsey's testimony had nothing whatsoever to do with Jose Zavaleta's compelling testimony establishing the defendants' knowledge and intent.  Cf., e.g., Frederick, 78 F.3d at 1381 (finding that "the cumulative effect of the errors was prejudicial" in large part because of inconsistency and contradictions by "the only direct witness").[86]

---

[85] There appears to be no legal authority (not even under a court's supervisory powers) for dismissing an indictment based on the type of accidental or negligent government action in this case.  Indeed, the defendants themselves style their argument as one based on instances of "misconduct."  (Br. at 60-61).  Some support for a prerequisite of misconduct — as opposed to honest mistakes — can be found in United States v. Berry, 627 F.2d 193 (9th Cir. 1980), where the Ninth Circuit explained that when assessing cumulative prejudicial error, the court will consider only (1) "errors and instances of prosecutorial misconduct which were preserved for appeal with a proper objection or which were plain error" and (2) "errors and instances of misconduct which [the court] earlier held were adequately cured by the court's instruction."  Id. at 200-01 (emphasis added).  In fact, the Ninth Circuit in Berry explicitly excluded from consideration "actions which we held to be not error misconduct or which we decided not to review as plain error."  Id. at 201 (emphasis added).

[86] The defendants' reliance on Berger v. United States, 295 U.S. 78 (1935), is misplaced.  In Berger, unlike here, the prosecutorial misconduct was pronounced, was persistent, and had a cumulative prejudicial effect on the jury.  Indeed, many of the defendants' claims concern matters that never came before the jury (such as the Angela Aguilar prison emails and the excluded testimony of Richard Serocki).

1

**D.   Agent Guernsey Did Not Commit Perjury in the Grand Jury, and Any
Misstatements Were Cured by the Guilty Verdict**

2

3
       Finally, the defendants renew their contention that the indictment should be dismissed

4
because (1) Agent Guernsey allegedly committed perjury in the grand jury and (2) the

5
prosecutors knew about the supposed perjury and "actively concealed" it.  (Br. at 61-62).  In

6
its June 6 filing, the government showed that Agent Guernsey did not commit perjury.  (DE

7
#600 at 4-25).  But even if Agent Guernsey misspoke in the grand jury, that is not a basis for

8
dismissal because this case subsequently went to trial and the jury found evidence of the

9
defendants' guilt beyond a reasonable doubt.[87]

10
       As the defendants appear to concede, (Br. at 61), even if alleged errors in the grand

11
jury proceedings are brought to the district court's attention before the conclusion of a trial, if

12
the court does not decide the issue and the "petit jury subsequently convicts a defendant of

13
the charges upon which he was indicted, 'any error in the grand jury proceeding connected

14
with the charging decision [is deemed] harmless beyond a reasonable doubt.'"  People of

15
Territory of Guam v. Muna, 999 F.2d 397, 399 (9th Cir. 1993) (quoting United States v.

16
Mechanik, 475 U.S. 66, 70 (1986)); see United States v. Bingham, – F.3d – , 2011 WL

17
3332325, *12 (9th Cir. Aug. 4, 2011) (characterizing as "quite narrow" the scope of an

18
appellate court's review of a denial of a motion to dismiss based on alleged "outrageous

19
[government] conduct" during the grand jury proceedings because the trial jury convicted the

20
defendant).  The rationale for the Supreme Court's rule is logical and sound: "[T]he petit

21

22
      [87] Not only did this case go to trial, but the defendants were able to present at the trial
Agent Guernsey's allegedly perjurious grand jury testimony during her cross-examination

23
and during the defendants' summations.  See, e.g., United States v. Stinson, – F.3d – , 2011

24
WL 3374231, *7 (9th Cir. Aug. 5, 2011) ("As for the witness's history of perjury, the jury
was made aware of this history on direct and cross-examination and was free to weigh the

25
testimony accordingly."); United States v. Ferguson, – F.3d – , 2011 WL 3251464, *14

26
(2d Cir. Aug. 1, 2011) (observing in response to a claim of prosecutorial misconduct based
on the presentation of alleged perjurious testimony, that "the potential that [the witness] had

27
lied . . . was fully presented in cross-examination and summation to the jury, which resolved
the credibility issue against the defendants").

28

jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." Mechanik, 475 U.S. at 70.  This is, after all, what happened here.[88]

In situations such as this, "dismissal of the indictment will be appropriate only where 'the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair.'"  Muna, 999 F.2d at 399 (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 257 (1988)).  "The only structural errors the Supreme Court has recognized are racial and gender discrimination in the selection of the grand jurors." Bingham, 2011 WL 3332325, *12 (citing Bank of Nova Scotia, 487 U.S. at 257).  Indeed, the Ninth Circuit has specifically held that "[p]resentation of perjured testimony to the grand jury is not such a structural flaw" and is "suitable for harmless error analysis."  United States v. Sitton, 968 F.2d 947, 954 (9th Cir. 1992) (abrogated on other grounds by Koon v. United States, 518 U.S. 81, 96-100 (1996)).[89]

Contrary to the defendants' suggestion, (Br. at 61-62), United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) — which was decided well before Mechanik (1986), Bank of Nova Scotia (1988), and Muna (1993) — does not provide a basis for dismissal of the indictment in this case.  The court in Basurto held only that "the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is

---

[88] The Supreme Court's reasoning in Mechanik makes even more sense in a case such as this, where the alleged grand jury errors were made known to the trial jury, the defendants argued to the trial jury that the errors mattered, (RT 5/6/11: 4225, 4261, 4264-65, 4318), and the trial jury rejected those arguments.  See, e.g., Stinson, 2011 WL 3374231, *7; Ferguson, 2011 WL 3251464, *14.

[89] Consistent with this view, other circuits have held that a trial jury's guilty verdict renders harmless the presentation of allegedly false or misleading testimony before the grand jury.  See United States v. Lombardozzi, 491 F.3d 61, 79-80 (2d Cir. 2007); United States v. Vincent, 416 F.3d 593, 600-02 (7th Cir. 2005); United States v. Combs, 369 F.3d 925, 936-37 (6th Cir. 2004); United States v. Reyes-Echevarria, 345 F.3d 1, 5 (1st Cir. 2003).

material, and when jeopardy has not attached." 497 F.2d at 785. Putting aside the fact that there was no grand jury perjury by Agent Guernsey in this case (let alone a purposeful presentation of perjurious testimony by the prosecutors), such a situation does not rise to the level of a "structural error." See United States v. Navarro, 608 F.3d 529, 539 (9th Cir. 2010) (observing that the Supreme Court's opinion in Bank of Nova Scotia "goes no farther" than identifying racial discrimination in selection of grand jurors and the exclusion of women from the grand jury "in carving out structural error"). Despite the fact that Navarro (which relies heavily on Mechanik) was cited by the government in its June 6 filing, the defendants ignored both Navarro and Mechanik in their June 17 reply, presumably because these decisions are controlling and because they undermine the defendants' grand jury perjury claims.

## IV.

## <u>CONCLUSION</u>

For all of the reasons set forth above and in the government's June 6 response, the defendants' motion to dismiss the indictment with prejudice due to alleged repeated and intentional government misconduct should be denied.  The defendants were appropriately indicted by a grand jury because they knowingly and intentionally bribed foreign officials in exchange for business, the defendants received a fair trial that was carefully overseen by this Court, and they were properly convicted by a trial jury consistent with the evidence and the law.  That verdict should not be overturned.